# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| DRIFTLESS AREA LAND CONSERVANCY and WISCONSIN WILDLIFE FEDERATION, | ) ) ) ) ) | COMPLAINT. |
| Plaintiffs, | ) ) | NO. 19-cv-1007 |
| v. | ) ) | |
| MICHAEL HUEBSCH, REBECCA VALCQ, and ELLEN NOWAK, Commissioners, and PUBLIC SERVICE COMMISSION OF WISCONSIN, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

---

## COMPLAINT

---

Plaintiffs DRIFTLESS AREA LAND CONSERVANCY and WISCONSIN WILDLIFE FEDERATION, for their Complaint herein, allege and state as follows:

## NATURE OF THE ACTION

1.  This is a civil action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983. Defendants have deprived plaintiffs of property without due process of law and allowed private entities to exercise eminent domain to take private property for private use in violation of the Fifth and Fourteenth Amendments of the United States Constitution, and Article 1, §§ 1, 9, and 13 of the Wisconsin Constitution.

2.   The avoidance of even the appearance of judicial bias, or lack of impartiality, and of conflicts of interest, is central and important in our administrative law and judicial systems.  The Defendant Commissioners and the Defendant PSC's decision-making process was imbued with at least an appearance of bias and a lack of impartiality, if not actual bias and a lack of impartiality, and conflicts of interest.

3.   Plaintiffs moved to recuse and disqualify certain Defendants because their entanglements with other parties centrally involved in this case presented conflicts of interest and at least an appearance of bias and lack of impartiality when the totality of the circumstances is considered.

4.   Three private entities, the American Transmission Company (ATC), ITC Midwest LLC, and Dairyland Power Cooperative (collectively, the "Transmission Companies") applied to Defendant Public Service Commission of Wisconsin (PSC) for a Certificate of Public Convenience and Necessity (CPCN) allowing them to construct the 345 kilovolt (kV) high-voltage Cardinal-Hickory Creek transmission line and 17-story high towers (the ATC Line), which would cut a wide swath through the Driftless Area's scenic and unique natural resources, communities, and family farms in Dane, Grant, and Iowa Counties, Wisconsin.

5.   The Defendants' Final Decision approving the CPCN allows the private Transmission Companies to exercise eminent domain power to condemn and take privately-owned property along the proposed transmission line corridor.

6.   The Defendants' Final Decision approving the CPCN, in conjunction with other regulatory decisions, allows the private Transmission Companies to charge Midwest utility ratepayers more than $2.2 billion over 40 years.

7.   The case before the PSC was contested, and it was adjudicative and judicial in nature.  The Transmission Companies, which applied for a CPCN, the Defendant PSC's Staff, Plaintiffs, and

2

other intervenors presented pre-filed expert testimony, conducted extensive discovery, filed pre-trial motions of many kinds, engaged in a week-long trial with direct expert testimony and cross-examinations presided over by an Administrative Law Judge, and submitted post-trial briefs.

8.   Many parties, including Plaintiffs Driftless Area Land Conservancy and Wisconsin Wildlife Federation, intervened in the contested case. There was an unusually large number of intervenors—over 40—in the adjudicative proceeding before the PSC in this contested case and public comments were submitted in opposition from the Dane County Board; the Iowa County Board; Townships including Arena, Montfort, Vermont and Wyoming among others; consumer organizations; conservation and environmental organizations; farm organizations; outdoor recreation groups; and many individuals.

9.   The contested issues included whether the proposed ATC Line is needed for reliability, whether it would actually benefit Wisconsin citizens, whether the economic benefits exceeded the costs, whether there are less expensive and less environmentally harmful alternatives to the proposed ATC transmission Line, whether the proposed high-voltage ATC Line and 17-story high towers would cause "undue environmental impacts," and other issues that needed to be fully and fairly addressed under applicable Wisconsin statutes.

10. Plaintiffs and many intervenors contended that the proposed ATC Line is not needed to meet anticipated electricity demand and sales in Wisconsin either at present or in the reasonably foreseeable future.

11. Plaintiffs and many intervenors contended that the proposed ATC Line is not needed to ensure the reliable supply of electricity in Wisconsin.  It is not needed to "keep the lights on."

12. In reaching its decision approving the Transmission Companies' requested CPCN in this contested case proceeding, the Defendants rejected the PSC's own Staff's expert witness testimony

3

and other evidence that in most economic "model runs," the costs of the proposed ATC Line exceeded the benefits for consumers and that there could be better, less costly, and more flexible alternatives.

13. In reaching its decision approving the Transmission Companies' requested CPCN in this contested case proceeding, the Defendants rejected the Plaintiffs Driftless Area Land Conservancy's and Wisconsin Wildlife Federation's expert witness testimony and other evidence that the costs of the proposed ATC Line exceeded the benefits for consumers, and that there are better, less costly, more flexible, more environmentally sound, and cleaner energy alternatives.

14. In reaching its decision approving the Transmission Companies' requested CPCN in this contested case proceeding, the Defendants rejected the Wisconsin Citizens Utility Board's expert witness testimony that the costs of the proposed ATC Line exceeded the benefits for consumers, and that there are better, less costly, and less polluting alternatives.

15. The law requires an impartial tribunal and adjudicators to decide the issues and determine whether or not to grant the Transmission Companies' requested CPCN.  The Defendants were not an impartial tribunal or adjudicators.

