# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| DRIFTLESS AREA LAND CONSERVANCY and WISCONSIN WILDLIFE FEDERATION, | No. 19-cv-1007 |
| Plaintiffs, | |
| v. | |
| MICHAEL HUEBSCH, REBECCA VALCQ, ELLEN NOWAK, and PUBLIC SERVICE COMMISSION OF WISCONSIN, | |
| Defendants. | |

## INTERVENOR-DEFENDANTS AMERICAN TRANSMISSION COMPANY LLC, DAIRYLAND POWER COOPERATIVE, AND ITC MIDWEST LLC'S BRIEF IN SUPPORT OF JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND 12(b)(6)

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND ............................................................................................. 3

        A.      Background on the Public Service Commission of Wisconsin ................ 3
        B.      Background on the Wisconsin Condemnation Process ............................ 4
        C.      Factual Background Regarding the Cardinal-Hickory Creek
                Proceeding.............................................................................................. 6
        D.      The Plaintiffs' Motion for Recusal .......................................................... 8

                1.      Commissioner Huebsch and MISO ................................................ 9
                2.      Chairperson Valcq's Employment History.................................. 10

        E.      Summary of Other Pending Appeals in State Court ............................... 10

III.    STANDARD OF REVIEW FOR MOTION TO DISMISS ............................. 11

IV.     THE COURT SHOULD DISMISS THE COMPLAINT BECAUSE IT
        DOES NOT STATE COGNIZABLE CLAIMS UNDER SECTION 1983 ........ 12

        A.      The Commission cannot be sued under Section 1983 ............................ 12
        B.      Plaintiffs' claims against Commissioner Nowak must be dismissed....... 12
        C.      Plaintiffs' claims are for wholly past action, which is not allowed
                under Section 1983 ............................................................................... 13
        D.      In any event, Plaintiffs' claims for injunctive relief are barred .............. 13

V.      THE COURT SHOULD DISMISS COUNTS TWO AND THREE FOR
        WANT OF STANDING ................................................................................. 16

        A.      Plaintiffs lack standing to sue in their own right ................................... 17
        B.      Plaintiffs do not have organizational standing....................................... 19

                1.      Plaintiffs' members would not have standing to sue in their
                        own right .................................................................................... 20
                2.      The property interests that Plaintiffs seek to protect are not
                        germane to the purpose of those organizations............................ 20
                3.      The claims asserted and the relief requested require the
                        participation of Plaintiffs' individual members in this
                        lawsuit ...................................................................................... 21

VI.     THE COURT SHOULD ALSO DISMISS COUNTS TWO AND THREE
        BECAUSE THOSE CLAIMS ARE NOT RIPE ................................................ 22

VII.    THE COURT SHOULD DISMISS THE COMPLAINT BECAUSE
        PLAINTIFFS HAVE FAILED TO STATE A PLAUSIBLE CLAIM FOR
        RELIEF ON ALL COUNTS ........................................................................... 24

        A.      The Court should dismiss all Counts because, even construing all
                well-pled facts in a light most reasonable to Plaintiffs, they have
                not stated a plausible claim for relief .................................................... 24

        1.     Plaintiffs have failed to allege that the Final Decision deprived them of a constitutionally protected property or liberty interest ................................................................ 24

        2.     Even assuming Plaintiffs have alleged a protected property or liberty interest, and construing all well-plead facts in a light most favorable Plaintiffs, they have failed to state a plausible due process claim ........................................................ 27

             a.     The Due Process Clause only requires disqualification of an administrative decisionmaker in extreme cases. ............................................................ 27

             b.     Chairperson Valcq's prior relationship with one of the Co-Owners' affiliates did not, in and of itself, require her to recuse herself ............................................ 29

             c.     Commissioner Huebsch's role as the Commission's representative to MISO does not, in and of itself, mean that he was required to recuse himself .................. 30

        3.     Even if Plaintiffs are correct that Chairperson Valcq and Commissioner Huebsch were required to recuse themselves, the CPCN would have been approved anyway ....... 32

        4.     Plaintiffs waited until the eleventh hour to raise their procedural due process claims before the Commission; therefore, those claims were not timely and should be dismissed here as well ................................................. 33

    B.     Count III should also be dismissed because, as a matter of law, condemnation of private property for transmitting electric power is a "public use" within the meaning of the Fifth Amendment .................. 35

VIII.   THE COURT SHOULD DISMISS THE COMPLAINT ON ALL COUNTS BECAUSE PLAINTIFFS HAVE OTHER ADEQUATE REMEDIES AT LAW ...................................................................... 37

    A.     Plaintiffs are already pursuing their claims under Counts One and Two in Wisconsin state court, and therefore, they have adequate remedies at law ....................................................................... 37

    B.     Plaintiffs also have an adequate remedy at law for Count Three ........... 39

IX.    CONCLUSION .................................................................................. 40

## I.    INTRODUCTION

There are so many problems with the Plaintiffs' Complaint, it is hard to know where to begin. The Complaint asserts claims arising out of a complex, lengthy, and contested proceeding before the Public Service Commission of Wisconsin ("Commission") that ended in September of 2019 and is now the subject of numerous state court appeals.[1] The subject of that Commission proceeding was whether and where to construct a new high-voltage transmission line in southwestern Wisconsin. The Plaintiffs opposed this project but waited until <u>after</u> the Commission preliminarily approved the transmission line, at a public open meeting in August 2019, to file a motion with the Commission demanding that two of the three Commissioners recuse themselves due to alleged biases, conflicts-of-interest, and *ex parte* communications.

The Commission denied that motion and issued a final written decision approving the transmission project on September 26, 2019. (*See* Declaration of Brian H. Potts in Support of Co-Owners' Motion to Dismiss, ¶ 3, Ex. A) (hereinafter, "Potts Decl.") Plaintiffs then appealed the Commission's final decision to the Wisconsin state courts, and also filed the instant action, asserting novel (but ultimately flawed) claims of bias and conflicts-of-interest against the Commission and the individual Commissioners under 42 U.S.C. § 1983 ("Section 1983").

At base, the Plaintiffs' Complaint is nothing more than an attempt to collaterally attack the Commission's decision—the review of which is ultimately a matter best left to the Wisconsin state judicial system—in federal court. Plaintiffs appear to be trying to challenge the Commission's decision in as many venues as possible, presumably to try to increase their likelihood of obtaining a favorable result.

---

[1] Unless otherwise indicated herein, capitalized terms used in this Brief have the same meaning as they do in the Notice of Motion and Motion being filed concurrently herewith.

The Plaintiffs' Complaint in this Court suffers from numerous fatal jurisdictional and substantive flaws, including:

(1) The Commission itself cannot be sued under Section 1983 (*see* Section IV(A));

(2) Under Section 1983, Plaintiffs cannot obtain the equitable relief that they are seeking (*see* Section IV(C)-(D));

(3) The Plaintiffs lack standing, and their claims are not ripe (Counts Two and Three) (*see* Sections V and VI);

(4) The Plaintiffs have failed to show that the Commission's decision deprived them of any federally protected constitutional rights (*see* Section VII(A)(1));

(5) The Plaintiffs did not assert their allegations of bias and conflicts of interest to the Commission in a timely manner, and as such, they have waived their right to assert those claims (*see* Section VII(A)(4)); and

(6) The Plaintiffs have other adequate remedies at law (*see* Section VIII).

Aside from these procedural and jurisdictional deficiencies, however, there is a much more egregious problem with the Complaint: the Plaintiffs have openly charged two public servants with being biased and conflicted without any actual evidence to back their claims up. (*See* Section VII(2)) None of the facts they have alleged, even if true, create a "plausible" claim for relief under the U.S. Constitution. Indeed, the fact that the Plaintiffs waited to assert these claims until after the Commission ruled against them suggests that their allegations are not genuine and that they are not proceeding in good faith. The Co-Owners therefore respectfully request that the Court dismiss the Complaint on all counts, with prejudice.

## II.     BACKGROUND

### A.     Background on the Public Service Commission of Wisconsin

In Wisconsin, the Legislature has delegated authority to the Commission to regulate and supervise utilities that produce or transmit heat, light, water, or power to the public. *See, e.g.*, Wis. Stat. §§ 196.01(5), 196.02(1).[2] The Commission consists of three Commissioners, who the Governor appoints, with the advice and consent of the Senate, for six-year terms, as well as a retinue of technical staff (engineers, accountants, attorneys, etc.) that advise the Commission regarding matters within its jurisdiction. Wis. Stat. §§ 15.06(1)(c), 15.79; (*see also* Compl. ¶¶ 47-48). The three commissioners currently sitting on the Commission are Chairperson Rebecca Valcq, Commissioner Michael Huebsch, and Commissioner Ellen Nowak. (Compl. ¶¶ 55, 78, 80)

Before any person can construct a high-voltage transmission line in Wisconsin, it must apply for, and the Commission must grant, a Certificate of Public Convenience and Necessity ("CPCN"). *See* Wis. Stat. § 196.491(3). The Commission has up to 360 days from the date that it determines the CPCN application is "complete" to act on the application, or it is deemed approved by operation of law. *Id.* § 196.491(3)(g). A proceeding for projects requiring a CPCN is considered a "Class 1 proceeding" governed by Wisconsin's Administrative Procedure Act ("APA"). *See* Wis. Stat. § 227.01(3)(a); *see also* Wis. Stat. §§ 227.44 to 227.51 (prescribing procedures applicable to administrative contested case hearings); Wis. Admin. Code § PSC ch. 2 (prescribing rules of procedure and practice in investigations, proceedings, and other dockets

---

[2] Intervenor-Defendant Dairyland is not a public utility since it is "[a] cooperative association organized under [Wis. Stat.] ch. 185 for the purpose of producing or furnishing heat, light, power or water to its members only." Wis. Stat. § 196.01(5)(b)1. The Commission's jurisdiction over cooperatives like Dairyland is limited. However, cooperatives like Dairyland are "persons" that must obtain a CPCN to construct certain transmission facilities under Wis. Stat. § 196.491(3).

before the Commission). An administrative law judge ("ALJ") presides over and regulates the proceeding and compiles the administrative record, but the Commission is responsible for making all findings of fact, conclusions of law, and final decisions. *See* Wis. Admin. Code § PSC 2.04. Any such decision must be based upon the evidence in the administrative record and is subject to judicial review in state court. *See* Wis. Stat. §§ 227.44(6), (9), 227.47, 227.57.