16. On August 20, 2019, the Defendant PSC and its Commissioners met for the first time in an open session to discuss and deliberate on the merits of this contested case.

17.  At that time, it became fully apparent that PSC Chair Valcq and PSC Commissioner Huebsch had conflicts of interest and had received *ex parte* information concerning the contested case.

18. Plaintiffs filed a Motion for Recusal and Disqualification (attached hereto as Exhibit A), which explained that the Defendant PSC Commissioner Michael Huebsch's and Defendant PSC Chair Rebecca Valcq's entanglements with other parties centrally involved in this case presented

4

conflicts of interest and at least an appearance of bias and lack of impartiality when the totality of the circumstances is considered.

19. On September 26, 2019, the PSC issued a Final Decision denying Plaintiffs' Motion for Recusal and Disqualification and approving the Transmission Company's CPCN application, thereby allowing the Transmission Companies to: (a) exercise eminent domain powers to condemn and take private property for the new ATC Line; and (b) charge Midwest utility ratepayers more than $2.2 billion over 40 years.

20. Plaintiffs seek a declaratory judgment that Defendants have deprived Plaintiffs of their rights under the Fifth and Fourteenth Amendments to the United States Constitution and an injunction vacating Defendants' Final Decision and requiring that any new decision-making process meet constitutional requirements.

## JURISDICTION AND VENUE

21. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367.

22. Venue in this district is appropriate under 28 U.S.C. § 1391 because the actions complained of all occurred in this district.

23. The federal courts are the appropriate fora for cases, such as this one, involving a private company's exercise of eminent domain to take private property. *See Knick v. Township of Scott, Pennsylvania, et al.*, ___ U.S. ___, 139 S. Ct. 2162 (2019).

## PARTIES

### Plaintiff Driftless Area Land Conservancy

24. Plaintiff Driftless Area Land Conservancy is a not-for-profit conservation organization in southwest Wisconsin with many local members who are electric utility consumers; who live, work, and play in areas that will be negatively affected by the proposed ATC Line and 17-story high towers; and who intend to continue doing so in the future.

25. Driftless Area Land Conservancy and its members work to protect ecologically sensitive lands, historic properties, and natural resources in southwest Wisconsin's Driftless Area.

26. Driftless Area Land Conservancy and its members maintain and enhance the health, diversity, and beauty of southwest Wisconsin's natural and agricultural landscape through permanent land protection and restoration, and other preservation actions.

27. Driftless Area Land Conservancy and its members aim to improve people's lives by connecting them to the land and to each other.

28. Driftless Area Land Conservancy is a nationally certified land trust that was recognized as the Wisconsin Land Conservancy of the Year in 2017 by Gathering Waters, Wisconsin's Alliance for Land Trusts.

29. Driftless Area Land Conservancy and its members own land, conservation easements, and other property interests on, along and near the route of the proposed ATC Line.

30. The proposed ATC Line will substantially reduce the economic and ecological value of the Driftless Area Land Conservancy's land, conservation easements, and other property interests.

31. For example, the Driftless Area Land Conservancy holds a conservation easement on the historic Thomas Barn property west of Barneveld, on both the north and south sides of U.S.

Highway 151. On information and belief, the ATC Line right-of-way will overlap with the Conservancy's conservation easement.

32. Some of the Driftless Area Land Conservancy's members' property will be taken by eminent domain to construct the ATC Line.

33. Lisa Schlimgen is a member of the Driftless Area Land Conservancy. She and her husband own a 280-acre farm—called "Dreamy 280"—at 2792 Cave of the Mounds, Blue Mounds, Wisconsin. They purchased it 30 years ago to fulfill their dream of raising their children on a farm, and the farm itself has existed since at least 1849. They raise cattle; grow corn, oats, and alfalfa; and operate a farm store. If the ATC Line is built, there would be two or three transmission towers on their property on prime agricultural land, and the ATC Line would run about 500 feet from their house and 550 feet from their barn.

34. Paul Bickford is a member of the Driftless Area Land Conservancy. He is a co-owner of Bickford Farms, Inc., a 100% certified organic farm. He lives at 3630 Ridgevue Road, Ridgeway Township, Iowa County, and owns about 650 acres of land on both sides of Highway 18/151. The ATC Line would require about five to seven transmission towers on his property, and would cross highly productive farmland.

35. Jeffrey Thomas and his wife live at 826 Highway 18, Montfort, and are members of the Driftless Area Land Conservancy. Their family farm is owned by Thomas's parents, but he and his wife live on it, are the caretakers, and make their living by farming the land, which is 585 acres and has been in the Thomas family since 1889. The PSC decision gives his family the option to select one of three routing options for the ATC Line as it passes through their property, with varying impacts to Thomas's and his neighbors' homes and property. One of the routes would place the conductor 70 feet from Thomas's home.

7

36. The proposed ATC Line will substantially reduce the economic and ecological value of some of the Driftless Area Land Conservancy's members' property.

37. On January 3, 2019, the Driftless Area Land Conservancy's request to intervene as a party in the contested case was granted.

**<u>Plaintiff Wisconsin Wildlife Federation</u>**

38. Plaintiff Wisconsin Wildlife Federation is a membership organization dedicated to protecting wildlife habitat and natural resources throughout the State of Wisconsin.

39. Wisconsin Wildlife Federation has members who are electric utility consumers; who live, work, and play in the area that will be negatively affected by the ATC Line; and who intend to continue doing so in the future.