### B.   Background on the Wisconsin Condemnation Process

The State of Wisconsin has the authority to condemn private property for public use as an inherent attribute of its sovereignty. *See Ferguson v. City of Kenosha*, 93 N.W.2d 460, 465 (Wis. 1958). The Wisconsin Legislature, not the Commission, has granted authority to condemn private property to each of the Co-Owners. *See generally* Wis. Stat. § 32.02. ATC is granted the authority as a Wisconsin corporation engaged in the business of transmitting electric power. *Id.* § 32.02(6). ITC is granted the authority via its status as a "foreign transmission provider." *Id.* § 32.02(5). And Dairyland is granted the authority as a rural electric cooperative association. *Id.* § 32.02(10).

Filing a condemnation petition with a state circuit court, *see* Wis. Stat. § 32.06(7), is not the only method by which a utility acquires property needed for a public use. Rather, condemnation is only used "in case such property cannot be acquired by gift or purchase at an agreed price." Wis. Stat. § 32.02. Obviously, if the utility and the landowner can agree on a price, the utility need not file a condemnation petition to acquire the property in question. For projects requiring a CPCN, a utility has no right to acquire property for that project by condemnation until the Commission has issued a CPCN. Wis. Stat. § 32.03(5)(a); *but see* Wis. Stat. § 32.03(5)(b) (allowing for condemnation for certain limited interests related to such a project).

4

The Wisconsin process to initiate condemnation proceedings involves several steps. *See* Wis. Stat. § 32.06.[3] For instance, the condemnor must arrange for at least one appraisal to be made of the property proposed to be acquired, attempt to negotiate with the landowner whose property is proposed to be acquired, and, if the amount of compensation is not agreed upon, make a formal jurisdictional offer to such landowner. Wis. Stat. §§ 32.06(2), (2a), (3). If the landowner does not accept the jurisdictional offer in the statutory time limit or fails to consummate an acceptance, then the condemnor may petition the circuit court of the county in which the property to be acquired is located for condemnation proceedings. Wis. Stat. § 32.06(7).

From there, the process addresses disputes regarding the valuation of the property and just compensation that is due on account of the taking. Wis. Stat. §§ 32.06(8), 32.08. If a landowner desires to contest the right of the condemnor to condemn the property described in the jurisdictional offer for any reason other than the amount of just compensation, Wisconsin law provides a process by which a landowner may bring an action to contest the condemnation.  Wis. Stat. § 32.06(5); *see also Falkner v. N. States Power Co.*, 248 N.W.2d 885, 889 (Wis. 1977) ("The owner's action [under Wis. Stat. § 32.06(5)] is now the only manner in which issues pertaining to the condemnation may be raised, except for those of title and just compensation . . . .").

In this case, Plaintiffs do not allege that jurisdictional offers have been made or that condemnation actions have begun, let alone allege that their property has been taken. They

---

[3] Wisconsin law creates two similar processes for condemnation. *See* Wis. Stat. §§ 32.05, 32.06. Condemnation for the Project will take place under Wis. Stat. § 32.06 because it is condemnation for an electric transmission line. While some of the details between these two processes vary, they are not material to the analysis of Plaintiffs' claims.

simply allege that the Commission has granted the Co-Owners a CPCN for the Project. (*See, e.g.*, Compl. ¶ 19)

### C.    Factual Background Regarding the Cardinal-Hickory Creek Proceeding

On April 30, 2018 the Co-Owners filed with the Commission an application (the "Application") for a CPCN to construct the Cardinal-Hickory Creek 345-kilovolt ("kV") transmission line project ("Cardinal-Hickory Creek Project" or "Project").[4] (*See* Potts Decl., ¶ 3, Ex. A, at 1) The Cardinal-Hickory Creek Project will be a 345-kV transmission line running along (primarily existing) utility and transportation rights-of-way from the Cardinal electrical substation in Dane County, to the new Hill Valley electrical substation in Montfort, Wisconsin, and terminating at the existing Hickory Creek electrical substation in Dubuque County, Iowa. (*See* Compl. ¶ 116; Potts Decl., ¶ 3, Ex. A, at 11)[5]

The purpose of the Project is to improve the reliability of the high-voltage transmission system; decrease energy costs in Wisconsin by reducing congestion on the system; and improve Wisconsin's access to a substantial amount of renewable wind generation being developed west of the state. (*See* Potts Decl., ¶ 3, Ex. A, at 18) The Midcontinent Independent System Operator, Inc. ("MISO"), a not-for-profit entity created under federal law that is responsible for planning

---

[4] The proceeding regarding CPCN Application was docketed as Docket No. 05-CE-146 before the Commission. *See* PSC of Wisconsin, *E-Services Portal*, *available at* http://apps.psc.wi.gov/.
[5] Exhibit A to this Motion is the Commission's Final Order regarding the Project, which is publicly available on the Commission's website, and to which Plaintiffs refer to repeatedly in their Complaint. (*See, e.g.*, Compl. ¶¶ 5-6, 19-20, 54, 168-172) The Applicants have attached the Final Order as an exhibit to this Motion because, even though it is not attached to the Complaint, it goes to the heart of the allegations in the Complaint. The Court may consider the Final Order as part of the Complaint in ruling on the Motion. *See, e.g. McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.") (internal quotes and citations omitted); *see also Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 505 (7th Cir. 2013). Moreover, since this document is publicly available, the Court may take judicial notice of it, without converting the Motion to a motion into for summary judgment. *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (quoting *U.S. v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991)).

and operating the transmission system and energy markets across fifteen states, included the Project in its Multi-Value Project ("MVP") portfolio. (*Id.* at 14) This portfolio includes seventeen regional transmission projects that were developed to deliver regional benefits by reducing congestion on the transmission system and facilitating the delivery of wind energy being developed in the Great Plains into midwestern energy markets. (*Id.*); *see also Ill. Commerce Comm'n v. FERC*, 721 F.3d 764, 770-772 (7th Cir. 2013) (describing the MVP portfolio).

Because MVP projects like the Cardinal-Hickory Creek Project provide benefits to the entire MISO region, they are cost-shared across the region. (*See* Potts Decl., ¶ 3, Ex. A, at 14-15) The Co-Owners estimate that the Project's gross cost will be $492 million. (*Id.* at 79) But because it will be cost-shared across the Midwest region, the cost of the Project to Wisconsin is estimated to be between $67 million and $72.2 million. (*Id.* at 16) Moreover, the Co-Owners' economic analysis indicates that the Project will generate between $23 million and $350 million in net economic benefits (i.e., in excess of its costs) for Wisconsin over its expected useful life. (*Id.* at 19-21)

Many parties actively participated in the CPCN proceeding. (*Id.* at 2) DALC moved to intervene on April 27, 2018 and WWF moved to intervene several months later, in November of 2018. (*Id.* at 81) On January 3, 2019, the ALJ allowed Plaintiffs and several dozen others to intervene as parties. (*Id.* at 2; Compl. ¶¶ 37, 45) The parties engaged in a substantial amount of pre-hearing discovery and motion practice; submitted written testimony and exhibits into the record; participated in a week-long technical hearing, which was held at the Commission in June 2019; and submitted post-hearing briefs. (*See* Potts Decl., ¶ 3, Ex. A, at 2-5)

At an open meeting held on August 20, 2019, the Commission unanimously determined that the Application was in the public interest and orally approved the Project. (*See, e.g.*, Compl. ¶¶ 142–145) At another open meeting held on September 26, 2019, the Commission issued its final written decision ("Final Order") approving the Application and issuing a CPCN for the Project. (*See* Compl. ¶ 19; Potts Decl., ¶ 3, Ex. A) Among other things, the Commission found that, by allowing Wisconsin to better access renewable generation projects being developed west of the Mississippi River, the Project "represents an important step in moving towards a future with increased renewable generation." (*See* Potts Decl., ¶ 3, Ex. A, at 24-26, 29-32) The Final Order also designates the approved route for the Project and (as mentioned) is a prerequisite for the Co-Owners to exercise eminent domain, if necessary, to acquire interests in land to construct the Project. (*Id.* at 43-44); Wis. Stat. § 32.03(5).

### D.     The Plaintiffs' Motion for Recusal

On September 20, 2019, the Plaintiffs filed a motion with the Commission (the "Recusal Motion") requesting that (1) Chairperson Valcq and Commissioner Huebsch recuse themselves from deliberating the merits of the case, and (2) the Commission refrain from approving the Project. (*See* Compl. ¶¶ 146-147; Potts Decl., ¶ 3, Ex. A, at 80-81) At no point between April 27, 2018 (when DALC sought intervenor status) and August 20, 2019 (when the Commission preliminarily approved the Project at its open meeting) did Plaintiffs or any other intervenor assert any allegations of bias or conflicts of interest against any Commissioner, nor did any other party request that any Commissioner recuse him or herself from the proceeding. Instead, the Plaintiffs waited until one month <u>after</u> the Commission orally approved the Project—and a mere six business days before the statutory deadline for final Commission action on the Application— to file the Recusal Motion. (*See* Potts Decl., ¶ 3, Ex. A, at 81-82)

### 1.   Commissioner Huebsch and MISO

Commissioner Huebsch was appointed to the Commission in 2015, and his involvement with MISO has been a matter of public record for years.[6] The Organization of MISO States ("OMS") was created in 2003 to represent the interests of state and local utility regulators in their dealings with MISO. (*See* Compl. Ex. F) The OMS selects members to serve on the MISO Advisory Committee, which is comprised of state regulatory authorities, environmental stakeholders, and public consumer groups, among others. (*See* Compl. Ex. A, at 15 & Ex. A-1) The Advisory Committee holds public meetings and provides information and advice to MISO's management and its Board of Directors on "policy matters of concern to the Advisory Committee, or its constituent stakeholder groups." (*See* Compl. Ex. A-1) Neither the MISO Advisory Committee nor its constituent groups exercise control over the OMS, the MISO Board of Directors, or MISO itself. (*See* Compl. Ex. E & F)

MISO's intervention in the Commission's CPCN proceedings was granted on January 3, 2019. (*See* Potts Decl., ¶ 3, Ex. A, at 2) At that time, Commissioner Huebsch was already serving as a Commissioner and had been the Commission's OMS representative since 2015. (*Id.* at 81; Compl. ¶ 80) In early 2019, the OMS appointed Commissioner Huebsch to the MISO Advisory Committee to represent the State Regulatory Authorities sector and, in that capacity, he attended his first Advisory Committee meeting on March 20, 2019. (Compl. ¶¶ 81, 100; Potts Decl., ¶ 3, Ex. A, at 86 n.31)

---

[6] Other states in MISO's footprint also designate commissioners to represent them at MISO. *See* https://cdn.misoenergy.org/2020%20AC%20Members-Alternates315720.pdf (noting that current designees also include officials from the North Dakota Public Service Commission, Public Utility Commission of Texas, and Indiana Regulatory Commission).