40. Wisconsin Wildlife Federation has individual members who own property on, near, or along the proposed ATC Line.

41. Wisconsin Wildlife Federation has individual members whose property will be taken by eminent domain to construct the ATC Line.

42. Alan Jewell is a member of the Wisconsin Wildlife Federation, and he is also a member of the Driftless Area Land Conservancy. He lives with his wife at 3362 County Road B, Dodgeville. His family farm is about 300 acres along Highway 18 in Dodgeville, and the farm has been in his family for decades. Most of the land is in a partnership, with Alan as the general partner. The ATC Line would be built for about half a mile through the family farm, including through land currently used for row crops and near and over areas restored to native prairie. Jewell also owns and runs a granary with his business partner at 2232 Highway 18, Dodgeville, and the ATC Line would also cross this property.

43. Megan Walter lives with her husband and baby at 504 East Main, Cobb. She is a member of the Wisconsin Wildlife Federation and the Driftless Area Land Conservancy. She and her husband purchased the home as a place to raise their family and spent significant funds remodeling the entire interior. If built, the ATC Line would run directly through her front yard.

44. The proposed ATC Line will substantially reduce the economic and ecological value of some of Wisconsin Wildlife Federation members' property.

45. On January 3, 2019, the Wisconsin Wildlife Federation's request to intervene as a party in the contested case was granted.

**<u>Defendant Public Service Commission of Wisconsin</u>**

46. Defendant Public Service Commission of Wisconsin (PSC) is an independent agency responsible for the regulation of Wisconsin public utilities.

47. The PSC is composed of three full-time Commissioners, including the Chair.

48. The PSC employs professional staff with expertise in energy economics, engineering, rates, and other issues.

49. A private Transmission Company cannot build a large new high-voltage transmission line, such as the ATC Line, unless and until it applies to the PSC and receives approval of a Certificate of Public Convenience and Necessity (CPCN).

50. Before issuing a CPCN, the PSC must review the application and conduct a fair and reasonable adjudicatory process, including evidentiary proceedings. *See* https://psc.wi.gov/Site Assets/TransmissionLineReviewProcess.pdf (attached hereto as Exhibit B).

51. The PSC must follow Wisconsin Statutes Chapter 227, which lays out Wisconsin's administrative procedures and review requirements, and requires adjudicatory hearings in contested cases.

52. On April 20, 2018, the Transmission Companies applied to the PSC for a CPCN for the ATC Line.

53. The Transmission Companies' application for a CPCN for the ATC Line was contested by Plaintiffs and many other intervenors.

54. On September 26, 2019, the PSC issued the Final Decision in this contested case, approving the Transmission Companies' application for a CPCN for the ATC Line.

**Defendant PSC Chair Rebecca Valcq**

55. Defendant Chair Rebecca Valcq is a Commissioner and the current Chair of the PSC.

56. Upon graduating from law school in 1999, Chair Valcq began working as regulatory counsel for We Energies (formerly known as Wisconsin Electric Power Company).

57. Chair Valcq's practice encompassed all aspects of administrative and regulatory law and policy, including "trying cases in front of the PSC." https://www.linkedin.com/in/becky-cameron-valcq-2aa4a28/ (attached hereto as Exhibit C).

58. Chair Valcq served as regulatory counsel for We Energies for 14 years and 11 months, until 2014.

59. We Energies provides electricity to customers in Wisconsin.

60. We Energies' parent company is WEC Energy Group Inc.

61. WEC Energy Group has more than a 60% controlling ownership of ATC.

62. ATC was the lead Transmission Company applicant for a CPCN for the proposed ATC Line in the adjudicatory proceeding before the PSC.

63. In 2017, Chair Valcq joined the Quarles & Brady law firm, becoming a partner in the firm's Energy, Environment, and Natural Resources Group.

64. On information and belief, Quarles & Brady is We Energies' principal outside law firm and legal counsel, and Chair Valcq represented We Energies during her time at the firm.

65. On information and belief, Chair Valcq also represented WEC Energy Group, the parent company of We Energies, during her time at the firm.

66. Chair Valcq left Quarles & Brady on Friday, January 4, 2019, and then began working for the PSC on Monday, January 7, 2019.

67. Soon after joining the PSC, Chair Valcq filed a Recusal Policy acknowledging her obligation to comply with Wisconsin's statutory and rule-based ethical obligations.

68. The Recusal Policy and its addendum lists 30 open matters before the PSC in which Chair Valcq "personally and substantially participated" while working at We Energies or Quarles & Brady, where she represented We Energies and WEC Energy Group. https://assets.documentcloud.org/documents/5755968/Valcq-Recusal-Policy-and-Addendum-a-as-of-2-1-19.pdf (attached hereto as Exhibit A-3).

69. Chair Valcq agreed to recuse herself from those 30 matters and any new matter filed with the PSC within 12 months of her appointment in which she "was personally and substantially involved." *See id.*

70. The 30 matters from which Chair Valcq agreed to recuse herself include three cases involving We Energies and ATC—both owned by WEC Energy Group—as parties.

71. The 30 matters from which Chair Valcq agreed to recuse herself also include several cases involving applications for approval to build renewable generation facilities that would connect to the regional grid.