### 2.     Chairperson Valcq's Employment History

Wisconsin Governor Tony Evers appointed Rebecca Valcq as a Commissioner, with her six-year term beginning on January 7, 2019. (Compl. ¶ 66; Compl. Ex. A-3) Prior to her appointment, Chairperson Valcq worked as inside and outside counsel for WEC Energy Group and Wisconsin Electric Power Company (also known as We Energies). (Compl. Ex. A-3) In January 2019, Chairperson Valcq and the Commission agreed to a recusal policy whereby Chairperson Valcq would not participate in any matters before the Commission where, while either in private practice or working at WEPCO, she personally and substantially participated in that matter. (*Id.*) In total, Chairperson Valcq recused herself from thirty matters. (Compl. ¶ 68, Ex. A-3) Chairperson Valcq did not identify the proceedings involving the Project as a matter in which she "substantially participated" during her career as an attorney in private practice or as in-house legal counsel for WEPCO. (Compl. Ex. A-3)

### E.     Summary of Other Pending Appeals in State Court

On December 13, 2019, DALC filed a petition for judicial review of the Commission's Final Order in the Iowa County Circuit Court, and WWF filed a petition for judicial review of the Final Order in the Columbia County Circuit Court. (*See* Potts Decl., ¶¶ 4-5 & Ex. B & C)[7] In their petitions, DALC and WWF assert conflict of interest and bias claims against the

---

[7] *See Driftless Area Land Conservancy v. Pub. Serv. Comm'n of Wis.*, No. 2019-CV-000144 (Wis. Cir. Ct. Iowa Cty. Dec. 13, 2019); *Wis. Wildlife Fed'n v. Pub. Serv. Comm'n of Wis.*, No. 2019-CV-000334 (Wis. Cir. Ct. Columbia Cty. Dec. 13, 2019). Exhibits B and C to this Motion, which are copies of the petitions for judicial review that DALC and WWF filed in Iowa County and Columbia County Circuit Court, respectively, are publicly available online on the Wisconsin Circuit Court Access website. *See Wisconsin circuit court eFiling*, https://logon.wicourts.gov/index.html?target=efiling. The Court can take judicial notice of these filings. (*See supra* footnote 5). Iowa County and Dane County have also filed petitions for review. *Iowa Cty. et al. v. Pub. Serv. Comm'n of Wis.*, No. 2019-CV-000142 (Wis. Cir. Ct. Iowa Cty. Dec. 12, 2019); *Cty of Dane v. Pub. Serv. Comm'n of Wis.*, No. 2019-CV-003418 (Wis. Cir. Ct. Dane Cty. Dec. 12, 2019). On the date of this Motion, the Dane County Circuit Court ordered that these proceedings be consolidated into Case No. 19-CV-3418, which is currently pending in that court. *See* Wis. Stat. § 227.53(1)(a)(3).

Commission that are virtually identical to the claims that they are asserting in this case. (*See* Potts Decl., ¶ 4, Ex. B, at ¶¶ 102-121; Potts Decl., ¶ 5, Ex. C, at ¶¶ 102-121)

## III.   STANDARD OF REVIEW FOR MOTION TO DISMISS

A well-pled complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The complaint must "describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests." *E.E.O.C. v. Concentra*, *Health Servs. Inc.* 496 F.3d 773, 776 (7th Cir. 2007) (internal quotations omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). And, the allegations set forth in the complaint "must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level.'" *Id.* A pleading that contains "an unadorned, the-defendant-unlawfully-harmed-me accusation" with a "'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555); *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010).

A two-step process guides a court's determination as to whether a claim is facially plausible. First, although the court must accept as true all <u>well-pled</u> allegations contained in a complaint, *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013), the court must identify the "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" that do not satisfy the pleading requirements and are thus not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678, 680; *Twombly*, 550 U.S. at 555; FED. R. CIV. P. 8. Second, taking the well-pled allegations as true and "draw[ing] on its judicial experience and common sense," the court must determine "whether a complaint states a plausible claim for relief." *Iqbal*, 556 U.S. at 679. A complaint is sufficiently plausible when the pleadings contain "factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id*. at 678. Although the plausibility standard "does not impose a probability requirement," *Twombly*, 550 U.S. at 556, it does require a pleading to show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

## IV.   THE COURT SHOULD DISMISS THE COMPLAINT BECAUSE IT DOES NOT STATE COGNIZABLE CLAIMS UNDER SECTION 1983.

### A.   The Commission cannot be sued under Section 1983.

Under Section 1983, the defendant must be a "person" within the meaning of the statute. *See* 42 U.S.C. § 1983; *see also Thomas v. Illinois*, 697 F.3d 612, 613 (7th Cir. 2012). Neither a state nor a state agency is a "person" that can be sued under Section 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65-66 (1989); *Thomas*, 697 F.3d at 613. The Commission is a state agency. As such, it is not a "person" subject to suit under Section 1983. *Thomas*, 697 F.3d at 613; *see also Coleman v. McCallum*, No. 15-cv-984, 2018 WL 1936486, *2 (E.D. Wis. Apr. 24, 2018) (Wisconsin Department of Labor Review Commission not a proper party under Section 1983).[8] Therefore Plaintiffs' claims against the Commission itself must be dismissed.

### B.   Plaintiffs' claims against Commissioner Nowak must be dismissed.

Under Section 1983, an individual defendant must be personally responsible for the deprivation of the Plaintiff's constitutional rights. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991); *see also Wilson v. Warren Cty. Ill.*, 830 F.3d 464, 469 (7th Cir. 2016). In other words, there must be some "causal connection or affirmative link between the action complained about and the official

---

[8] The Commission is also immune from suit under the Eleventh Amendment to the United States Constitution, which prohibits citizens from bringing suit in federal court against their own state or another state (unless the state has waived it sovereign immunity). *See* U.S. CONST. amend. XI; *Welch v. Tex. Dep't of Highways and Pub. Transp.*, 483 U.S. 468, 472-73 (1987). However, since it is clear that the Commission is not a "person" within the meaning of Section 1983, the Court need not reach the issue of the Commission's sovereign immunity under the Eleventh Amendment. *See Power v. Summers*, 226 F.3d 815, 818 (7th Cir. 2000) (citing *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 777-80 (2000)) (district court "should have dismissed the official capacity claims before addressing the Eleventh Amendment defense").

sued." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). In this case, the Complaint contains no allegation that Commissioner Nowak was personally responsible for the deprivation of Plaintiff's constitutional rights.  Therefore, Plaintiffs' claims against Commissioner Nowak should be dismissed.

### C.    Plaintiffs' claims are for wholly past action, which is not allowed under Section 1983.

Plaintiffs seek declaratory and injunctive relief, asking the Court to "[v]acat[e] the CPCN and prohibit[] Defendants from enforcing it."[9] (Compl. Relief Requested, ¶ 5.) However, the relief requested is not available to Plaintiffs under Section 1983. As discussed by the Commission in its Motion to Dismiss, (ECF No. 7 at 9-12), Plaintiffs do not allege an ongoing violation of federal law, nor do they seek prospective relief; rather, they allege a past violation of law and seek retrospective relief. However, this type of relief is not available under Section 1983. *See*, *e.g.*, *Sonnleitner v. York*, 304 F.3d 704, 717-18 (7th Cir. 2002); *Green v. Mansour*, 474 U.S. 64, 73 (1985).

### D.    In any event, Plaintiffs' claims for injunctive relief are barred.

Injunctive relief is also not available under Section 1983 in this case because the Commissioners were acting as quasi-judicial officers. Specifically, in 1996, Congress amended Section 1983 to provide that injunctive relief is generally not available against judicial officers: "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or

---

[9] Plaintiffs fail to specify whether they are suing the Commissioners in their individual or official capacities. Because injunctive relief is not available against officials in their individual capacities, and Plaintiffs seek only injunctive relief, the Co-Owners presume Plaintiffs have named the Commissioners in their official capacities. *Greenawalt v. Ind. Dep't of Corr.*, 397 F.3d 587, 589 (7th Cir. 2005) ("[S]ection 1983 does not permit injunctive relief against state official sued in their individual as distinct from their official capacity."); *see also Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011); *Wolfe v. Strankman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004) .

declaratory relief was unavailable." *See* S. Rep. No. 104-366, at 13 (1996), *as reprinted in* 1996 U.S.C.C.A.N. 4202. The purpose of this amendment was to overturn *Pulliam v. Allen*, 466 U.S. 522, 542-44 (1984). *Id.* at 4216-17 ("This section restores the doctrine of judicial immunity to the status it occupied prior to the Supreme Court's decision in *Pulliam v. Allen*, 466 U.S. 522 (1984) . . . . [Section 1983 and the Civil Rights Attorney Fees Award Act] are now amended to preclude awards of costs and attorney's fees against judges for acts taken in their judicial capacity, and to bar injunctive relief unless declaratory relief is inadequate.").[10]

Consistent with prior case law determining that quasi-judicial officers enjoy the same immunity from liability as judicial officers,[11] courts interpret this Section 1983 language to also prohibit injunctive relief against quasi-judicial actors. *See, e.g.*, *Niebur v. Town of Cicero*, No. 98 C 4157, 1998 WL 677155, *12 (N.D. Ill. Sept. 22, 1998) (members of Board of Fire, Policy, and Public Safety Commissioners of town enjoyed quasi-judicial immunity from damages and injunctive relief in Section 1983 action alleging claims relating to employment actions); *Roth v. King*, 449 F.3d 1272, 1287 (D.C. Cir. 2006) (holding that director of public defender service was immune from Section 1983 suit for injunctive relief and stating "[t]here is also no reason to believe that the [FCIA] is restricted to 'judges'"); *Deters v. Ky. Bar Ass'n*, 130 F. Supp. 3d 1038, 1047

---

[10] For the same reason that injunctive relief is not available to Plaintiffs, their request for attorneys' fees is also barred by the text of Sections 1983 and 42 U.S.C. § 1988.