72. The proposed ATC Line will, if built, be integrated into the regional grid.

11

73. The Midcontinent Independent System Operator (MISO, *see* paragraph 83, *infra*) developed a portfolio of 17 transmission line projects called the Multi-Value Portfolio (MVP). Exploratory studies began in 2003, and a Regional Generation Outlet Study was carried out in 2008. The final MVP was approved in 2011. The ATC Line was conceived as part of the MVP.

74. Chair Valcq's work as in-house counsel for We Energies and outside counsel for We Energies and its parent company, WEC Energy Group, while at Quarles & Brady, encompassed the time period during which MISO conceived of and planned the MVP transmission projects, including the ATC Line. MISO's 2012 report on its MVP lists ATC and ITC as the transmission owners for the "Dubuque to Spring Green to Cardinal" line, which was ultimately finalized as the ATC Line.

75. Chair Valcq sat as an adjudicator in the contested case concerning the CPCN application for the ATC Line.

76. As an adjudicator, Chair Valcq has a duty to recuse herself when the facts and circumstances are such that a reasonable person would reasonably question her ability to be impartial. *See* WI SCR 60.04(4).

77. Chair Valcq voted in favor of the PSC's Final Decision.

**Defendant PSC Commissioner Ellen Nowak**

78. Defendant Commissioner Ellen Nowak has been a PSC Commissioner for much of the time since 2011.

79. Commissioner Nowak voted in favor of the PSC's Final Decision.

**Defendant PSC Commissioner Michael Huebsch**

80. Defendant Commissioner Michael Huebsch has been a PSC Commissioner since 2015.

81. In January 2019, Commissioner Huebsch was appointed as a member of the formal Advisory Committee of the Midcontinent Independent System Operator (MISO).

82. MISO is a regional transmission organization that services the high-voltage transmission system in the Midwest states, Manitoba, and a southern region including much of Arkansas, Mississippi, and Louisiana.

83. MISO is not a governmental agency.

84. MISO is a private entity owned by public utilities and transmission companies that operate in the MISO region, including ATC, Dairyland Power, ITC Midwest, LLC, and We Energies. https://cdn.misoenergy.org/Current%20Members%20by%20Sector95902.pdf (attached hereto as Exhibit D).

85. The MISO Advisory Committee's Charter states: "The Advisory Committee reports to the MISO Board of Directors."   MISO Advisory Committee Charter, adopted March 15, 2019, https://cdn.misoenergy.org/2019%20AC%20Charter328080.pdf (attached hereto as Exhibit A-1).

86. The MISO Advisory Committee's Charter states: "[T]he MISO President and at least two other members of the MISO Board of Directors shall meet with the Advisory Committee at least quarterly." (Exhibit A-1).

87. According to the MISO Advisory Committee's mission statement, it "serves as a forum for MISO members to keep apprised of MISO's activities and to provide information and advice to the [MISO] Board of Directors on policy matters of concern." https://www.misoenergy.org/stakeholder-engagement/committees/advisory-committee/ (attached hereto as Exhibit E).

88. The MISO Advisory Committee includes representatives of transmission owners, utilities, independent power producers, and other MISO stakeholders.

89. The MISO Advisory Committee meets several times a year to discuss policy matters and "hot topics," which have involved contested issues in the PSC case regarding the application for a CPCN for the ATC Line. https://www.misoenergy.org/stakeholder-engagement/committees/advisory-committee/ (Exhibit E).

90. As a MISO Advisory Committee member, Commissioner Huebsch engages in regular meetings and conversations with MISO Board members and staff outside of the PSC hearing process.

91. On information and belief, Commissioner Huebsch has meetings and communications with MISO Board members and staff that are not open or available to the public.

92. MISO developed and approved the proposed ATC Line as part of its "Multi Value Portfolio" a decade ago.

93. MISO has at all times material herein been a proponent of the ATC Line proposal.

94. MISO and ATC entered into a "Common Interest Agreement" to jointly strategize and litigate the contested case involving the Transmission Companies' application to the PSC for an CPCN for the ATC Line. This agreement was in place by November, 2017. (Attached hereto as Exhibit A-2.)

95. MISO intervened in the contested case before the PSC and was an active litigating party filing legal briefs, presenting expert testimony, and cross-examining Plaintiffs' expert witnesses and the PSC Staff expert witnesses, among others.

96. Commissioner Huebsch was meeting with and having conversations with MISO's Board and Staff during the time at which the contested case proceedings on the ATC Line were being conducted before the PSC.

97. On information and belief, those meetings and conversations included issues that related to the contested issues before the PSC.

98. Documents posted on MISO's website demonstrate that Commissioner Huebsch attended at least three in-person MISO Advisory Council meetings during the pendency of or in proximity to this contested case in March 2018 (in New Orleans), March 2019 (again in New Orleans), and June 2019 (in Traverse City, Michigan).

99. Documents posted on MISO's website demonstrate that at these meetings, there were presentations and discussions on relevant, material contested facts and issues that the Transmission Companies, MISO, Plaintiffs, and other parties were contemporaneously litigating before the PSC in this contested case.  See Exhibit A at pages 14 – 17.

100.    Meeting minutes of the MISO Advisory Committee indicate that Commissioner Huebsch was on the Agenda Planning Committee for the MISO Advisory Committee meeting held on September 18, 2019, in St. Paul.

101.    The MISO Advisory Committee meetings and discussions included representatives of WEC Energy Group, which owns more than 60% of ATC, while the contested case was pending before the PSC.

102.    On information and belief, the MISO Advisory Committee meetings and discussions included representatives of ATC while the contested case was pending before the PSC.