[11] *See, e.g.*, *Crenshaw v. Baynerd*, 180 F.3d 866 (7th Cir. 1999) (state civil rights commission members entitled to quasi-judicial immunity); *see also Capra v. Cook Cnty. Bd. of Review*, 733 F.3d 705 (7th Cir. 2013) (county tax review board members entitled to quasi-judicial immunity); *Heyde v. Pittenger*, 633 F.3d 512 (7th Cir. 2011) (holding that members of county tax board of review entitled to quasi-judicial immunity and stating that the "cloak of immunity is designed to prevent a situation in which decision-makers act with an excess of caution or otherwise skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct. . . .") (quoting *Tobin for Governor v. Ill. State Bd. of Elec.*, 268 F.3d 517, 522 (7th Cir. 2001)); *Balcerzak v. City of Milwaukee*, 980 F. Supp. 983 (E.D. Wis. 1997) (applying quasi-judicial immunity from suit to members of board of fire and police commissioners in a 1983 action arising from employment dispute and stating, "This immunity springs not from the notion that judges are above reproach, but rather that an appellate process exists for righting judicial wrongs. If aggrieved litigants are permitted to end-run, or in this case exceed, the appellate process, judicial actors would be hard-pressed to carry out their duties.").

(E.D. Ky. 2015) (applying quasi-judicial immunity to bar injunctive relief against members of a state bar council under Section 1983); *Farland v. Wall*, 91 F. Supp. 3d 74, 77 (D. Mass. 2015) (parole board had quasi-judicial immunity for suit seeking injunctive relief under Section 1983).

Courts analyze various factors when determining whether judicial immunity applies to members of a quasi-judicial adjudicatory body, including (1) the need to assure the individual can perform her functions without harassment or intimidation; (2) the presence of safeguards that reduce the need for damages actions as a means for controlling unconstitutional conduct; (3) the insulation from political influence; (4) the importance of precedent; (5) the adversarial nature of the process; and (6) the correctability of error on appeal. *See Heyde*, 633 F.3d at 517 (citing *Butz v. Economou*, 438 U.S. 478, 512 (1978)).

In this case, the factors establish that the individual Commissioners were acting in a quasi-judicial capacity. For example, the Commission is responsible for regulating all public utilities in the state of Wisconsin, *see, e.g.*, Wis. Stat. § 196.02(1), which is an essential duty that the Commissioners must be able to carry out without fear of harassment or intimidation. Further, the proceeding in which the Commissioners issued the Final Order was an adversarial Class 1 contested case proceeding, which included, among other things: the opportunity to intervene, public notice, pre-filed testimony, discovery, the opportunity to cross-examine witnesses, and briefing. In addition, Wisconsin statute provides for the right to judicial review of the Final Order. (*See supra*, Section II(A))

Most notably, the Plaintiffs have themselves affirmatively asserted that the Commissioners were acting in a quasi-judicial capacity with respect to the Final Order:

- "The case before the PSC was contested, and it was adjudicative and judicial in nature." (Compl. ¶ 7)

15

- "There was an unusually large number of intervenors—over 40—in the adjudicative proceeding before the PSC in this contested case." (*Id.* ¶¶ 8, 126)

- "Before issuing a CPCN, the PSC must review the application and conduct a fair and reasonable adjudicatory process, including evidentiary proceedings." (*Id.* ¶ 50)

- "The PSC must follow Wisconsin Statutes Chapter 227, which lays out Wisconsin's administrative procedures and review requirements, and requires adjudicatory hearings in contested cases." (*Id.* ¶ 51)

- "Chair Valcq sat as an adjudicator in the contested case concerning the CPCN application." (*Id.* ¶ 75)

- "Commissioner Huebsch sat as an adjudicator in the contested case." (*Id.* ¶ 110)

- "The contested case before the PSC was adjudicative and judicial in nature." (Compl. ¶ 128)

In short, the Plaintiffs' claims arise out of the Commissioners' quasi-judicial functions when issuing the Final Order, and the Plaintiffs are seeking to enjoin the individual Commissioners from enforcing that decision. Plaintiffs have not alleged that the Commissioners violated a declaratory decree or that declaratory relief is unavailable,[12] and such injunctions are not permitted under Section 1983. Accordingly, Section 1983 also bars Plaintiffs' claims for injunctive relief and the Co-Owners respectfully request that these claims be dismissed.

## V.   THE COURT SHOULD DISMISS COUNTS TWO AND THREE FOR WANT OF STANDING.

Standing is rooted in Article III of the United States Constitution, which limits the jurisdiction of the federal judiciary to actual "Cases" or "Controversies." U.S. CONST., art. III, § 2. Standing enforces a constitutional restraint on the judicial power, so federal courts must always require "that a litigant have 'standing' to challenge the action sought to be adjudicated in

---

[12] Indeed, as discussed in Section II(E), above, Plaintiffs are actively pursuing state court appeals.

the lawsuit before proceeding to the merits of a claim." *Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833 (7th Cir. 2019 (internal quotation omitted) (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982)). Courts presume lack of jurisdiction "unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546 (1986)) (internal quotation marks omitted).

To show Article III standing, a plaintiff must demonstrate that (1) they are under an actual or imminent threat of suffering a concrete and particularized "injury in fact"; (2) this injury is fairly traceable to the defendant's conduct; and (3) it is likely that a favorable judicial decision will prevent or redress the injury. *Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). Plaintiffs bear the burden of establishing each of these elements at the time they commenced their action. *MDK, Inc. v. Vill. of Grafton*, 277 F. Supp. 2d 943, 946 (E. D. Wis. 2003) (citing *Alliant Energy Corp. v. Bie*, 277 F.3d 916, 919 (7th Cir. 2002)). As associations, Plaintiffs must either demonstrate that they have standing in their own right, or that they have associational standing to assert claims on behalf of their members. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975).

### A. Plaintiffs lack standing to sue in their own right.

Standing must be analyzed with reference to the particular claims the plaintiff is asserting. *See Peoples Gas, Light & Coke Co. v. U.S. Postal Serv.*, 658 F.2d 1182, 1193 (7th Cir. 1981) (citing *Flast v. Cohen*, 392 U.S. 83, 99 (1968)). Counts Two and Three allege that the issuance of the Final Decision violates the Fifth Amendment's Takings Clause. (Compl. ¶¶ 187-196.) However, Plaintiffs lack standing to assert these claims because the Final Order did not affect an actual taking of their property. *See Danforth v. United States*, 308 U.S. 271, 286 (1939) ("The mere enactment of legislation which authorizes condemnation of property cannot be a

17

taking."). Absent such a showing, Plaintiffs cannot satisfy the injury-in-fact or causation requirements of standing. The requirement of an actual or immediate injury means the injury must have already been inflicted or it must be likely to occur imminently. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff seeking prospective declaratory and injunctive relief (as here) must establish an ongoing or future injury that is "'certainly impending'"—it cannot rest on past injury. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013)). Causation requires a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560.

Here, Plaintiffs have not alleged facts sufficient to show that the Final Order has caused the injury that they are complaining about—namely, a future potential deprivation of their property under the Fifth Amendment. The Final Order is a prerequisite to the Co-Owners' exercising eminent domain, if necessary, to construct the Project. *See* Wis. Stat. § 32.03(5)(a). It has not, however, resulted in an actual taking of Plaintiffs' property. Whether and to what extent the Co-Owners will initiate condemnation proceedings for the Project is left to Wisconsin's statutory eminent domain process. (*See supra*, Section II(B)) There are several steps the Co-Owners must follow before they can initiate a condemnation proceeding through this process. (*See supra*, Section II(B)) Plaintiffs have not alleged that the Co-Owners have taken any of their (or any of their members') property through this statutory process, or that the Co-Owners have commenced the process and failed to reach a voluntary agreement regarding just compensation to warrant issuance of any jurisdictional offers to them (or their members). Therefore, neither the Plaintiffs nor their members have suffered any injury because they have not been deprived of their property.

The allegations in the Complaint confirm as much. Plaintiffs do not allege that WWF owns an interest in any property along the Project route. (Compl. ¶¶ 40-44) The only property interest that Plaintiffs allege they have and that may be taken is a conservation easement (held by DALC) near Barneveld in Iowa County with which the Project right-of-way "will overlap." (Compl. ¶ 31) In other words, Plaintiffs have not affirmatively alleged that any of their land has actually been, or ever will be, condemned. (*See* Compl. ¶¶ 29-36, 40-44, 139) Rather, Plaintiffs allege only that their members' property will be subject to future potential takings. (*See* Compl. ¶¶ 4, 30, 31-36, 41-44, 72, 116, 175, 178, 189, 192, 195-96) The thrust of the Plaintiffs' alleged injury is that their members' land could be taken for the Project, at some unspecified future date.

This alleged injury is neither actual nor imminent and is not causally connected to the Defendants' issuance of the Final Order. Rather, Plaintiffs' injury depends on future events or actions of the Co-Owners (not the Commission or the Commissioners, who are the defendants here) that may never come to pass, or that may not occur in the manner Plaintiffs have alleged. This is not the kind of "impending" injury sufficient to confer standing on Plaintiffs for the declaratory or injunctive relief they have requested. *Arpaio*, 797 F.3d at 19; *see also United Transp. Union v. Interstate Commerce Comm'n*, 891 F.2d 908, 912 (D.C. Cir. 1989) (noting that, for standing purposes, a court may "reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)").

**B.**     **Plaintiffs do not have organizational standing.**

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash.*

*Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 600 (7th Cir. 1993) (applying the same elements for associational standing).