103.    The MISO Advisory Committee meetings and discussions included representatives of ITC Midwest, LLC, while the contested case was pending before the PSC.

104.    The MISO Advisory Committee meetings and discussions included representatives of other proponents of the Transmission Companies' requested ATC Line CPCN while the contested case was pending before the PSC.

15

105.     On information and belief, Commissioner Huebsch continues to be active on the MISO Advisory Committee.

106.     Commissioner Huebsch also serves as the Secretary of the Organization of MISO States (OMS).

107.     According to the OMS Mission Statement, "The purpose of the OMS is to coordinate regulatory oversight among the states; making recommendations to the Midcontinent Independent System Transmission Operator (MISO), the MISO Board of Directors, the FERC, other relevant government entities, and state commissions as appropriate; and intervening in proceedings before the FERC and in related judicial proceedings to express the positions of the OMS."  https://www.misostates.org/index.php/about (attached hereto as Exhibit F).

108.     MISO provides funding to OMS, including a grant of $1,348,959 in 2018.

109.     Through his position at OMS, Commissioner Huebsch has frequent communications with representatives of MISO and other parties that regularly participate in contested cases before the PSC.

110.     Commissioner Huebsch sat as an adjudicator in the contested case concerning the Transmission Companies' application for a CPCN for the ATC Line.

111.     As an adjudicator, Commissioner Huebsch has a duty to recuse himself when the facts and circumstances are such that a reasonable person would reasonably question his ability to be impartial and without bias. *See* WI SCR 60.04(4).

112.     Commissioner Huebsch had *ex parte* communications with parties in this contested case before the PSC.

113.     Commissioner Huebsch voted in favor of the PSC's Final Decision.

114.    The graph on the following page summarizes Chair Valcq's and Commissioner Huebsch's relationships with parties to the contested case before the PSC concerning the ATC Line:



Parties to Contested Case = ★



## STATEMENT OF THE CASE AND FACTUAL BACKGROUND

115.     This complaint involves the PSC's adjudication of the contested case concerning the Transmission Companies' application for a Certificate of Public Convenience and Necessity (CPCN) to exercise eminent domain powers and condemn private land to construct the ATC Line.

116.     The proposed high-voltage ATC Line and 17-story high towers would begin in Dubuque County, Iowa, run for more than 100 miles through the Driftless Area, including through the protected Upper Mississippi River National Wildlife and Fish Refuge, cut a wide swath through Lancaster in Grant County and Montfort in Grant and Iowa Counties. It would then turn east and run through Dodgeville and then run along and through natural resources conservation and historic preservation areas in the Military Ridge Prairie Heritage Area and along the Military Ridge State Trail and Highway 18 in Iowa County. At Blue Mounds, the ATC Line would cross into Dane County and go toward and skirt the edge of Mount Horeb where it would then turn north and run through the Black Earth Creek Watershed Conservation Area in Dane County before ending at a transmission substation in Middleton, Wisconsin.

117.     The map on the following page indicates the path that the ATC Line would cut through Southwest Wisconsin (available at https://www.cardinal-hickorycreek.com/wp-content/uploads/2019/09/C-HC-WI-Ordered-Route.pdf).



118.     Under Wisconsin law, the Transmission Companies that propose to construct the ATC Line cannot exercise eminent domain powers to condemn private property unless and until they demonstrate that they meet the statutory standards through an adjudicatory proceeding and are granted a CPCN by the PSC.  Wis. Stat. § 196.491(3)(d); Wis. Stat. § 32.03(5)(a).

119.     On April 20, 2018, the Transmission Companies seeking to construct the ATC Line applied to the PSC for a CPCN to exercise eminent domain powers and condemn private land along the proposed route.   The PSC Staff deemed the application complete on October 4, 2018.

120.     MISO and ATC strategized together to craft the CPCN application.   PSC REF#:363983 (Exhibit A-2).

121.     Plaintiffs Driftless Area Land Conservancy and Wisconsin Wildlife Federation each filed requests to intervene in the contested case.

122.     On January 3, 2019, Plaintiffs' intervention requests were granted.

123.     MISO also requested to intervene in the contested case in support of the Transmission Companies' requested CPCN. MISO's motion stated that it has "a substantial interest in the outcome of this proceeding," and that MISO "will be affected by any order issued by the Commission" in this case.

124.     MISO and ATC entered into a "common interest" arrangement to cooperatively litigate this case together before the PSC and allow them to share and discuss sensitive case information and strategy on a protected privileged basis. (Exhibit A-2).

125.     MISO's intervention request was granted.

126.     There were an unusually large number of intervenors and public commenters in the adjudicatory proceeding before the PSC in this contested case, including: the Dane County Board and Iowa County Board; Townships including Arena, Montfort, Vermont, and Wyoming among

others; many conservation and environmental organizations including the Driftless Area Land Conservancy, Wisconsin Wildlife Federation, and many others; consumer advocates including the Wisconsin Citizens Utility Board; farm organizations (e.g., Wisconsin Farmers Union); outdoor recreation groups; and others, who all opposed the Transmission Companies' requested CPCN for the ATC Line.

127.     The PSC received many hundreds of public comments of which almost all were in opposition to the requested CPCN for the ATC Line.