>    **1.    Plaintiffs' members would not have standing to sue in their own right.**

Plaintiffs' allege that the Project would cross some of their members' land. (*See* Compl. ¶¶ 34-35, 42-43) However, for the same reasons discussed above, Plaintiffs' members would not have standing to assert these claims in their own right because the Final Order has not caused them any concrete, actual, or imminent injury-in-fact. (*See supra*, Section IV(A))

>    **2.    The property interests that Plaintiffs seek to protect are not germane to the purpose of those organizations.**

The "germaneness" test requires that "an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together." *Ret. Chi. Police Ass'n*, 7 F.3d at 607 (citing *Humane Soc'y v. Hodel*, 840 F.2d 45, 56 (D.C. Cir. 1988)). Plaintiffs' Complaint describes DALC and WWF's purposes as protecting and restoring land and natural resources, (*see* Compl. ¶¶ 25-27, 38), but their takings claims are not relevant to these organizational interests. Neither organization has alleged an interest in any property that will actually be condemned in connection with the Project.  Plaintiffs do not allege that vindicating their members' private property rights is pertinent to their organizational purpose. The fact that some of the Plaintiffs' members may incidentally own land that will be impacted by the Project is not sufficient to satisfy the germaneness requirement. *See Minn. Fed'n of Teachers v. Randall*, 891 F.2d 1354, 1359 (8th Cir. 1989) (members' interests as taxpayers as not germane to organization's purpose when "[t]he fact that some or all of its members pay taxes is purely incidental"). Therefore, Plaintiffs also fail to satisfy the second prong of the organizational standing test.

###### 3.   The claims asserted and the relief requested require the participation of Plaintiffs' individual members in this lawsuit.

The third prong of the associational standing test is not a constitutional requirement, but a prudential one. *United Food & Commercial Workers Union Local 751 v. Brown Gr., Inc.*, 517 U.S. 544, 555-56 (1996). Under this element, neither the claim asserted, nor the relief requested should require the participation of individual members in the lawsuit. *Hunt*, 432 U.S. at 343. Whether this prong is met "depends in substantial measure on the nature of the relief sought." *Warth*, 422 U.S. at 515. If an association is seeking declaratory or injunctive relief, this requirement is generally met because "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Id.* By contrast, if the association is seeking damages for alleged injuries to its members, "no award . . . can be made to the association" because "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Id.* at 515-16.

In this case, Plaintiffs' <u>claims</u> do require the participation of their members. Although the Co-Owners will follow the same statutory process to acquire and (if necessary) condemn land for the Project, the process will proceed differently for each landowner. One landowner may willingly negotiate with the Co-Owners, while another may refuse to do so, effectively forcing condemnation. The overarching point here is that the Plaintiffs have no property interests that will be condemned as part of the Project; and, it is unclear whether and to what extent the Co-Owners will need to condemn land from the Plaintiffs' members. If and when the Co-Owners do initiate the condemnation process over those lands, the Plaintiffs' members can raise their own takings claims at that time through the appropriate procedures.

## VI.   THE COURT SHOULD ALSO DISMISS COUNTS TWO AND THREE BECAUSE THOSE CLAIMS ARE NOT RIPE.

Like standing, the doctrine of ripeness is also based on both Article III's "case or controversy" requirement. *Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011). Ripeness concerns arise "when a case involves uncertain or contingent events that may not occur as anticipated, or not occur at all." *Id.*; *see also Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008) (quoting *Lehn v. Holmes*, 364 F.3d 862, 867 (7th Cir. 2004)) (cases are unripe "when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts.") (internal quotation marks and citations omitted). Thus, ripeness is sometimes viewed as a component of the "injury-in-fact" prong of standing. *See Smith v. Wis. Dep't of Agric., Trade, & Consumer Prot.*, 23 F.3d 1134, 1141 (7th Cir. 1994).

The Fifth Amendment protects landowners from <u>actual takings</u>. *See Shaikh v. City of Chi.*, 341 F.3d 627, 633 (7th Cir. 2003) (citing *Garry v. Geils*, 82 F.3d 1362, 1368 (7th Cir. 1996) and "observing that the takings injury alleged was only complete when state court actually condemned the property"). It is designed "not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of an otherwise proper interference amounting to a taking." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005) (internal quotation marks omitted) (emphasis in original). Therefore, a property owner has a ripe claim for a violation of the Takings Clause as soon as a government takes his property without paying for it. *Knick v. Twshp. of Scott*, 139 S. Ct. 2162, 2179 (2019); *see also United States v. Dow*, 357 U.S. 17, 21-22 (1958) (government's entry into possession of property prior to the acquisition of title is the "event which gives rise to the claim for compensation"). However,

enjoining a condemnor from acting in the first instance is inappropriate.[13] *See Knick*, 139 S. Ct. at 2177 ("Given the availability of post-taking compensation, barring the government from acting will ordinarily not be appropriate."); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking.") (footnote omitted).[14]

Therefore, to the extent Plaintiffs have standing to raise takings claims on behalf of their members under Section 1983 (which they do not), those claims are not ripe. As the Complaint acknowledges, the Co-Owners have not taken any of the Plaintiffs' property—let alone taken it without providing just compensation. (*See, e.g.*, Compl. ¶¶ 192, 196) (alleging that Plaintiffs and their members "will be unlawfully deprived of their property" (emphasis added)) No taking has occurred. At this stage, there are simply far too many steps prior to any taking that might occur. Appraisals need to be prepared, negotiations need to take place, final pole placements need to be determined, and jurisdictional offers need to be developed and sent to landowners. The results of this process may mean some properties are not acquired through the filing of a condemnation petition in state court at all.

---

[13] Notably, although Plaintiffs have sued the Commission and individual Commissioners, those defendants are not condemnors. Rather, the condemnors for the Project will be the Co-Owners. And, even though Plaintiffs are asserting claims regarding the Co-Owners' authority to use eminent domain for the Project, Plaintiffs failed to name the Co-Owners in the Complaint.

[14] Plaintiffs' cite the Supreme Court's recent decision in *Knick* as a basis for this Court's jurisdiction over the Complaint. (Compl. ¶ 23) Their reliance on that decision is misplaced. *Knick* overruled the Court's prior decision in *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, which held that a property owner whose property has been taken via inverse condemnation has not suffered a violation of her Fifth Amendment rights—and thus cannot bring a takings claim in federal court—until a state court decided her claim for just compensation under state law. 473 U.S. 172, 186 (1985). *Knick* effectively removed this "state exhaustion" requirement for inverse condemnation claims, but still held that a takings claim does not accrue until the property has been taken. *Knick*, 139 S. Ct. at 2170. And since the Final Order did not affect a taking of the Plaintiffs' property, their takings claim is not ripe.

As discussed in Section VIII, *infra*, there are also other, more appropriate venues for Plaintiffs (and their members) to raise the claims they have asserted. Therefore, the Court should dismiss Counts Two and Three because they are not ripe.

## VII. THE COURT SHOULD DISMISS THE COMPLAINT BECAUSE PLAINTIFFS HAVE FAILED TO STATE A PLAUSIBLE CLAIM FOR RELIEF ON ALL COUNTS.

### A. The Court should dismiss all Counts because, even construing all well-pled facts in a light most reasonable to Plaintiffs, they have not stated a plausible claim for relief.

Counts One and Two of the Complaint allege that the Final Decision was "imbued with at least an appearance of bias and a lack of impartiality, as well as potential actual bias and a lack of impartiality," violating Plaintiffs' constitutional rights under the Fifth and Fourteenth Amendments. (*See* Compl. ¶¶ 176-192) For several reasons, Plaintiffs have failed to state a plausible claim for relief on these counts. First, Plaintiffs have failed to allege that the Final Decision will deprive them of a constitutionally protected property or liberty interest. Second, even under a generous reading of Plaintiffs' Complaint, Plaintiffs have failed to state a plausible claim for relief.  Finally, the Recusal Motion was untimely and their procedural due process claims related to that motion are therefore waived.

#### 1. Plaintiffs have failed to allege that the Final Decision deprived them of a constitutionally protected property or liberty interest.

The Fourteenth Amendment provides that no state can "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV § 1. To state a claim for relief under the Due Process Clause of the federal Constitution, a plaintiff must allege that the government has deprived her of a protected property or liberty interest, without constitutionally sufficient process. *Ky. Dept. of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989); *see also Vukadinovich v. Bd. of Sch. Trs. of Mich. City*, 978 F.2d 403, 410 (7th Cir. 1992). The existence

of a cognizable liberty or property interest is a threshold question: if the government conduct at issue does not deprive the plaintiff of a cognizable liberty or property interest, then the Due Process Clause has no application. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) ("Only after finding deprivation of a protected interest do we look to see if the State's procedures comport with due process.")

Certainly, state law may require (among other things) that administrative decisionmakers perform their functions in an impartial manner, regardless of the existence of a protected property or liberty interest, and the Wisconsin Administrative Procedure Act imposes such a requirement. *See, e.g.*, Wis. Stat. § 227.46(6). But as a matter of federal constitutional due process, these kinds of "procedural[] protections or the lack thereof do not determine whether a property right exists." *Shango v. Jurich*, 681 F.2d 1091, 1100 (7th Cir. 1982); *see also Crenshaw*, 180 F.3d at 869 ("[T]he mere expectation of receiving a state-afforded process does not establish either an independent liberty or property interest protected by the [U.S. Constitution] Due Process Clause."). Ultimately, "mere bias, without an effect on a cognizable liberty interest, is not a liberty interest." *EJS Properties, LLC v. City of Toledo*, 736 F. Supp. 2d 1123, 1129 (N.D. Ohio 2010) *aff'd* 698 F.3d 845 (6th Cir. 2012).