128.     The contested case before the PSC was adjudicative and judicial in nature.

129.     The parties conducted discovery and filed pre-trial motions.

130.     From June 17 to June 21, 2019, an Administrative Law Judge held a trial-type evidentiary hearing in which the Transmission Companies, Plaintiffs, and other parties participated. The PSC Staff also participated in the evidentiary hearing.

131.     The process employed was adversarial, with interested parties offering evidence and cross examining the others' witnesses.

132.     During the week-long hearing, more than 70 witnesses presented expert testimony concerning energy, economics, and environmental impacts.

133.     After the week-long hearing, Plaintiffs, the Transmission Companies, MISO, the Citizens Utility Board, Iowa County, Dane County, and many other intervenors submitted post-trial briefs.

134.     Evidence was presented that the proposed ATC Line is not needed to meet anticipated electricity demand and sales in Wisconsin either at present or in the reasonably foreseeable future.

22

135.    Evidence was presented that the proposed ATC Line is not needed to ensure the reliable supply of electricity in Wisconsin.  It is not needed to "keep the lights on."

136.    Evidence was presented that the proposed ATC Line would principally benefit private parties for private uses and would not serve the public's interests.

137.    Evidence was presented that the Transmission Companies would be provided an annual "rate of return" of between 10 percent and 11.2 percent of their capital investment in the ATC Line, in addition to charging utility ratepayers for the Companies' operating, maintenance, and other expenses, even though the ATC Line is not needed for reliable service (i.e., "keeping the lights on") in Wisconsin.

138.    Evidence was presented that the proposed ATC Line will reduce the economic, ecological, and scenic value of private property located near, on, or along the proposed ATC Line route.

139.    Evidence was presented that the proposed ATC Line would negatively impact conservation easements, and more specifically, that the ATC Line would cross property around the historic Thomas Barn owned by the Prairie Enthusiasts (on which the Driftless Area Land Conservancy holds a conservation easement) and could negatively impact the property. The Administrative Law Judge's role was to manage the hearings, and he did not make an initial determination or recommendation on the merits of the CPCN application. The Commissioners' decision was ostensibly based on the record compiled in the evidentiary and public hearings.

140.    The PSC held three public hearings on the contested case in late June 2019.

141.    All of the Wisconsin State Senators and State Representatives representing the areas crossed by the proposed ATC Line submitted letters to the PSC expressing opposition to the

proposed ATC transmission line and requesting that the PSC fully and fairly consider alternatives to the Transmission Companies' requested CPCN.

**The PSC's August 20, 2019 open meeting**

142.     On August 20, 2019, the Defendant Commissioners met for the first time in public open session to discuss the evidence presented in the contested case.

143.     PSC Chair Valcq convened the open meeting and stated at the outset that Commissioner Huebsch would lead the PSC's deliberations because of his close ties to MISO and the OMS: "As Commissioner Huebsch is our delegated Commissioner for MISO and OMS, it makes sense for him to lead the discussion since the project before us is due to MISO's MVP process." PSCW Open Meeting Transcript, Aug 20, 2019.

144.     Commissioner Huebsch led the Commissioners' deliberations and decision-making on the contested issues in this case throughout that meeting.

145.     The Commissioners took a preliminary vote on August 20, 2019, to approve the proposed ATC Line.

**Plaintiffs' Motion to Recuse and Disqualify Chair Valcq and Commissioner Huebsch**

146.     On September 20, 2019, Plaintiffs filed a motion requesting that Chair Valcq and Commissioner Huebsch recuse themselves and be disqualified from further substantive proceedings and from making a final decision on the merits in this contested case, which is an adjudicatory proceeding.

147.     Plaintiffs' Motion for Recusal and Disqualification (Exhibit A) explained that Chair Valcq's and Commissioner Huebsch's entanglements with other parties centrally involved in this case each presented conflicts of interest and, at a minimum, an appearance of bias and lack of impartiality when the totality of the circumstances is considered. *Guthrie v. Wisconsin*

*Employment Relations Comm'n*, 111 Wis. 2d 447, 454 (1983); *Guthrie v. Wisconsin Employment Relations Comm'n*, 107 Wis. 2d 306, 314 (1982); *See Bus. & Prof'l People for Pub. Interest v. Barnich*, 244 Ill. App. 3d 291 (1993).

148.    The PSC's decision-making process was imbued with at least an appearance of bias and a lack of impartiality, if not actual bias and a lack of impartiality. Moreover, the process did not contain adequate procedural or substantive safeguards to meet constitutional requirements.

149.    The avoidance of even the appearance of judicial bias is central and important in our administrative law and judicial systems. "The very purpose of § 455(a) [the federal judicial recusal statute] is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 865 (1988). Avoiding the appearance of bias or partiality is so important that it does not matter "whether or not the judge actually knew of facts creating an appearance of impropriety." *Id.* at 860.  Therefore, recusal is required whenever "impartiality might reasonably be questioned." *Id.* at 861; *see* 28 U.S.C. § 455(a) (requiring a federal judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned"); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883 (2009) ("the Due Process clause has been implemented by objective standards that do not require proof of actual bias"); *Liteky v. United States*, 510 U.S. 540, 548 (1994) (same).