Here, the Plaintiffs were intervenors in a contested case proceeding before the Commission, which addressed whether to grant the Co-Owners' Application. The Complaint suggests that the Due Process Clause guarantees Plaintiffs a right to a neutral and impartial decisionmaker when the Commission acts on a CPCN, regardless of the existence of a constitutionally protected interest. (*See* Compl. ¶¶ 165-67) However, "[t]o trigger the right to an impartial decision maker and other procedural protections, petitioner's allegations must implicate" a protected property or liberty interest." *Ferguson v. Pulver*, Case No. 06-C-303-C,

2006 WL 2289212, at *3 (W.D. Wis. Aug. 7, 2006); *see also Rasheed-Bey v. Duckworth*, 969

F.2d 357, 361 (7th Cir. 1992) ("Before being deprived of a protected liberty interest, a prisoner is

entitled to . . . the opportunity to be heard before an impartial decisionmaker.") (emphasis added)

In other words, to prevail on their procedural due process claims, Plaintiffs must establish that

the Final Order deprived them of a protected liberty or property interest. Plaintiffs have not

satisfied their burden. The only cognizable property or liberty interest referenced in the

Complaint is Plaintiffs' (and their members') ownership interest in property along the Project

route. However, Plaintiffs' do not allege that their or any of their members' property has actually

been taken—only that their members' property will be subject to potential future takings. (*See*

Compl. ¶¶ 4, 30-36, 41-44, 72, 116, 175, 178, 189, 192, 195-96)

      Rather, as Plaintiffs acknowledge, any taking of real property related to the Project will

occur (if at all) in the future, through Wisconsin's statutory condemnation process. *See generally*

Wis. Stat. § 32.06. But the fact that the Final Order may lead to the exercise of condemnation in

subsequent eminent domain proceedings "does not constitute a protected property interest

granting the Plaintiffs additional, pre-eminent domain due process rights during the [CPCN]

approval stage." *Del. Riverkeeper Network v. FERC*, 243 F. Supp. 3d 141, 153 (D.D.C. 2017)

*aff'd* 895 F.3d 102 (D.C. Cir. 2018). In *Riverkeeper*, a pipeline applied for a CPCN from FERC

to build a new natural gas pipeline in Pennsylvania and New Jersey, and the Plaintiffs filed a

separate lawsuit alleging that FERC was structurally biased in favor of permit applicants because

of its funding structure. *Id.* at 144-45. On a motion to dismiss, the court rejected this claim,

noting that "administrative decision-maker bias is a subset of procedural due process, not an

independent area of law." *Id.* at 152. The court held that plaintiffs failed to identify any liberty or

property interest that is cognizable under the Due Process Clause. It noted that "any actual taking

of real property related to a FERC proceeding would occur through the process of eminent domain, which would be a separate proceeding from the issuance of a [CPCN], and which has generated its own due process jurisprudence." *Id.* at 153.

The reasoning in *Riverkeeper* applies equally here. Even assuming all well-pled facts in a light most favorable to the Plaintiffs, the Plaintiffs have failed to allege a critical element of their procedural due process claims: namely, that the Commission's Final Order deprived them of a property or liberty interest protected by the Due Process Clause of the Fourteenth Amendment. For these reasons, Plaintiffs' Complaint should be dismissed.

> **2.   Even assuming Plaintiffs have alleged a protected property or liberty interest, and construing all well-plead facts in a light most favorable Plaintiffs, they have failed to state a plausible due process claim.**

>> **a.   The Due Process Clause only requires disqualification of an administrative decisionmaker in extreme cases.[15]**

Due process requires that, before the government may deprive a person of a constitutionally protected interest, that person is entitled to a fair hearing before an impartial decisionmaker. *See Bakalis v. Golembeski*, 35 F.3d 318, 323 (7th Cir. 1994) (citing *Withrow v.*

---

[15] Plaintiffs argue that the Wisconsin Code of Judicial Conduct, WI SCR 60, and the federal code of judicial conduct, 28 U.S.C. § 455, are applicable to this case. (Compl. ¶¶ 161-67) This is wrong, for at least two reasons. First, these statutes apply only to members of the state or federal judiciary—not administrative decisionmakers. *See* Wis. Stat. § 757.19(1) (Wisconsin Code of Judicial Conduct applies only to "the supreme court justices, court of appeals judges, [and] circuit court judges and municipal judges"); *Guthrie v. Wis. Employment Relations Comm'n*, 111 Wis. 2d 447, 457 (Wis. 1983) (Wisconsin code of judicial ethics does not extend "over adjudicative officials who are appointees of the executive branch); 28 U.S.C. § 455(a) (applying recusal standards to "any justice, judge, or magistrate judge of the United States"); *Bunnell v. Barnhart*, 336 F.3d 1112, 1114 (9th Cir. 2003) (noting that the "appearance of impropriety standard" under Section 455(a) does not apply to administrative decisionmakers) (citing cases). Second, and relatedly, the specific claims that the Plaintiffs are alleging in this case arise under the Due Process Clause of the Fourteenth Amendment and the Takings Clause of the Fifth Amendment. (*See* Compl. ¶¶ 176-196) Plaintiff has not (and could not) allege any claim under these recusal statutes, which do not define the contours of the constitutional due process. *See Suh v. Pierce*, 630 F.3d 685, 691-92 (7th Cir. 2011) (noting that these statutes "'establish[] stricter grounds for disqualification than the Due Process Clause.'") (quoting *Davis v. Jones*, 506 F.3d 1325, 1336 (11th Cir. 2007)).

*Larkin*, 421 U.S. 35, 47 (1975)); *Marder v. Bd. of Regents of Univ. of Wis. Sys.*, 286 Wis. 2d 252, 270 (Wis. 2005). To that end, a decision-maker cannot have a "direct, personal, substantial, pecuniary interest" in the matter at hand. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986) (citation omitted). Due process not only prohibits bias in-fact, but also situations that present a "particularly high probability of bias." *Alston v. Smith*, 840 F.3d 363, 368 (7th Cir. 2016) (citing *Withrow*, 421 U.S. at 47). Whether a probability of bias exists is an objective inquiry: the question is whether the average decision maker "is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Id.* (quoting *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 881 (2009)).

However, "personal bias or prejudice 'alone would not be a sufficient basis for imposing a constitutional due process requirement under the Due Process Clause.'" *Caperton*, 556 U.S. at 877 (citing *Lavoie*, 475 U.S. at 820). Cases involving an unconstitutional "probability" of bias deal with "extreme facts . . . that cannot be defined with precision." *Lavoie*, 475 U.S. at 887. Only "the most extreme of cases" of bias or partiality rise to the level of constitutionally requiring disqualification. *Id.* at 821; *see also Marder*, 286 Wis. 2d at 270-74 (noting that the risk of bias must be "impermissibly high" or "too high to be constitutionally tolerable").

Notably, decisionmakers are entitled to a strong presumption of honesty and integrity. *Alston*, 840 F.3d at 368 (quoting *Withrow*, 421 U.S. at 47). Those alleging bias in an administrative proceeding have the burden of overcoming this presumption. *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982); *Withrow*, 421 U.S. at 47 (1975); *Sanchez ex rel. Sanchez v. Barnhart*, 2005 WL 752220 at *10 (W.D. Wis. 2005). To establish bias, a Plaintiff must show "substantial evidence of actual or potential bias, such as evidence of a pecuniary interest in the proceeding, personal animosity toward the plaintiff, or actual prejudgment of the plaintiff's

case." *Head v. Chi. Sch. Reform Bd. of Trs.*, 225 F.3d 794, 804 (7th Cir. 2000). Where a complaint fails to include "an allegation of a factual basis revealing the bias or prejudice," that presumption is not rebutted, and the complaint fails to state a claim. *Dell v. Bd. of Educ., Tp. High Sch. Dist. 113*, 32 F.3d 1053, 1066 (7th Cir. 1994). Moreover, this presumption is not rebutted solely because of an unfavorable ruling against the party claiming bias. *See, e.g.*, *Liteky v. United States*, 510 U.S. 540, 555 (1994).

> **b.      Chairperson Valcq's prior relationship with one of the Co-Owners' affiliates did not, in and of itself, require her to recuse herself.**

Plaintiffs' allegations of bias against Chairperson Valcq do not rise to the "extreme" level that would require disqualification under the Due Process Clause. *Caperton*, 556 U.S. at 887. The sole basis of these allegations is that Chairperson Valcq used to work for and represent companies—We Energies and WEC Energy Group—that are affiliated with ATC, one of the Co-Owners. (*See, e.g.*, Compl. ¶¶ 150, 183) Plaintiffs <u>do not</u> allege that Chairperson Valcq has a continuing relationship with those entities; that she had a "direct, personal, substantial, pecuniary interest" in the approval of the Project; or that she was actually biased against them. *Lavoie*, 475 U.S. at 822.

Viewed in the light most favorable to Plaintiffs, these allegations amount to nothing more than a recitation of Chairperson Valcq's employment history. (*See* Compl. ¶¶ 55-58, 63-67) Absent discrete evidence, courts have rejected claims of administrative bias due to a past employment relationship. *Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 716 (7th Cir. 2000) (on summary judgment, rejecting claim of bias where plaintiffs "bald accusation is based solely on the fact that the hearing officer *was* employed by the Park District, which of itself is insufficient to establish actual bias") (emphasis added); *Ala. v. U.S. Envtl. Prot. Agency*, 911 F.2d 499, 506

(11th Cir. 1990) (on federal APA review of environmental permit issuance, finding no bias where a party employs former agency officials).

Here, the Complaint is bereft of any plausible suggestion that Chairperson Valcq's prior employment had any influence on, or otherwise led her to prejudge, the merits of the Application. Indeed, the Complaint itself shows that, after joining the Commission, Chairperson Valcq recused herself from any matter in which she "participated personally and substantially" during her time in the private sector. (Compl. Ex. A-3) The Commission proceeding was not a matter in which she ever participated. (*Id.*) "Without an allegation of a factual basis revealing the bias or prejudice," Plaintiffs have failed to overcome the presumption of honesty and integrity afforded to administrative decisionmakers. *Dell*, 32 F.3d at 1066. Therefore, their allegations against Chairperson Valcq do not state a plausible claim for relief under the Due Process Clause.

### c. Commissioner Huebsch's role as the Commission's representative to MISO does not, in and of itself, mean that he was required to recuse himself.

Plaintiffs have also not pled sufficient facts to state a plausible due process claim that Commissioner Huebsch was required to recuse himself from the Commission proceedings. The crux of Plaintiff's claim here is that, because Commissioner Huebsch served as the Commission's representative to MISO, he had a disqualifying conflict of interest. However, the Complaint does little more than allege that Commissioner Huebsch was engaged in activities any official in his position would undertake during the course of his duties. (*See, e.g.*, Compl. ¶¶ 90-91, 96, 98, 105, 109-110, 152, 157) Many of the allegations just describe MISO itself. (*See, e.g.*, Compl. ¶¶ 82-88) As with Chairperson Valcq, these allegations do not implicate the "extreme" circumstances that would require Commissioner Huebsch to recuse himself.

Plaintiffs' conclusory allegations about Commissioner Huebsch's involvement with MISO do not raise the possibility that they might be entitled to relief above a "speculative level."