**The Reasons Supporting Recusal of Chair Valcq**

150.    The extent of Chair Valcq's relationship with We Energies and WEC Energy Group, which owns more than 60% of ATC,  and the lack of any meaningful gap between her representation of We Energies and this case, create at least an appearance of bias and lack of impartiality to a reasonable person that warrants recusal in this particular contested case. *See Pepsico Inc. v. McMillen*, 764 F.2d 458, 461 (1985) (requiring recusal even if the circumstances

are "accidental" and are not the result of any bad faith or impropriety on the part of the judge). The standard is whether "a reasonable well-informed observer could question [her] impartiality" considering the totality of the facts and circumstances. *In re U.S.*, 572 F.3d 301, 312 (7th Cir. 2009); *see Guthrie v. Wisconsin Employment Relations Comm'n*, 111 Wis. 2d 447, 454 (1983); *Guthrie v. Wisconsin Employment Relations Comm'n*, 107 Wis. 2d 306, 314 (1982); *Bus. & Prof'l People for Pub. Interest v. Barnich*, 244 Ill. App. 3d 291 (1993).

### The Reasons Supporting Recusal of Commissioner Huebsch

151.     On information and belief, through his participation and membership on the MISO Advisory Committee, Commissioner Huebsch received *ex parte* information about transmission planning, alternative transmission solutions, and non-transmission alternatives, which were central issues in the contested CPCN case before the Defendants.

152.     Commissioner Huebsch's position as Secretary of OMS involves participating in various proceedings and meetings in which he represents the positions of the OMS to MISO.

153.     On information and belief, Commissioner Huebsch was meeting with, communicating with, and advising MISO outside of the PSC's evidentiary hearing process at the very time that: (1) MISO was an active intervenor party in this contested case; and (2) Commissioner Huebsch was leading the PSC Commissioners' deliberations to adjudicate and decide the issues in this contested case.

154.     Wis. Stat. § 227.50 prohibits *ex parte* communications with a commissioner in contested cases.

155.     Wis. Stat. § 227.57(7) requires a reviewing court to remand a contested case to the PSC if the PSC's action depends on facts determined without a hearing.

156.     Commissioner Huebsch failed to disclose his *ex parte* communications with parties to the proceeding.

157.     Commissioner Huebsch was engaged in activities with the MISO Board and Staff as a member of the MISO Advisory Committee at that same time that (1) MISO was an active party litigating before the PSC in the contested case, (2) MISO engaged in a joint litigation agreement with ATC, and (3) MISO was actively advocating and supporting the CPCN for the proposed ATC Line.

158.     Commissioner Huebsch should have recused himself from participating in this contested case.

159.     The ongoing *ex parte* communications during the pendency of this contested case and Commissioner Huebsch's activities as a member of the MISO Advisory Committee while MISO was a party in the contested case violated Wis. Stat. § 227.50(1).

160.     Commissioner Huebsch's entanglements with MISO presented a conflict of interest and created at least the appearance of bias and impropriety if not actual bias and impropriety.

**The Duty to Recuse in Adjudicatory Cases**

161.     The legal standards for judicial recusal apply to Defendants in this contested case because they exercised adjudicatory, judicial decision-making powers.

162.     The Wisconsin Code of Judicial Conduct parallels the Code of Conduct for United States Judges, which provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).

163.     Wisconsin's Judicial Code states that a judge should recuse himself or herself in a proceeding when the facts and circumstances are such that a reasonable person "would reasonably question the judge's ability to be impartial." WI SCR 60.04(4). "Under this rule, a judge must

27

recuse himself or herself whenever the facts and circumstances the judge knows or reasonably should know raise reasonable question of the judge's ability to act impartially." WI SCR 60.04(4) (Comment).

164.     The duty to recuse is mandatory, and a judge must recuse himself or herself, whether or not a motion to disqualify has been filed, whenever he or she comes to the realization that impartiality can reasonably be questioned or that there might reasonably be an appearance of bias.

165.     The test is objective and depends not on the presence of actual prejudice or bias, but on the appearance of prejudice or bias—that is, whether an objective observer would entertain a significant doubt that justice would be done in the case.

166.     The due process requirement of a fair trial in a fair tribunal applies to administrative agencies that adjudicate as well as to courts.

167.     The common-law rule of disqualification applicable to judges extends to every tribunal exercising judicial or quasi-judicial functions.

**The PSC's Final Decision**

168.     The PSC issued its Final Decision on September 26, 2019.

169.     In its Final Decision, the PSC approved the CPCN permitting the Transmission Companies to exercise eminent domain powers and condemn private property for the proposed ATC Line.

170.     In its Final Decision, the PSC refused to recuse Chair Valcq and Commissioner Huebsch.

171.     Also, on September 26, 2019, the PSC held a meeting at which Commissioner Huebsch denied pre-judging whether the ATC Line should be approved.

172.     At the same PSC meeting on September 26, 2019, Commissioner Huebsch expressed his strong position in favor of transmission projects that he anticipated would come before the PSC in light of his involvement in MISO meetings and discussions: "You cannot have renewable energy without transmissions lines. And if you believe that just this transmission line that we put up is the last you're going to have to deal with, you're wrong. Take a look at the public record of what's going on as far as transmission that's going to be coming into this – er, uh – renewable energy that's going to be coming in to this state and others surrounding us. And the only way it's going to come in is through additional transmission lines."

173.     Timely petitions for rehearing were filed, and the Defendants did not issue a further Decision or Order by the deadline of November 15, 2019, which thereby denied the petitions for rehearing and established finality for the September 26, 2019 Final Decision.

174.     Plaintiffs intend to pursue their state appellate remedies on the merits of the Defendants' approval of the CPCN in the Final Decision.