*Concentra Health Servs.*, 497 F.3d at 776. For one thing, many of Plaintiff's allegations are not well-pled, and are not entitled to a presumption of truth. Speculating that Commissioner Huebsch "had *ex parte* communications" with parties to the proceeding below, or "received *ex parte* information," (*see, e.g.*, Compl. ¶¶ 112, 151), is nothing more than a conclusory, "threadbare recital" of the elements of the Plaintiffs' claim and is not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678; *see also Taha v. Int'l Brotherhood of Teamsters, Local 781*, -- F.3d --, 2020 WL 132503 (7th Cir. 2020) (in ruling on a motion to dismiss, court may reject sheer speculation, bald assertions, and unsupported conclusory statements).

For another, none of these allegations contain any "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," or otherwise show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 675, 678. As the Commission's representative to MISO, Commissioner Huebsch is presumably just helping the Commission stay apprised of important issues affecting the energy sector and to coordinate with other stakeholders in the region—including MISO, the regional grid operator—regarding these issues. Even if, as Plaintiffs allege, Commissioner Huebsch may have discussed issues that were broadly related to what was being litigated at the Commission, that does not mean (and the Complaint does not specifically allege) that he was having *ex parte* communications regarding the merits of the Project itself or the claims that other parties were raising before the Commission regarding the Project. *See* Wis. Stat. § 227.50 (prohibiting *ex parte* communications "relative to the merits" of a proceeding). And Plaintiffs have affirmatively acknowledged that they do not know what, if anything, Commissioner Huebsch said to anyone at MISO about any of these topics. (*See* Compl. Ex. A at 16) ("[I]t is not clear from the posted

documents who said what to whom on all matters at this New Orleans meeting [that Commissioner Huebsch attended in March 2019] . . . .").

In other words, there are no well-pled, factual allegations in the Complaint to overcome the presumption of honesty afforded to Commissioner Huebsch. Nor are there any such allegations that would support a "reasonable inference" that he engaged in any *ex parte* communications. *Iqbal*, 556 U.S. at 678. Therefore, Plaintiffs' claims against Commissioner Huebsch must be dismissed.

> ### 3. Even if Plaintiffs are correct that Chairperson Valcq and Commissioner Huebsch were required to recuse themselves, the CPCN would have been approved anyway.

The Commission voted unanimously to approve the Project. (Compl. ¶¶ 77, 79, 113) A majority of the commissioners (i.e., two) must be present to conduct business, but "vacancies shall not prevent a commission from doing business." Wis. Stat. § 15.06(6). Therefore, even if Chairperson Valcq and Commissioner Huebsch were required to recuse themselves, Commissioner Nowak's vote would have been sufficient to approve the CPCN. *See id.*; *see also State ex rel. Burdick v. Tyrell*, 158 Wis. 425, 149 N.W. 280, 283 (Wis. 1914) (under Wisconsin common law, a majority of a quorum was sufficient for Common Council to elect a City Attorney, even when the number of alders voting in favor did not constitute a majority of the whole Common Council); *Ballenger v. Door County*, 131 Wis. 2d 422, 431 (Wis. 1985) ("[W]hen a [county] board member is required by law to abstain from voting, this member is not present for calculating the number of votes required for the passage of legislation."); 68 Op. Atty. Gen. 324 (1979) (where two of the three members on the Wisconsin personnel commission resigned, the remaining commissioner was permitted to decide contested cases before that commission).

In fact, even if none of the Commissioners were present, the CPCN application would still stand. *See* Wis. Stat. § 196.491(3)(g) (requiring that the Commission take final action on a CPCN application in no more than 360 days or it is deemed approved by operation of law). As such, even if Chairperson Valcq and Commissioner Huebsch had recused themselves, the outcome of the case before the Commission would have been no different.

> **4.** **Plaintiffs waited until the eleventh hour to raise their procedural due process claims before the Commission; therefore, those claims were not timely and should be dismissed here as well.**

In addition to the other infirmities described previously, the allegations in the Complaint demonstrate that Plaintiffs' waived their bias and conflict of interest claims. *See NewSpin Sports, LLC. v. Arrow Electronics*, 910 F.3d 293, 299-300 (7th Cir. 2018) ("[W]hen a plaintiff's complaint nonetheless sets out all of the elements of an affirmative defense, dismissal under Rule 12(b)(6) is appropriate."); (citing *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012)); *John K. Maciver Institute for Public Policy, Inc. v. Schmitz*, 885 F.3d 1004, 1014 (7th Cir. 2018).

Here, the allegations in Plaintiffs' Complaint demonstrate that the facts underlying the Plaintiffs' procedural due process claims were a matter of public knowledge for months—and even years—before the Commission issued the Final Decision. (Potts Decl. ¶ 3, Ex. A, at 81-82) Specifically, Plaintiffs intervened in the proceedings before the Commission as early as April 2018. (*Id.* at 81) At that time, Commissioner Huebsch was already serving on the Commission, and it was publicly known that he had been the Commission's OMS representative since 2015. (*Id.*) He was appointed to the MISO Advisory Committee in early 2019—around the time that DALC/WWF were granted intervenor status—and attended his first Advisory Committee meeting in March 2019. (Compl. ¶¶ 81, 100) Likewise, Chairperson Valcq's appointment was effective January 7, 2019—less than a week after DALC/WWF were granted intervenor status.

(Compl. ¶ 66; Potts Decl. ¶ 3, Ex. A, at 81) She and the Commission agreed to her recusal policy "[s]oon after joining the [Commission]." (Compl. ¶ 67)

In short, the allegations in Plaintiffs' Complaint affirmatively demonstrate that the information supporting Plaintiffs' Recusal Motion was available to Plaintiffs months (if not years) before the Commission issued its preliminary decision approving the Project on August 20, 2019. Plaintiffs could have raised their conflict of interest claims at any point in time prior to that date. Instead, Plaintiffs waited until a month _after_ the Commission issued a decision contrary to their interests—and only six days before the Commission was statutorily required to act on the Application—to file the Recusal Motion and try to secure a second bite at the apple. (Compl. ¶¶ 142-146)

In other contexts, courts recognize arguments related to conflicts of interest and bias of a decisionmaker must be raised in a timely manner, or they are waived. *See Jackson v. Benson*, 249 Wis. 2d 681, 691-95 (Wis. 2002) (granting summary judgment on grounds that 21-month delay in filing motion to vacate based on justice's prior disqualification was untimely); *United States v. Betts-Gaston*, 860 F.3d 525, 538 (7th Cir. 2017) (granting summary judgment on grounds that motion for recusal was untimely when filed on eve of resentencing). If a party has information that goes to the issue of a decisionmaker's participation in the matter, "that party has an obligation to promptly bring the matter to the individual judge's or justice's attention before a decision has been rendered." *Storms v. Action Wis.*, 314 Wis. 2d 510, 529 (Wis. 2008). "[I]t is contrary to general principles of court administration to permit a party to proceed in the face of full knowledge of a cause for objection and then to allow an initial objection only when the proceeding has produced an untoward result." *Guthrie*, 111 Wis. 2d at 453 n.7 (Wis. 1983); *see also United States v. Rogers*, 119 F.3d 1377, 1382-83 (9th Cir. 1997).

34

In short, the allegations in Plaintiffs' Complaint demonstrate that Plaintiffs failed to raise their claim in a timely manner, instead waiting until after the Commission indicated it would issue a decision contrary to Plaintiffs' positions. Because the face of the Complaint demonstrates that Plaintiffs have waived their claim, the Co-Owners respectfully request that it be dismissed.[16]

### B. Count III should also be dismissed because, as a matter of law, condemnation of private property for transmitting electric power is a "public use" within the meaning of the Fifth Amendment.

Plaintiffs allege that the Final Order allows the Co-Owners "to exercise eminent domain to condemn and take private land for their private use" and that the Project "does not have the 'public use' required by the Fifth Amendment." (Compl. ¶ 195) However, these allegations do not qualify as "well-pled" facts, and the Court therefore need not construe them in favor of Plaintiffs. *See, e.g.*, *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of elements of a cause of action, supported by mere conclusory statements" do not satisfy the pleading requirements and are thus not entitled to the presumption of truth).

Moreover, as a matter of law, Plaintiffs cannot state a plausible claim for relief on this count. The legislature makes the initial determination of what use is a "public use." *Wis. Cent. Ltd. v. Pub. Serv. Comm'n of Wis.*, 95 F.3d 1359, 1367 (7th Cir. 1996); *see also David Jeffrey Co. v. City of Milwaukee*, 66 N.W.2d 362, 574-75 (Wis. 1954) ("It is within the province of the Legislature to declare public use or purpose.") Whether a taking is for a "public" use or purpose is an issue the judiciary can review, but courts defer to such legislative determinations and will

---

[16] Plaintiffs suggest that Commissioner' Huebsch's alleged conflict of interest "became clear and crystallized" after the August 20, 2019 meeting, during which Chairperson Valcq indicated that Commissioner Huebsch was the Commission's OMS representative. (Compl. Ex. A-1, at 7) As the Commission noted, "that excuse rings hollow given he has had that position for more than four years." (Potts Decl. ¶ 3, Ex. A, at 81) And in any event, it still does not explain why Plaintiffs failed to bring <u>any</u> conflict of interest allegations against Chairperson Valcq earlier than they did. Her appointment to the Commission was effective January 7, 2019, and her past affiliation with We Energies (which serves as the entire basis for Plaintiffs' conflict-of-interest claim) was well known at that time and was disclosed as part of her recusal policy. (*Id.*)

not substitute their judgement for that of the state legislature unless the decision is "palpably without reasonable foundation." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 240-41 (1984) (quoting *United States v. Gettysburg Elec. R. Co.*, 160 U.S. 668, 680 (1896); *see also Klump v. Cybulski*, 81 N.W.2d 42, 47 (Wis. 1957) (determination that property is necessary for a public use is "primarily for the legislature, and the judgment of the party to whom such determination has been delegated (in this case the power company) is beyond question by any court if there is reasonable ground to support it.") It is not for the "courts to consider broadside allegations that the purported public use to be served is merely a pretense or a sham to cover arbitrary official conduct," but rather "[t]he only question for judicial review in condemnation proceedings is whether the purpose for which property was taken is for a Congressionally authorized public use." *U.S. v. 416.81 Acres of Land*, 514 F.2d 627, 631 (7th Cir. 1975).