175.     The Transmission Companies have begun their notification process to individuals with property along the ATC Line, which includes contacting landowners for permission to perform pre-construction activities in the right-of-way and discussing the eminent domain and easement acquisition process, among other matters.

## COUNT ONE—PROCEDURAL DUE PROCESS

176.     Plaintiffs reallege the preceding paragraphs in this complaint.

177.     The Fourteenth Amendment to the United States Constitution provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law."

178.     Plaintiffs and their members will be deprived of property interests by the Defendants' approval of the CPCN for the ATC Line.

179.     Defendants' process in adjudicating the Transmission Companies' request for a CPCN does not contain adequate procedural safeguards to prevent *ex parte* communications, conflicts of interest, prejudgment, or bias or lack of impartiality.

180.     A fair trial in a fair tribunal is a basic requirement of Due Process, and that rule applies to administrative agencies such as the PSC as well as to courts.

181.     Defendants' adjudicative process and decision-making in this contested case was imbued with at least an appearance of bias and a lack of impartiality, as well as potential actual bias and a lack of impartiality.

182.     Commissioner Huebsch's *ex parte* communications with parties in the case, the lack of disclosure of the *ex parte* communications, and the apparent conflicts of interest create at least an appearance of bias and lack of impartiality, thereby violating Plaintiffs' and their members' constitutional Due Process rights.

183.     Chair Valcq's longstanding representation and engagement with We Energies and WEC Energy Group, which owns more than 60% of ATC, creates at least an appearance of bias and lack of impartiality, thereby violating Plaintiffs' and their members' constitutional Due Process rights.

184.     The cumulative impacts and the totality of facts and circumstances regarding Defendant Commissioner Huebsch and Defendant Chair Valcq create an objective risk of bias and lack of impartiality that is impermissibly high.

185.     "Where a justice who participated in a case was disqualified by law the court's judgment in that case is void." *Jackson v. Benson*, 249 Wis. 2d 681, 691 (2002). The same rule applies "when the disqualified judge has acted simply as one of a bench composed of several

judges, even though the vote of the disqualified judge was not necessary to the decision." *Case v. Hoffman*, 100 Wis. 314, 74 N.W. 220, 222 (1898).

186.     Plaintiffs have no adequate remedy at law.

## COUNT TWO—DUE PROCESS AND EMINENT DOMAIN

187.     Plaintiffs reallege the preceding paragraphs in this complaint.

188.     The Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation."

189.     Defendants' approval of the CPCN for the ATC Line permits the Transmission Companies to exercise eminent domain to take Plaintiffs', their members', and others' private property.

190.     Defendants' adjudicative decision process in approving the Transmission Companies' request for a CPCN in this contested case was imbued with at least an appearance of bias and a lack of impartiality, as well as potential actual bias and a lack of impartiality.

191.     Land may not constitutionally be taken for the ATC Line whether or not just compensation is provided.

192.     Without this Court's intervention, Plaintiffs and their members will be unlawfully deprived of their property, and they have no adequate remedy at law.

## COUNT THREE—DUE PROCESS AND TAKING FOR PRIVATE USE

193.     Plaintiffs reallege the preceding paragraphs in this complaint.

194.     The Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation."

195.     The Defendants' approval of the CPCN allows private Transmission Companies to exercise eminent domain to condemn and take private land for their private use.  The ATC Line

does not have the "public use" required by the Fifth Amendment, and therefore land may not constitutionally be taken for this project, whether or not just compensation is provided.

196.     Without this Court's intervention, Plaintiffs and their members will be unlawfully deprived of their property, and they have no adequate remedy at law.

### **REQUESTED RELIEF**

WHEREFORE, Plaintiffs respectfully request an Order from the Court:

1. Declaring that Defendant Commissioner Huebsch should have been recused and disqualified from participating in the PSC's adjudicatory decision-making in this contested case.

2. Declaring that Defendant Chair Valcq should have been recused and disqualified from participating in the PSC's adjudicatory decision-making in this contested case.

3. Declaring that because Defendant Commissioner Huebsch and Defendant Chair Valcq participated in the contested case and should have been recused and disqualified, the PSC Final Decision in that case is void as a matter of law.

4. Declaring that Defendants' decision granting a Certificate of Public Convenience and Necessity for the ATC Line constitutes: (a) A deprivation of Plaintiffs' and their members' property without due process of law in violation of the Fourteenth Amendment of the United States Constitution; (b) An impermissible approval for private companies to exercise eminent domain and condemn private property in violation of the Fifth Amendment of the United States Constitution; and (c) An impermissible approval for private companies to exercise eminent domain and a taking of private property for a private use in violation of the Fifth Amendment of the United States Constitution.

5. Vacating the CPCN and prohibiting Defendants from enforcing it.

6. Awarding attorney fees and costs to Plaintiffs under 42 U.S.C. § 1988.

32

7.   Granting such further relief as may be just, equitable and appropriate, and in the public interest.

Dated: December 11, 2019

Respectfully submitted,

/s/ Stephen P. Hurley
Stephen P. Hurley
Catherine E. White
Hurley Burish, S.C.
33 East Main Street, #400
P.O. Box 1528
Madison, WI 53703
T: (608) 257-0945
F: (608) 257-5764
shurley@hurleyburish.com
cwhite@hurleyburish.com

/s/ Howard A. Learner
Howard A. Learner
Rachel L. Granneman
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
hlearner@elpc.org
rgranneman@elpc.org