State courts throughout the country routinely hold that condemning land for the construction and operation of transmission lines is a "public use." *See, e.g.*, *Mont.-Dakota Utilities Co. v. Parkshill Farms, LLC*, 905 N.W.2d 334, 338-39 (S.D. 2017); *Rutland Ry. Light & Power Co. v. Clarendon Power Co.*, 83 A. 332, 336 (Vt. 1912); *Rockingham Cty. Light & Power Co. v. Hobbs*, 58 A. 46, 47 (N.H. 1904). The same is true in Wisconsin, where generating, transmitting, and distributing electric power is a "public use." *See* Wis. Stat. §§ 32.02(5), (6), (10); *see also In re Milwaukee Elec. Ry. & Light Co.*, 203 N.W. 912, 913 (Wis. 1925) ("The right to condemnation springs from the fact that electric power lines, telephone lines, and telegraph lines are public utilities and serve public needs; therefore it is not the taking of private property for private use but for the public use."); *see also Wis. River Imp. Co. v. Pier*, 118 N.W. 857, 863 (Wis. 1908) (generating and distributing power a public use).

In light of this precedent, it is clear that the Wisconsin Legislature has broad discretion in determining what qualifies as a "public use" under the Fifth Amendment. It is equally clear that the courts have upheld the Legislature's determination that the generation and transmission of electricity is a public use for which property may be condemned. Therefore, Count Three should be dismissed.

## VIII.   THE COURT SHOULD DISMISS THE COMPLAINT ON ALL COUNTS BECAUSE PLAINTIFFS HAVE OTHER ADEQUATE REMEDIES AT LAW.

In connection with each of their claims, Plaintiffs seek equitable (injunctive and declaratory) relief from this Court. However, Plaintiffs' claims for equitable relief must be dismissed because they already have an adequate remedy at law.

### A.   Plaintiffs are already pursuing their claims under Counts One and Two in Wisconsin state court, and therefore, they have adequate remedies at law.

Counts One and Two are essentially different variations on the same theory: for the reasons stated in their Recusal Motion, Plaintiffs claim that "an appearance of bias and a lack of impartiality, as well as potential actual bias and a lack of impartiality," violated their procedural due process right to a fair and impartial hearing under the Fourteenth Amendment (Count One), which will result in an unlawful deprivation of their property under the Fifth Amendment (Count Two). (Compl. ¶¶ 181-192) However, Plaintiffs have an adequate remedy at law for asserting these claims, which they are currently pursuing in Wisconsin state courts. As the Plaintiffs acknowledge in the Complaint, (*see, e.g.*, Compl. ¶ 186), to obtain equitable relief, the Plaintiffs must demonstrate that they have no adequate remedy at law. *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("It is a basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.") (internal citations and quotation marks omitted); *Builder's World, Inc. v. Marvin Lumber and Cedar, Inc.*, 482 F.Supp.2d 1065, 1075 (E.D. Wis.

2007) ("The absence of an adequate remedy at law is a precondition to any type of equitable relief."); *Bolin v. Story*, 225 F.3d 1234, 1242 (11th Cir. 2000) ("In order to receive declaratory or injunctive relief, plaintiffs must establish that there was a violation, that there is a serious risk of continuing irreparable injury if the relief is not granted, and the absence of an adequate remedy at law.").

Plaintiffs assert that they have no adequate remedy at law, (Compl. ¶ 186), but this is incorrect.[17] Wisconsin state law sets forth a comprehensive regime governing a Commission decision and any appeals thereof. *See* Wis. Stat. § 227.52 *et seq.* Courts recognize that the existence of a state appellate regime can constitute an adequate remedy at law. *See, e.g.*, *Zirkle v. Peller*, No. 2:11-cv-302, 2011 WL 3844086, *1, 3 (N.D. Ind. Aug. 30, 2011) ("[Plaintiff] is not arguing that the state court itself fails to provide sufficient procedural safeguards, and he may appeal any constitutional violations committed in his child custody case to Indiana appellate courts."); *see also SKS & Assoc., Inc. v. Dart*, 619 F.3d 674 (7th Cir. 2010) (applying the *Younger* doctrine and holding that plaintiff could not seek declaratory relief in federal court where it had remedies under related state court proceedings); *Rogers v. Allen Super. Ct.*, No. 1:16-cv-40, 2017 WL 1133600, *5 (N.D. Ind. Mar. 27, 2017); *Kapacs v. Jurevica*, No. 15-3019, 2016 WL 11491366, *4 (D. Minn. Jan. 27, 2016). Plaintiffs do not allege that the Wisconsin state court system does not constitute an adequate remedy, and their own actions in bringing the same claims before the state courts demonstrate the adequacy of this remedy. (*See* Potts Decl. ¶ 4, Ex. B, at ¶¶102-121. Potts Decl. ¶ 5, Ex. C, at ¶¶ 102-121)

---

[17] Although Plaintiffs allege that they have no adequate remedy at law, the Court is not required to "credit legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Tobey v. Chibucos*, 890 F.3d 634, 639 (7th Cir. 2018).

Plaintiffs are fully exercising their state remedies in those state court appeals. Plaintiffs assert the same bias and conflicts of interest claims and seek the same relief as they do before this Court. (*See id.*) The Seventh Circuit has explained that, under these circumstances, a plaintiff will not be able to state a claim under Section 1983:

> Normally when a parallel state court action is pending, the plaintiff will not be able to make a colorable claim of violation of his federal constitutional rights, and so will not be able to maintain a parallel federal suit (at least under section 1983), quite apart from any doctrines of abstention. To establish a claim under section 1983 requires that the plaintiff show a deprivation of a federal right; . . . and ordinarily therefore a claimant will not be able to establish a deprivation while the state court action is in progress . . . . An adverse interim ruling, such as a refusal to grant [plaintiff]'s motion for judgment on the pleadings, would not work a deprivation either. <u>Even if the judge had dismissed the petition, [plaintiff] still could not claim that he had been deprived of his right, because there would be no deprivation until he had exhausted his right to appeal from the dismissal.</u> After all his procedural rights were exhausted the doctrines of res judicata and collateral estoppel would in all likelihood prevent a successful challenge to the state court's action, but we are interested in the case where a judgment has not yet become final. And ordinarily, as we have said, a challenge to the proceeding then will be premature because no deprivation will yet have occurred.

*Lynk v. LaPorte Superior Court No. 2*, 789 F.2d 554, 560 (7th Cir. 1986) (emphasis added).

## B. Plaintiffs also have an adequate remedy at law for Count Three.

With respect to Count Three, Plaintiffs have alleged that the Final Order permits the Co-Owners to condemn property "for their private use," in violation of the Fifth Amendment. (Compl. ¶ 195) Wisconsin law establishes statutory procedures for a landowner to challenge a condemnation action "for any reason other than that the amount of compensation offered is inadequate." *See* Wis. Stat. § 32.06(5); *see also Falkner*, 248 N.W.2d at 889 ("[T]he owner's action [under Wis. Stat. § 32.06(5)] is now the only manner in which issues pertaining to the condemnation may be raised, except for those of title and just compensation . . . ."). Plaintiffs'

Count Three arguments must therefore be brought in state court by way of the state's process of addressing challenges to direct condemnation actions. *See Green St. Ass'n v. Daley*, 373 F.2d 1, 6 (7th Cir. 1967) (citing *Zurn v. City of Chicago*, 59 N.E.2d 18 (Ill. 1945)) ("[I]n nearly all cases the question of whether the land to be acquired will be devoted to a public purpose is more appropriate for the state court to make in the condemnation proceedings.") While the Co-Owners do not believe these claims have merit and should (and will) be rejected by the state circuit court in the context of Chapter 32, that is the procedure that must be followed to present them.

## IX.    CONCLUSION

For the reasons stated above, the Co-Owners respectfully request that the Court dismiss the Complaint on all counts, with prejudice.


*[The remainder of this page is intentionally left blank]*

40

Dated: January 24, 2020

Respectfully submitted,

**PERKINS COIE, LLP**

*/s/ Brian H. Potts*
Brian H. Potts (Wis. Bar No. 1060680)
David R. Zoppo (Wis. Bar No. 1094283)
Mary N. Beall (Wis. Bar No. 1115830)
33 East Main Street, Suite 201
Madison, WI 53703-5118
Tel: (608) 663-7460
Fax: (608) 663-7499
Email: bpotts@perkinscoie.com
          dzoppo@perkinscoie.com
          mbeall@perkinscoie.com

*Attorneys for Intervenor-Defendants*
*American Transmission Company LLC and*
*ATC Management Inc.*

**FREDRIKSON & BYRON, P.A.**

*/s/ Lisa M. Agrimonti*
Lisa M. Agrimonti (Wis. Bar No. 1032645)
Haley L. Waller Pitts (Wis. Bar No. 1115291)
John P. Pavelko (MN Bar No. 0398495)
200 South 6th Street, Suite 4000
Minneapolis, MN 55402
Tel: (612) 492-7000
Fax: (612) 492-7077
Email: lagrimonti@fredlaw.com
          hwallerpitts@fredlaw.com
          jpavelko@fredlaw.com

**TAFT STETTINIUS & HOLLISTER LLP**
Valerie T. Herring
(Wis. Bar No. 1076996)
2200 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2157
Tel: (612) 977-8400
Fax: (612) 977-8650
Email: vherring@taftlaw.com

*Attorneys for ITC Midwest LLC*

**WHEELER, VAN SICKLE &**
**ANDERSON, S.C.**

*/s/ Jeffrey L. Landsman*
Jeffrey L. Landsman (Wis. Bar No. 1017670)
Justin W. Chasco (Wis. Bar No. 1062709)
44 East Mifflin Street, Suite 1000 Madison,
WI 53703
Tel: (608) 255-7277
Fax: (608) 255-6006
Email: jlandsman@wheelerlaw.com
          jchasco@wheelerlaw.com

*Attorneys for Intervenor-Defendant Dairyland*
*Power Cooperative*

41

**CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2020, I electronically served the forgoing document on all counsel of record registered for electronic filing in the above-captioned proceeding by filing the same with the Clerk of Court using the Court's ECF system.

*/s/ Brian H. Potts*
Brian H. Potts, SBN 1060680

*Attorney for Intervenor-Defendants*
*American Transmission Company LLC and*
*ATC Management Inc.*