IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DRIFTLESS AREA LAND CONSERVANCY,
WISCONSIN WILDLIFEE FOUNDATION,

                    Plaintiffs,                           OPINION AND ORDER

        v.                                                    19-cv-1007-wmc

PUBLIC SERVICE COMMISSION OF
WISCONSIN, MICHAEL HUEBSCH,
REBECCA VALCQ, & ELLEN NOWAK,

                    Defendants,

        and

AMERICAN TRANSMISSION COMPANY
LLC, BY ITS CORPORATE MANAGER,
ATC MANAGEMENT, INC, DAIRYLAND
POWER COOPERATIVE, and ITC
MIDWEST LLC,

                    Intervenor-Defendants.

        Plaintiffs are two Wisconsin conservation organizations who seek to challenge a

final decision by the Public Service Commission of Wisconsin ("PSC"), which granted

three private transmission companies the right to exercise eminent domain in constructing

a high-voltage transmission line running more than 100 miles through Wisconsin's

Driftless Area.[1]   The defendants named in this case are the PSC and its three

Commissioners, Michael Huebsch, Rebecca Valcq, and Ellen Nowak.   The three

---

[1] The Driftless Area is a region in the upper American Midwest covering southwestern Wisconsin, southeastern Minnesota, northeastern Iowa, and the extreme northwestern corner of Illinois.  This region escaped the flattening effects of glaciation during the last ice age and is consequently characterized by steep, forested ridges, deeply carved river valleys, and karst geology characterized by spring-fed waterfalls and cold-water trout streams.  *See Driftless Area*, Wikipedia, https://en.wikipedia.aorg/wiki/Driftless_Area (last visited Oct. 28, 2020).

transmission companies -- American Transmission Company, ITC Midwest LLC, and Dairyland Power Cooperative -- have joined the suit as intervening defendants.

In this suit, plaintiffs assert violations of their federal constitutional rights, claiming that:  (1) the PSC's final decision approving the transmission line amounted to an unconstitutional taking of land for a private purpose; and (2) the PSC Commissioners also acted with bias in violation of procedural due process.  Before the court are defendants' and intervening-defendants' motions to dismiss, as well as their respective motions to stay. (Dkts. #6, 16, 101, 129.)  Having fully considered the arguments made by the parties in their briefing, as well as during oral argument held on November 9, 2020, the court will grant in part and deny in part their respective motions to dismiss.  Specifically, for the reasons explained below, the court will (1) dismiss the PSC itself as a party in suit, (2) dismiss plaintiffs' takings claim, (3) dismiss Commissioner Ellen Nowak from plaintiffs' remaining due process claim, and otherwise deny these motions.

ALLEGATIONS OF FACT

Plaintiffs Driftless Area Land Conservancy ("DALC") and Wisconsin Wildlife Federation ("WWF") are both Wisconsin conversation and membership organizations. DALC and its members "work to protect ecologically sensitive lands, historic properties, and natural resources in southwest Wisconsin's Driftless Area."  (Compl. (dkt. #1) ¶ 25.) Similarly, WWF and its members are "dedicated to protecting wildlife habitat and natural resources throughout the State of Wisconsin."  (*Id.* ¶ 38.)  While originally naming the PSC and its three Commissioners as defendants, plaintiffs now concede that the PSC should be dismissed.  (Pls.' Opp'n (dkt. #55) 2 n.1; Pls.' Opp'n (dkt. #77) 2.).

Accordingly, the PSC will be dismissed as a defendant from this suit.[2]

On April 20, 2018, three private transmission companies -- the American Transmission Company, ITC Midwest LLC, and Dairyland Power Cooperative (the "Transmission Companies" or "intervening defendants") -- applied for a Certificate of Public Convenience and Necessity ("CPCN") with the PSC to construct a high-voltage transmission line ("the Transmission Line" or "the Line") running from Dubuque County, Iowa, through Grant and Iowa Counties in Wisconsin, and ultimately ending in Dane County, Wisconsin.[3]   The application triggered an adjudicatory proceeding under Wisconsin law, in which plaintiffs DALC and WWF intervened.

After a public comment period and a week-long evidentiary hearing, the Commissioners took a preliminary vote on August 20, 2019, approving the proposed Line application.  One month after this preliminary vote, DALC and WWF moved to recuse Commissioners Valcq and Huebsch from further proceedings involving this application. The PSC not only denied recusal motion, but in the same decision, approved the Transmission Companies' CPCN application, granting them eminent domain powers to condemn private property in order to construct the Transmission Line.

Plaintiffs allege that the Line will reduce the economic and ecological value of their

---

[2] Since plaintiffs' claims are all brought under 42 U.S.C. § 1983, and it is well-established that a state agency may not itself be sued under that section, this concession is both appropriate and prudent.  *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 65-66 (1989).

[3] Early in this case, the three transmission companies moved to intervene as defendants in this case. (Dkts. #10, 23, 28.)  While this court denied their motions (dkt. #49), on appeal the Seventh Circuit reversed this decision and held that the transmission companies were entitled to intervene as of right under Federal Rule of Civil Procedure 24(a)(2) (dkt. #76).

and their members' land.  (*Id.* ¶¶ 30-36, 39-44.)   DALC itself holds a conservation easement through which the Line's right-of-way will overlap.   Further, plaintiffs have identified a number of DALC and WWF members who own land that will be affected by the Line.  For example, DALC member Lisa Schlimgen owns a 280-acre farm through which the Line will run.  Under the current plan, two or three transmission towers will be built on her land.  (*See also id.* ¶¶ 34-35, 42-43 (identifying various other DALC and WWF members whose land or other property interests will be affected by the Line).)

According to plaintiffs, the final decision from the PSC approving the Line amounts to an unconstitutional taking of private property for private use.  (*Id.* ¶ 1.)  Plaintiffs generally allege that during the adjudicatory proceeding before the PSC, "[e]vidence was presented that the proposed ATC Line would principally benefit private parties for private uses and would not serve the public's interests."  (*Id.* ¶ 136.)  More specifically, plaintiffs note that they and other intervenors contended that the proposed Line was not needed to meet anticipated electricity demand and sales in Wisconsin.  At the same time, the Line will charge Midwest utility ratepayers more than $2.2 billion over 40 years and the Transmission Companies will be provided an annual rate of return of between 10 and 11.2 percent of their capital investment in the Line.  (*Id.* ¶¶ 6, 135-37.)  Plaintiffs and others also presented expert testimony and other evidence at the hearing that, according to "most economic 'model runs,'" the cost of the proposed Line would exceed the benefits for consumers, and that there were "better, less costly, more flexible, more environmentally sound, and cleaner energy alternatives."  (*Id.* ¶¶ 12, 13.)  The evidence also allegedly showed that the Line would "reduce the economic, ecological, and scenic value of private

property located near, on, or along the proposed ATC Line route." (*Id.* ¶ 138.)

Plaintiffs further allege that the PSC decision-making process was "imbued with at least an appearance of bias and a lack of impartiality, if not actual bias and a lack of impartiality, and conflicts of interest." (*Id.* ¶¶ 2, 17.) in particular, plaintiffs allege that Commissioners Valcq and Huebsch had conflicts of interest and received *ex parte* information concerning the case. (*Id.* ¶ 17.) Plaintiffs did not include any specific allegations of bias as to Commissioner Nowak.

Following the PSC's final vote and approval of the Line, plaintiffs filed petitions for judicial review of the PSC decision in Wisconsin courts, seeking relief under Wisconsin state law.[4] Plaintiffs also filed this federal lawsuit, bringing procedural due process and takings claims under the U.S. Constitution and "seek[ing] a declaratory judgment that Defendants have deprived Plaintiffs of their rights under the Fifth and Fourteenth Amendments to the United States Constitution and an injunction vacating Defendants' Final Decision and requiring that any new decision-making process meet constitutional requirements." (*Id.* ¶ 20.)[5]

---

[4] At least four related actions were filed in Wisconsin state court. *See Dane Cty., v. Pub. Serv. Comm'n of Wis.*, Case No. 19-CV-3418 (Wis. Cir. Ct. Dane Cty.); *Driftless Area Land Conservancy v. Pub. Serv. Comm'n of Wis.*, Case No. 19 CV 144 (Wis. Cir. Ct. Iowa Cty.); *Wis. Wildlife Federation v. Pub. Serv. Comm'n of Wis.*, Case No. 19 CV 334 (Wis. Cir. Ct. Columbia Cty.); *Iowa County et al. v. Pub. Serv. Comm'n of Wis.*, Case No. 19 CV 142 (Wis. Cir. Ct. Iowa Cty.). By order of the Dane County Circuit Court, these actions have now been consolidated into a single case. *See Dane Cty.*, Case No. 19-CV-3418 (Wis. Cir. Ct. Dane Cty. Jan. 24, 2020).

[5] In the first paragraph of their complaint, plaintiffs also allege that defendants' actions violated the Wisconsin Constitution (*see* Compl. (dkt. #1) ¶ 1), but they do not include these state law claims in their formal counts. (*Id.* at 29-33.) Moreover, they do not mention them in their complaint or subsequent briefing. Accordingly, as confirmed during oral argument, the court therefore understands plaintiffs are only asserting the two federal claims in this lawsuit.

OPINION

Defendants[6] advance a number of jurisdictional arguments, including that: (1) state sovereign immunity bars plaintiffs' suit; (2) judicial immunity bars plaintiffs' suit; (3) the court should decline to exercise jurisdiction under the *Younger*[7] and *Colorado River*[8] abstention doctrines; (4) plaintiffs lack standing; and (5) the claims are not ripe. Defendants also contend that plaintiffs have failed to state a claim on which relief may be granted. In response, plaintiffs maintain that their suit is excepted from state sovereign immunity under *Ex parte Young,* 209 U.S. 123 (1908), is not barred by judicial immunity, does not qualify for abstention, is justiciable, and properly states a claim on which relief may be granted. The court will address each argument in turn.

## I. Jurisdictional Arguments

### A. Sovereign Immunity

Defendants first argue that state sovereign immunity bars plaintiffs' suit. (Defs.' Br. (dkt. #7) 8-12; Int. Defs.' Br. (dkt. #17) 13.) The Eleventh Amendment bars suits by citizens against unconsenting states in federal court. *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 54 (1996). This amendment also protects arms of the state, such as state agencies or state employees acting in their official capacity. *See Barnes v. Bd. of Trustees of Univ. of*

---

[6] Because the arguments raised by defendants and intervening defendants overlap significantly, the court will generally refer to them collectively as "defendants," and only when specifically relevant, will the court call out which party made a given argument.

[7] *Younger v. Harris*, 401 U.S. 37 (1971).

[8] *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).

*Illinois*, 946 F.3d 384, 391 (7th Cir. 2020); *Indiana Prot. & Advocacy Servs. v. Indiana Family & Soc. Servs. Admin.*, 603 F.3d 365, 370 (7th Cir. 2010).

Of course, there exist certain exceptions to state sovereign immunity, including the *Ex parte Young* doctrine, which permits federal jurisdiction over claims seeking prospective injunctive relief to remedy an ongoing violation of federal law. *See Seminole Tribe of Fla.*, 517 U.S. at 73. If a suit seeks to remedy only a past legal violation that has no "ongoing" effects, it does not fall under the *Ex parte Young* exception to sovereign immunity. *MCI Telecommunications Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 345 (7th Cir. 2000) ("The plaintiff must allege that the officers are acting in violation of federal law, and must seek prospective relief to address an ongoing violation, not compensation or other retrospective relief for violations past.") (quoting *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 298-99 (1997) (Souter, J., dissenting)).

There appears no dispute that the Commissioners were sued in their official capacity. (Defs.' Br. (dkt. #7) 8 n.4; Pls.' Opp'n (dkt. #55) 2 n.1, 14; Defs.' Reply (dkt. #58) 10; Int. Defs.' Br. (dkt. #17) 13 n.9.) While thus considered "arms of the state" for purposes of state sovereign immunity, plaintiffs argue that the Commissioners do not enjoy immunity because the *Ex parte Young* exception applies. Defendants dispute this, contending that plaintiffs challenge only a past action and not an ongoing violation of law. (Defs.' Br. (dkt. #7) 9-12.)[9] Defendants further argue that *Ex parte Young* is inapplicable

---

[9] Alternatively, the intervening defendants frame this argument as a failure to state a claim under § 1983. (*See* Int. Defs.' Br. (dkt. #17) 13 ("Plaintiffs do not allege an ongoing violation of federal law, nor do they seek prospective relief; rather, they allege a past violation of law and seek retrospective relief. However, this type of relief is not available under Section 1983.").)

as the Commissioners' only role going forward is "to defend their decision in court or enforce the decision's requirements against the applicants [here, the Transmission Companies]." (*Id.* at 11.) Plaintiffs counter that while the PSC's past decision is final, it has ongoing effects against which plaintiffs seek prospective relief. (Pls.' Opp'n (dkt. #55) 15.) They also assert that the Commissioners continue to play a role in enforcing the allegedly unlawful decision. (*Id.*)

The distinction between prospective and retrospective relief has been described as a "'straightforward inquiry' into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland,* 535 U.S. 635, 636 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296, 298-99)). Still, as the Supreme Court has recognized, and as this case highlights, "the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night." *Edelman v. Jordan*, 415 U.S. 651, 667 (1974).

In analyzing the nature of plaintiffs' requested relief, the court finds it helpful to distinguish between plaintiffs' takings claim and their due process claims (although the parties themselves did not fully address this distinction in their briefing). The relief sought by plaintiffs to remedy the alleged violation of the takings clause presents a relatively straightforward example of a prospective remedy for an ongoing legal violation. According to plaintiffs, the PSC's final decision authorizes the taking of land for private purpose in violation of the takings clause, and they seek an injunction vacating the CPCN and prohibiting the Commissioners from enforcing it prospectively, as well as a related

8

declaration that the decision is unlawful.  This is akin to the situation presented in *Verizon Maryland Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002).  The plaintiff in that case challenged a final decision by the Maryland Public Service Commission, arguing that it was not consistent with the federal Telecommunications Act of 1996 and requesting "that state officials be restrained from enforcing an order in contravention of controlling federal law."  *Id.* at 638-42.  Accordingly, the Supreme Court concluded that plaintiff's request for this prospective relief fell under the *Ex parte Young* exception.  *Id.* at 645.  In *Verizon Maryland*, the Court recognized plaintiff also sought a declaration that the Commissioner's past decision violated federal law, such that plaintiff's request involved "a declaration of the *past,* as well as the *future,* ineffectiveness of the Commission's action."  *Id.* at 646 (emphasis in original).  Still, the Court concluded that "[i]nsofar as the exposure of the State is concerned, the prayer for declaratory relief adds nothing to the prayer for injunction," because the declaration imposed no monetary loss on the state for any past breach of legal duty.  *Id; see also MCI Telecommunications Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 345 (7th Cir. 2000) ("The commissioners argue that, if any violations occurred, they occurred in the past, and that therefore the *Ex parte Young* doctrine should not apply. We cannot accept this argument.  The challenged determinations are still in place, and the carriers seek to have the commissioners conform their future actions, including their continuing enforcement of the challenged determinations, with federal law.").

Whether or not plaintiffs' due process claim alleges an ongoing legal violation for which a prospective remedy is sought is arguably a closer question.  Unlike the cases cited above, in which the challenged orders were (allegedly) *substantively* in contravention of

federal law, plaintiffs' due process claim seeks to vacate the CPCN on the grounds that it was arrived at via a procedurally unconstitutional hearing.  In some ways, this case is similar to *Sonnleitner v. York*, 304 F.3d 704 (7th Cir. 2002), in which the plaintiff brought suit after being demoted by his employer, a state-run psychiatric facility, arguing that his procedural due process rights had been violated.  *Id.* at 706.  In that case, the Seventh Circuit ultimately held that because plaintiff had not alleged an "ongoing" violation of federal law, his official capacity claims were barred by the Eleventh Amendment.  *Id.* at 718-19.

In *Sonnleitner*, however, the plaintiff had *already received* a post-deprivation hearing before a commission that found in his favor.  *Id.* at 718 ("Sonnleitner was eventually given an opportunity to tell his side of the story, and the Personnel Commission found it to be persuasive. The Commission determined that only one of the charges had merit and that Sonnleitner's demotion violated a state policy of progressive discipline.").  Other courts interpreting *Sonnleitner* have found this fact to be significant.  *See, e.g.*, *Nelson v. Univ. of Texas at Dallas*, 535 F.3d 318, 324 n.4 (5th Cir. 2008); *Moore v. Shaw*, No. 07-1253, 2008 WL 2692123, at *6 (C.D. Ill. July 1, 2008); *Kinney v. Anglin*, No. 10-2238, 2011 WL 1899345, at *7 (C.D. Ill. Apr. 25, 2011)*, report and recommendation adopted*, No. 10-CV-2238, 2011 WL 1899560 (C.D. Ill. May 19, 2011).  This court, too, finds that the holding in *Sonnleitner* was contingent on the fact that a favorable, post-deprivation hearing had already been granted.  Because no post-deprivation hearing has been provided in the present case, *Sonnleitner* is not controlling.

Moreover, in other cases involving procedural due process claims in the employment

context, the Seventh Circuit has concluded that the *Ex parte Young* exception applies.  For example, in *Levenstein v. Salafsky*, 414 F.3d 767 (7th Cir. 2005), the Seventh Circuit indicated (albeit without much discussion) that a procedural due process claim could proceed against state officials under *Ex parte Young*.  *Id.* at 772.  In *Levenstein*, the plaintiff sued state university officials for various adverse employment actions, alleging procedural due process and equal protection violations, with a request for reinstatement to his former position.  *Id.* at 768-71.  The Seventh Circuit explained that "under the well-recognized theory of *Ex parte Young* . . . [plaintiff] was entitled to pursue injunctive relief" against defendants.  *Id.* at 772.  Although the specific relief requested in *Levenstein* differs from that proposed here, the court assumed that a refusal to reinstate the plaintiff for the allegedly deficient procedure amounted to an "ongoing" violation.  *Id.; see also Elliott v. Hinds*, 786 F.2d 298, 302 (7th Cir. 1986) (plaintiff's procedural due process and first amendment claims challenging his discharge and seeking reinstatement and expungement of personnel records fell under the *Ex parte Young* exception to state sovereign immunity).  As the court reads these decisions, an "ongoing" legal violation under *Ex parte Young* can include the continued effect and enforcement based on a past, unconstitutional decision.

Further, courts outside of this circuit have held that a request for a new hearing to remedy an alleged procedural due process violation qualifies as prospective relief from an ongoing legal violation under *Ex parte Young*.  *See Brown v. Georgia Dep't of Revenue*, 881 F.2d 1018, 1020 (11th Cir. 1989) (employee's procedural due process claim and request for a new hearing could proceed against state officials under *Ex parte Young* doctrine); *Martin Marietta Materials, Inc. v. Kansas Dep't of Transp.*, 953 F. Supp. 2d 1176, 1187 (D. Kan.

11

2013), aff'd, 810 F.3d 1161 (10th Cir. 2016) (request for a new hearing based on alleged violations of procedural due process, among other claims, was prospective relief for an ongoing law violation); *Columbian Fin. Corp. v. Stork,* 702 F. App'x 717, 721 (10th Cir. 2017) (same, explaining that the fact plaintiff was "seeking to right a previous wrong [does] not disqualify the action from the *Ex Parte Young* exception") (alteration in original) (quoting *Opala v. Watt*, 454 F.3d 1154, 1158 (10th Cir. 2006)).  As the Tenth Circuit succinctly stated, "[t]o hold otherwise would permit state actors to avoid an injunction requiring them to comply with federal due process standards simply by providing a sham hearing."  *Columbian Fin. Corp.*, 702 F. App'x at 722.  In sum, this court concludes that both plaintiffs' takings and due process claims assert ongoing legal violations for which they seek prospective relief.

Alternatively, the intervening defendants argue that because the Transmission Companies will be the ones to take the actual land at issue, the Commissioners have no further role in the alleged ongoing violation, and thus puts the claims here outside of the *Ex parte Young* exception.  The court does not find this argument persuasive either. Certainly, "a plaintiff must show that the named state official plays some role in enforcing the statute in order to avoid the Eleventh Amendment."  *Doe v. Holcomb*, 883 F.3d 971, 975 (7th Cir. 2018).  This requirement "overlap[s] significantly" with the standing requirements of causation and redressability.  *Id.*  Thus, a plaintiff must "establish that his injury is causally connected to [the] enforcement [of the challenged determination] and that enjoining the enforcement is likely to redress his injury."  *Id.* at 975-76.  However, "when the plaintiff is not himself the object of the government action or inaction he

challenges, standing is not precluded." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). It is enough for a plaintiff to show "a nexus sufficiently strong between the plaintiffs' injury and the defendant's putatively illegal conduct," such that the court is assured the relief requested "will personally benefit the plaintiffs*." Banks v. Sec'y of Indiana Family & Soc. Servs. Admin.*, 997 F.2d 231, 239 (7th Cir. 1993).

There are numerous instances in which courts have found that a defendant's action with respect to a third party is sufficiently connected to plaintiff's injury to permit suit. For example, in *United States v. Students Challenging Regulatory Agency Procedures ("SCRAP")*, 412 U.S. 669 (1973), various environmental groups brought suit against the United States and the federal Interstate Commerce Commission, alleging "economic, recreational and aesthetic harm" due to defendants' failure to suspend a railroad freight rate charge. *Id.* at 669-70. The Court recognized that the line of causation was "attenuated," and rested on plaintiffs' allegations that "a general rate increase would allegedly cause increased use of nonrecyclable commodities as compared to recyclable goods, thus resulting in the need to use more natural resources to produce such goods, some of which resources might be taken from the Washington area, and resulting in more refuse that might be discarded in national parks in the Washington area." *Id.* at 688. Still, the Court concluded that these allegations were sufficient to connect plaintiffs' injuries to defendants' actions for purposes of establishing standing. *Id.* at 688-90; *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) (defendants' actions over third party sufficiently connected to plaintiffs' alleged injury to permit suit); *Central Arizona Water Conservation Dist. v. EPA*, 990 F.2d 1531, 1537-38 (9th Cir. 1993) (same).

Here, the Commissioners issued the CPCN, which authorizes the Transmission Companies to take the land at issue; without the CPCN, the Companies would not have the authority to do so.  *See* Wis. Stat. § 196.491(3).  Moreover, even defendants concede the Commissioners have a direct, ongoing role in enforcing the CPCN, albeit a limited one. (Defs.' Br. (dkt. #7) 11 ("The Commissioners' only role and authority once a CPCN is granted approving a project is to defend their decision in court or enforce the decision's requirements against the applicants.") (emphasis omitted); *see also* PSC Final Decision Approving the CPCN (dkt. #7-1) 99-100.)  While the Commissioners' enforcement actions will be against the Transmission Companies, a defendant's actions need not be directly against the plaintiffs for a sufficiently strong causal nexus to be found.  Finally, an order from this court requiring the Commissioners to vacate the CPCN and hold a new hearing would redress plaintiffs' alleged injuries.

Thus, this case is unlike *Doe v. Holcomb*, 883 F.3d 971 (7th Cir. 2018), in which the Seventh Circuit found that the Eleventh Amendment barred plaintiff's suit against various state officials.  *Id.* at 975-78.  In *Holcomb*, plaintiff sued the Governor and Attorney General of Indiana, as well as the Executive Director for State Court Administration,[10] challenging the enforcement of Indiana's name-change statute.  *Id.*  The Seventh Circuit found that none of the named state defendants played *any* role in enforcing the challenged statute, and thus their actions did not fall under the *Ex parte Young* exception to state sovereign immunity.  *Id.*  In contrast, the PSC Commissioners play a *direct* role in defending and

---

[10] The plaintiff also sued a county official, but that is not relevant to the present discussion of *state* sovereign immunity.

enforcing the challenged CPCN.   Accordingly, plaintiffs have shown an adequate connection between the Commissioners' approval and ongoing enforcement of the CPCN to satisfy the requirements of *Ex parte Young* and avoid the assertion of sovereign immunity under the Eleventh Amendment.

### B. Judicial Immunity

Next, intervening defendants (although not the Commissioners themselves) argue that the Commissioners enjoy judicial immunity.   Like other official immunity doctrines, however, judicial immunity is not relevant in claims brought against state officers acting in their official capacity.   This is because an official capacity suit is treated as a suit against the state, *not* against the individual.   *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (a suit against a state official in his official capacity is, in all respects other than name, to be treated as a suit against the state itself).   While official capacity suits may, therefore, be vulnerable to state sovereign immunity challenges, this case falls under the *Ex parte Young* exception as discussed above.

As noted above, the parties appear to agree that the Commissioners were sued in their official capacity.   (*See* Defs.' Br. (dkt. #7) 8 n.4; Pls.' Opp'n (dkt. #55) 2 n.1, 14; Defs.' Reply (dkt. #58) 10; Int. Defs.' Br. (dkt. #17) 13 n.9.)   Indeed, the Commissioners themselves indicated that they did not assert judicial or qualified immunity based on their understanding that the suit was purely an official capacity one.   (*See* Defs.' Br. (dkt. #7) 13 n.9 ("The Commissioners reserve their right to assert judicial and qualified immunity from any personal capacity claims should the Plaintiffs identify them as such.").   Accordingly, the court will reject the intervening defendants' judicial immunity argument.

15

## C. Abstention Doctrines

Defendants next argue that this court is required to abstain from exercising its jurisdiction. (Defs.' Br. (dkt. #7) 12; Int. Defs.' Br. (dkt. #17) 37-39.)[11] More specifically, defendants point out that plaintiffs have filed petitions seeking judicial review of the PSC's decision in state court and, therefore, contend that this court must abstain under the *Younger* and *Colorado River* abstention doctrines pending completion of ongoing state proceedings. (*Id.*; Defs.' Reply (dkt. #58) 23-24 (citing *Younger v. Harris*, 401 U.S. 37 (1971); *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800 (1976).)

As a general rule, "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Colo. River Water Conservation Dist.*, 424 U.S. at 817 (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)). Still, under certain "exceptional" circumstances, a federal court may be required to abstain so as not to interfere with ongoing state proceedings. *See id.* at 813. For example, in *Colorado River*, the Court held that a federal court may defer to a "concurrent state proceeding" as a matter of "wise judicial administration." 424 U.S. at 818. "Two suits are parallel for *Colorado River* purposes when substantially the same parties are contemporaneously litigating substantially the same issues. . . . In essence, the question is whether there is a substantial likelihood that the state litigation will dispose of all claims

---

[11] Intervening defendants frame this same argument in terms of whether the plaintiffs have adequate remedies in state law without explicitly asking that this court "abstain." (*See* Int. Defs.' (dkt. #17) 37-40.) However, the relevant discussions in the cases they cite all deal with federal court abstention in the presence of related state court proceedings. (*See id.* (citing cases).) Accordingly, the court also addresses intervening defendants' arguments regarding adequate state remedies in this section.

presented in the federal case." *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 498 (7th Cir. 2011) (internal quotations omitted). *Younger* and its progeny also hold that a federal court generally cannot interfere with ongoing "'state criminal prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 367-68 (1989)).

Neither abstention doctrine squarely applies here. First, the *Younger* abstention is not appropriate as the parallel state proceedings are not among the specific "exceptional" state proceedings requiring abstention. *See Sprint Commc'ns, Inc.*, 571 U.S. at 73 (where a case "presents none of the circumstances the Court has ranked as 'exceptional,'" the general rule that a court must exercise jurisdiction over a case properly before it governs). Indeed, the Supreme Court has expressly instructed that a parallel state court review of a state utility board's order did not require abstention of a federal court action challenging the same order. *Id.* at 72-73. Second, the *Colorado River* abstention does not apply because the state court petitions do not assert any of the federal constitutional issues before this court; similarly, this case does not concern any of the state law claims plaintiffs are bringing in state court. Since the cases do not involve substantially the same issues, and the state cases would not dispose of the claims brought in this court, abstention is not appropriate.

### D. Standing

As for the challenge to plaintiffs' standing to assert their federal claims, the required elements are (1) an injury-in-fact suffered by the plaintiff that is (2) fairly traceable to the

challenged action and (3) likely to be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  An organization may establish standing either by asserting an injury to its own interests or by bringing suit on behalf of its members *provided* "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

Moreover, only one plaintiff is required to establish standing in order for a dispute to be justiciable.  *Tierney v. Advocate Health & Hosps. Corp.*, 797 F.3d 449, 451 (7th Cir. 2015) ("[W]here at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not.") (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011)).  Of particular relevance to this case, the Supreme Court has explained that a

> person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.7 (1992).

As *Lujan* indicates, the alleged procedural injury must be connected to the plaintiff's "concrete interests."  *Id*; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)

18

("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation -- a procedural right in *vacuo* -- is insufficient to create Article III standing."). A concrete interest may be established through allegations that a challenged action has or is reasonably likely to result in the taking or devaluation of the plaintiff's property. *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 n.1 (2018) (a decrease in market value due to the designation of plaintiff's private land as a "critical habitat" sufficiently concrete injury for standing purposes); *MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 745 (7th Cir. 2007) (the "reasonable probability" that a city ordinance would decrease the value of property and hence the commissions of plaintiffs, who were real estate brokers who serviced the land at issue, was adequate to confer Article III standing). Also, in cases challenging some action impacting the environment, "plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000).

As to this latter interest, the Seventh Circuit's recent decision in *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722 (7th Cir. 2020), is instructive. There, a nonprofit park advocacy group and city residents challenged Chicago's plan to construct a presidential memorial center on land in a city park. *Id.* at 736. The court noted that plaintiffs' alleged property right -- the "beneficial interest in a public park" -- was "highly unusual," yet still constituted a cognizable injury. *Id.*

Defendants assert that plaintiffs here lack both standing to sue on their own behalf

*and* associational standing.  (Int. Defs.' Br. (dkt. #17) 17-21; Defs.' Br. (dkt. #7) 16.)  The court disagrees.  Due to an alleged, constitutionally deficient procedure, plaintiffs claim the PSC approved the condemnation of land for a transmission line that will injure their own concrete interests.  In particular, they allege that DALC and members of both plaintiff organizations own land, conservation easements, and other property interests on and near the proposed site of the line, and further that the construction of the line will reduce both the economic and ecological value of those properties.  Moreover, they seek redress through an injunction vacating the allegedly flawed PSC decision and enjoining enforcement of the CPCN, as well as various declarations of the law.  Consistent with the Seventh Circuit decision in *Protect Our Parks*, these allegations are adequate to establish standing, at least at the pleading stage.  971 F.3d at 736.

### E.  Ripeness

Defendants' final jurisdictional argument is that plaintiffs' claims are not ripe, since they have yet to experience any actual injury.  (Defs.' Br. (dkt. #7) 20-22; Int. Defs.' Br. (dkt. #17) 25-27.) [12]   Claims relating to governmental taking of property are to be

---

[12] Both defendants and intervening defendants dedicate a separate section of their brief to the question of ripeness.  (*See* Defs.' Br. (dkt. #7) 20-22; Int. Defs.' Br. (dkt. #17) 22-24.)  Both also weave ripeness arguments into various other parts of their brief.  For example, defendants argue that plaintiffs have failed to state a § 1983 claim because they do not allege that any property has *yet* been condemned and, thus, have not alleged a deprivation of a constitutionally protected right.  (*See id.* at 18; Defs.' Reply (dkt. #58) 1.)  Similarly, intervening defendants argue that plaintiffs have failed to state a due process violation because they have not *yet* suffered a deprivation of a property interest.  (Int. Defs.' Br. (dkt. #17) 24-27.)  However, since all of these arguments relate to *timing* (i.e., plaintiffs' complaint is insufficient because their alleged injury has not *yet* come to pass), the court will address them under the general category of "ripeness."  *Church of Our Lord & Savior Jesus Christ v. City of Markham*, 913 F.3d 670, 677 (7th Cir. 2019) ("[R]ipeness is 'peculiarly a question of timing.'") (quoting *Buckley v. Valeo*, 424 U.S. 1, 114-18 (1976)).

20

evaluated under a unique ripeness standard.  *See* Wright & Miller, 13B Fed. Prac. & Proc. Juris. § 3532.1.1 (3d ed.) ("A special category of ripeness doctrine surrounds claims arising from government takings of property."); *Forseth v. Vill. of Sussex,* 199 F.3d 363, 368 (7th Cir. 2000) ("the Supreme Court articulated a special ripeness doctrine for constitutional property rights claims").  This standard may apply to both plaintiffs' claims brought directly under the takings clause of the Fifth Amendment, as well as plaintiffs' related procedural due process claim.  *See Forseth,* 199 F.3d at 368 (explaining that a procedural or substantive due process claim premised on the argument that a "state or local regulation of the use of land has gone overboard" must still satisfy the special ripeness standard for takings claims); *Unity Ventures v. Lake Cty.,* 841 F.2d 770, 775 (7th Cir. 1988) (in case challenging governmental land use, special ripeness standard for takings claims applied to plaintiff's due process claim)..

Under this ripeness standard, a plaintiff may initiate an action when "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."  *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott, Pennsylvania,* 139 S. Ct. 2162 (2019);[13] *Church of Our*

---

[13] Two rules were set forth in *Williamson County,* the Court required that in order to ripen a takings case for federal judicial review, a takings plaintiff (1) receive a final state agency decision and (2) exhaust state court remedies.  *See Williamson Cty.,* 473 U.S. at 186.  While the former state exhaustion requirement was recently overruled in *Knick,* the Court specifically did not disturb the latter finality requirement.  *See Knick,* 139 S. Ct. at 2169 ("[Petitioner] does not question the validity of [the *Williamson*] finality requirement, which is not at issue here.").  *See also* 2 Am. Law. Zoning § 16:12 (5th ed.) ("The Supreme Court's decision in *Knick* overruled *Williamson County* only to the extent that it forced takings plaintiffs to seek just compensation in state court in order to ripen their federal court takings action. The decision expressly states that it does not affect the

*Lord & Savior Jesus Christ v. City of Markham, Ill.*, 913 F.3d 670, 678 (7th Cir. 2019) (noting that "the Supreme Court's ripeness test for Takings Clause claims . . . requires a plaintiff to obtain a 'final decision' from a local government about how it may use its property before ripening a claim"); *see also Goldstein v. Pataki*, No. 06 CV 5827 NGG RML, 2007 WL 1695573, at *13 (E.D.N.Y. Feb. 23, 2007), *report and recommendation adopted in relevant part, rejected in part*, 488 F. Supp. 2d 254 (E.D.N.Y. 2007) (plaintiffs' takings claim ripened when state commission issued final determination approving a redevelopment project, even though condemnation proceedings against plaintiffs had not yet commenced); *but see Samaad v. City of Dallas*, 940 F.2d 925, 934 (5th Cir. 1991) (questioning the applicability of the *Williamson County* ripeness test in private purpose takings claim).

The overall purpose of the ripeness doctrine is to "prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 580 (1985) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967)). Where there exists a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality," however, a plaintiff generally need not to wait until he is actually injured to bring suit. *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506 (1972). Even more specifically, "[w]hile a landowner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion" to make future land-use decisions, "a takings claim is likely to have ripened." *Palazzolo v. Rhode Island*, 533 U.S.

---

other prong of the *Williamson County* ripeness test, which requires takings plaintiffs to obtain a final agency decision in order to establish ripeness.").

606, 620 (2001).

Here, plaintiffs have alleged that the September 2019 PSC decision approving the CPNC was a "final" decision.  (*See* Compl. (dkt. #1) ¶ 168.)  Indeed, the Commissioners have represented that their only role going forward is to enforce the CPCN or defend it against legal challenges (*see* Defs.' Br. (dkt. #7) 11), suggesting that they no longer have discretion over future land use decisions.  Curiously, only intervening defendants argue that the CPNC is *not* final, asserting that there are still "several steps the [Transmission Companies] must follow before they can initiate a condemnation proceeding."  (Int. Defs.' Opp'n (dkt. #17) 18.)  Regardless, the court will leave any remaining factual dispute over the finality of the CPCN to summary judgment or trial.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.   At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.")  (internal citations, quotations, and alteration omitted).  Thus, accepting plaintiffs' well-pleaded facts as true, the CPCN is a "final decision," and as such, they have demonstrated (at least at this stage) that their claims are ripe for adjudication, even though their and their members' land has not *yet* been taken.

## II.  Failure to State a Claim

Putting these jurisdictional arguments aside, defendants assert that plaintiffs have

23

failed to state a claim upon which relief may be granted.  In particular, the defendants argue Commissioner Nowak must be dismissed because plaintiffs have not adequately pleaded that she was personally involved in the alleged deprivations as required by § 1983. Defendants further argue that plaintiffs have not successfully pleaded a takings claim because:  (1) they have not alleged that any property owned by plaintiffs' *will* be condemned; (2) the land at issue has not and will never be in the possession of the government; (3) the PSC's decision was a legislative determination, which cannot amount to a taking; and (4) the proper relief for a taking is just compensation, not injunctive relief as requested by plaintiffs.  Finally, defendants argue that plaintiffs failed to state a procedural due process claim because:  (1) they failed to plead a lack of state law remedies; (2) they have not alleged a deprivation of a constitutionally protected property or liberty interest; (3) they have not alleged sufficient facts to show unconstitutional bias on the part of the Commissioners; and (4) they did not timely complain about the Commissioners' bias.

Dismissal pursuant to Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  To survive a motion to dismiss, a complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While detailed factual allegations are not required, plaintiff but must provide "enough facts to raise [the claim] above the level of mere speculation." *Riley v. Vilsack*, 665 F. Supp. 2d 994, 997 (W.D. Wis. 2009).  In reviewing the sufficiency of a complaint under the

24

plausibility standard, the court will accept well-pleaded facts in the complaint as true, but "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).[14]

### A. Personal Involvement of Commissioner Nowak

"[P]ersonal involvement is a prerequisite for individual liability in a § 1983 action." *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997). "[A]n official meets the 'personal involvement' requirement when 'she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent.'" *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985) (quoting *Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir. 1994)).

Here, defendants contend that Commissioner Nowak in particular should be dismissed because plaintiffs' complaint contains *no* allegations that Novak was personally responsible for the deprivation of plaintiffs' constitutional rights. (Int. Defs.' Br. (dkt. #17) 12-13.) Unquestionably, plaintiffs' allegations as to Commissioner Nowak's personal involvement are sparse, but they still allege that she personally voted to approve the Transmission Line, thereby authorizing a taking of land for allegedly private purposes in

---

[14] Defendants also encourage the court to apply an additional gloss to the Rule 12 standards when considering plaintiffs' allegations of bias, contending that plaintiffs' allegations of bias must be pleaded "with particularity, citing to cases considering federal recusal claims under 28 U.S.C. § 455. (*See* Defs.' Br. (dkt. #7) 23.) But plaintiffs' allegations of bias are brought via a constitutional due process claim, and thus the § 455 pleading standards are not applicable here.

violation of the Fifth Amendment.  Facially, at least, this would appear to be enough to establish personal involvement in an unlawful taking.

As to the due process claim, however, plaintiffs neither allege that Nowak was personally biased or conflicted, nor knew or should have known of her co-Commissioners' biases.  Because plaintiffs' have failed to allege that Commissioner Nowak was personally involved in any alleged due process violation, therefore, she will be dismissed as to that claim.

### B.  Takings Claims

The Takings Clause of the Fifth Amendment, which has been incorporated against the states through the Fourteenth Amendment, *Phillips v. Washington Legal Found.*, 524 U.S. 156, 163 (1998), prohibits the taking of private property for public use without just compensation, U.S. Const. Am. V.  The clause has also been interpreted as prohibiting the taking of land "for the purpose of conferring a private benefit on a particular private party," even where just compensation is paid  *Kelo v. City of New London*, 545 U.S. 469, 477 (2005). Even if land is taken and transferred to a private owner, however, that taking "can still be constitutional if it is done for a 'public purpose.'"  *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 737 (7th Cir. 2020) (citing *Kelo*, 545 U.S. at 483-84).

The United States Supreme Court has held that the "public use" requirement of the Taking Clause is "coterminous with the scope of a sovereign's police powers." *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 240 (1984).  As a result, while the Supreme Court recognizes "a role for courts to play in reviewing a legislature's judgment of what constitutes a public use," it has held that role to be "'an extremely narrow' one." *Id.* (quoting *Berman v. Parker*,

348 U.S. 26, 32 (1954)).  Indeed, "where the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause."  *Id*.  Similarly, the Sixth Circuit described the showing required to allege a private taking as "extraordinarily difficult," and that "[i]n the overwhelming majority of cases, there will be virtually no chance" that the plaintiff will be able to succeed on such a claim.  *Montgomery v. Carter Cty.*, 226 F.3d 758, 766 (6th Cir. 2000).  Finally, discussing such a claim, Judge Posner previously observed noted that he could "find no case in the last half century where a taking was squarely held to be for a private use."  *Gamble v. Eau Claire Cty.*, 5 F.3d 285, 287 (7th Cir. 1993).

With this daunting burden in mind, plaintiffs have simply failed to allege sufficient facts to support their claim that the CPCN amounts to an impermissible, private purpose taking under the Fifth and Fourteenth Amendments.  At most, plaintiffs allege that the costs of the Line will exceed the public benefits, and there are better alternatives available, but this argument invites judicial oversight over complicated policy considerations, rather than merely questioning whether the Line advances a "conceivable public purpose."  *Hawaii Hous. Auth.*, 467 U.S. at 240.  As noted, judicial review over this claim is "extremely narrow," which no doubt explain why the condemnation of land for the construction of power lines has been regularly affirmed as serving a public purpose.  *E.g.*, *Mont.-Dakota Utilities Co. v. Parkshill Farms, LLC*, 905 N.W.2d 334, 338-39 (S.D. 2017); *Rutland Ry. Light & Power Co. v. Clarendon Power Co.*, 83 A. 332, 336 (Vt. 1912); *Rockingham Cty. Light & Power Co. v. Hobbs*, 58 A. 46, 47 (N.H. 1904).  Certainly, the present composition of the United States Supreme Court could enliven the reach of the Fifth Amendment's Takings

27

Clause, but this court is not authorized to act on such speculation.  *See Levine v. Heffernan*, 864 F.2d 457, 461 (7th Cir. 1988) ("[O]nly the Supreme Court may overrule one of its own precedents . . . [and] out of respect for the great doctrine of stare decisis, [lower courts] are ordinarily reluctant to conclude that a higher court precedent has been overruled by implication.").  Absent that, plaintiffs' allegations simply do not plausibly call into question that the construction of the Transmission Line is "rationally related to a conceivable public purpose," however ill-advised it may be or prove to be.  Accordingly, their taking claim must be dismissed.[15]

## C. Due Process Claim

### 1. Availability of State Law Remedies

According to defendants, a plaintiff is required to plead a lack of adequate state law remedies to state a claim under the procedural due process clause.  (Defs.' Br. (dkt. #7) 17, 20.)  Since plaintiffs have not done so, defendants contend that they have failed to state a claim.  (*Id.*)  Defendants' argument rests on a proposition purportedly derived from the United States Supreme Court's decision in *Parratt v. Taylor*, 451 U.S. 527 (1981).  In *Parratt*, a prisoner ordered "hobby materials," but those materials never reached him, allegedly due to the actions of certain state prison guards.  *Id.* at 529.  The Supreme Court concluded that this deprivation of property occurred before any hearing and was the "result of a random and unauthorized act," thus making it "beyond the control of the state," at

---

[15] The court emphasizes that plaintiffs are not arguing, and this court is not reaching, the issue of whether just compensation was immediately due for the cloud created by the PSC's grating of the CPCN.

least as a practical matter. *Id.* at 541. Moreover, the Court pointed out that a state tort claims procedure was available to plaintiff to redress this deprivation after the fact. *Id.* at 543. Accordingly, the Court held that the plaintiff failed to state a viable procedural due process claim. *Id.*

To begin, the Supreme Court itself has emphasized that *Parratt* departs from the "'general rule' . . . that plaintiffs may bring constitutional claims under § 1983 'without first bringing any sort of state lawsuit, even when state court actions addressing the underlying behavior are available.'" *Knick*, 139 S. Ct. at 2172-73 (quoting D. Dana & T. Merrill, Property: Takings 262 (2002)). Thus, the Seventh Circuit has described the holding in *Parratt* as "narrow" and "a rare exception to due process norms." *Brunson v. Murray*, 843 F.3d 698, 715 n.9 (7th Cir. 2016). Indeed, the Seventh Circuit instructs that the *Parratt* doctrine is applicable where "a predeprivation hearing 'is not only impracticable, but impossible,' and yet 'some meaningful opportunity subsequent to the initial taking' is available to provide redress." *Bradley v. Vill. of Univ. Park*, 929 F.3d 875, 886 (7th Cir. 2019).

In particular, the Supreme Court has questioned the applicability of *Parratt* to takings claims, noting that the decision:

> did not involve a takings claim for just compensation. Indeed, it was not a takings case at all. *Parratt* held that a prisoner deprived of $23.50 worth of hobby materials by the rogue act of a state employee could not state a due process claim if the State provided adequate post-deprivation process. But the analogy from the due process context to the takings context is strained . . . . It is not even possible for a State to provide pre-deprivation due process for the unauthorized act of a single employee. That is quite different from the taking of property by the government through physical invasion or a regulation

that destroys a property's productive use.

*Knick*, 139 S. Ct. at 2174.

Understood in this way, *Parratt* is inapplicable to the actions of the Commissioners in extending the powers of eminent domain to the Transmission Companies. In particular, the CPCN was granted after a contested case process, including the presentation of evidence at a week-long hearing; thus, the deprivation was not the result of a random and unauthorized act and occurred after a state-sanctioned predeprivation hearing. As the Supreme Court recognized in *Knick*, an alleged taking based on such a governmental process is "quite different" from the scenario in *Parratt*. As such, the court concludes that plaintiffs were not required to plead a lack of adequate state, post-deprivation remedies in order to proceed with their procedural due process claim.

## 2. Deprivation of a Constitutionally Protected Interest

To state a procedural due process claim, a plaintiff must allege a deprivation of a constitutionally protected property or liberty interest. *Ky. Dept. of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989). Here, plaintiffs allege that the PSC's final decision will result in the condemnation of their members' property, the construction of transmission towers, and the passage of the Line on land owned by them and their members. Defendants do not appear to dispute that the seizure or permanent physical invasion of real property would amount to a deprivation of a property interest protected by the constitution, nor could they. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (holding that installation of cable lines that crossed plaintiff's property was a "permanent physical occupation of another's property" and that "[s]uch an appropriation is perhaps the most

30

serious form of invasion of an owner's property interests"). Instead, defendants argue that this deprivation has *not yet* occurred, and therefore plaintiffs have no claim. But again, this argument is best understood as a question of ripeness which the court has addressed above. *See supra* section I.E & n.12. Moreover, at the pleadings stage, it is at worst plausible and at best likely that plaintiffs' property has been reduced in value by the award of eminent domain rights to the Transmission Companies, whether ever exercised or not. Accordingly, plaintiffs have adequately stated a deprivation of a constitutionally protected property interest.

### 3. Bias

Defendants' next argue that plaintiffs' allegations do not demonstrate unconstitutional bias by the Commissioners, even if accepted as true. (Defs.' Br. (dkt. #7) 24.) "The Due Process Clause entitles a person to an impartial and disinterested tribunal." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). This requirement extends to state administrative proceedings of a quasi-judicial nature. *See Gibson v. Berryhill*, 411 U.S. 564, 578 (1973). The test for determining the existence of unconstitutional bias is an objective one: courts "ask[] not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his [or her] position is likely to be neutral, or whether there is an unconstitutional potential for bias.'" *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009)).

Recusal is required under the due process clause where the adjudicator has a "direct, personal, substantial pecuniary interest in reaching a conclusion." *Tumey v. Ohio*, 273 U.S.

510, 523 (1927).  The Supreme Court has also "identified additional instances which, as an objective matter, require recusal," including "circumstances 'in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'"  *Caperton*, 556 U.S. at 877 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).  For example, recusal may be required where:  an adjudicator was "exposed to unofficial, 'extrajudicial' sources of information," *Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1030-31 (Fed. Cir. 2016) (citing *Liteky v. United States,* 510 U.S. 540, 554 (1994)); a judge has an indirect financial interest in the outcome of a case, *Ward v. Monroeville*, 409 U.S. 57, 93 (1972); *or* a judge has a conflict of interest due to his participation in an earlier proceeding, *e.g.*, *In re Murchison,* 349 U.S. 133, 133 (1955).  In contrast, no unconstitutional bias has been found where:  an adjudicator made a "tongue-in-cheek" remark indicating which facts and witnesses he found persuasive, *Impact Indus., Inc. v. NLRB*, 847 F.2d 379, 382 (7th Cir. 1988); the government was a party to a case and the administrative law judge is previously employed by the government, *Abdulahad v. Holder*, 581 F.3d 290, 296 (6th Cir. 2009); *or* an adjudicator had a limited, past association with a party, *Stivers v. Pierce*, 71 F.3d 732, 744 (9th Cir. 1995).

For this reason, "most matters relating to judicial disqualification [do] not rise to a constitutional level." *Fed. Trade Comm'n v. Cement Inst.,* 333 U.S. 683, 702 (1948).  Even an allegation that recusal was *required* under state or federal ethics rules does not itself demonstrate a violation of constitutional due process.  *See Suh v. Pierce*, 630 F.3d 685, 691-92 (7th Cir. 2011) (explaining that cases interpreting 28 U.S.C. § 455, the federal recusal statute, were not "on point" with plaintiff's due process argument).  So, too, a mere

"appearance of bias," without more, does not violate the due process clause. *Id.*

As noted above, the court will dismiss Commissioner Nowak from plaintiffs' due process claims as they allege *no* facts demonstrating her personal bias. This does not, however, eliminate plaintiffs' overall claim, as even one biased decisionmaker in a multimember panel may amount to a due process violation. *See Williams*, 136 S. Ct. at 1909 (one member's "unconstitutional failure to recuse" himself from a multimember tribunal "constitutes structural error even if the judge in question did not cast a deciding vote"). If anything, this is even more true in a case like this one, where plaintiffs have alleged specific facts as to the alleged bias of two out of three decisionmakers, including that: (1) during the course of the CPCN proceedings, Commissioner Huebsch served as a member of the advisory committee for an organization that developed, approved, and was a proponent of the Transmission Line (*id.* ¶¶ 81, 92, 93); (2) Commissioners Valcq and Huebsch received *ex parte* information regarding the case (*id.* ¶¶ 17, 112, 151); (3) Commissioners Valcq and Huebsch had "conflicts of interest" (*id.* ¶ 17); and (4) Commissioner Valcq had recently been employed by a company whose parent corporation owned a controlling interest in ATC, one of the three transmission companies applying for the CPCN permit (*id.* ¶¶ 56-74). Due to the fact-specific nature of these allegations, the court is not prepared to declare as a matter of law that, considered as a whole, they do not

state a claim for unconstitutional bias.[16]

At the same time, plaintiffs are on notice that they will ultimately face an uphill battle in actually proving their allegations. Adjudicators such as Commissioners Valcq and Huebsch are "presumed to act in good faith, honestly, and with integrity." *Head v. Chicago Sch. Reform Bd. of Trustees*, 225 F.3d 794, 804 (7th Cir. 2000). While "[t]he presumption is a rebuttable one . . . the burden of rebuttal is heavy indeed." *Hess v. Bd. of Trustees of S. Illinois Univ.*, 839 F.3d 668, 675 (7th Cir. 2016). To carry that burden, the party claiming bias must come forward with "substantial evidence" and lay a specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable. *Head*, 225 F.3d at 804; *Navistar Intern. Transp. Corp. v. U.S. EPA*, 941 F.2d 1339, 1360 (6th Cir. 1991) ("[A]ny alleged prejudice on the part of the decisionmaker must be evident from the record and cannot be based on speculation or inference.").

### 4. Untimeliness

Finally, defendants contend that plaintiffs' complaint sets out all the elements of a dispositive affirmative defense by indicating that the facts underlying their claims were a matter of public knowledge for months before the PSC's final decision, and plaintiffs' waived any bias argument by not raising it in a timely manner. (Int. Defs.' Br. (dkt. #17)

---

[16] Even so, the court would be remiss not to point out that plaintiffs' frequent assertion that there existed "at least an appearance of bias and lack of impartiality" (Compl. (dkt. #1) 148) is unlikely to be enough to state a claim for unconstitutional bias. Similarly, as discussed above, plaintiffs' arguments that the Commissioners had an obligation under state or federal judicial ethics laws to recuse themselves does not by itself create a *constitutional* recusal obligation.

34

33-35.)   In particular, defendants complain that "[p]laintiffs could have raised their conflict of interest claims at any point in time prior to [the decision]," but instead "waited until a month *after* the Commission issued a decision contrary to their interests."  (*Id.* at 34 (emphasis in original).)  Defendants further observe that "in other contexts" -- namely, in cases involving judicial recusal rules -- a party's failure to move to recuse or disqualify a judge timely may result in a waiver of that argument.  (*Id.*)

However, these judicial recusal cases are inapt to the present procedural due process claim.  As defendants themselves point out elsewhere (*id.* at 27 n.15), the requirements under the due process clause are different than the requirements for judicial recusal governed by state and federal ethics statutes.  Given that an element of a *due process* claim is the deprivation of a protected interest, plaintiffs' attempt to bring their bias claim *before* the final decision may have resulted in dismissal for lack of ripeness.  Moreover, as plaintiffs point out, they *did* move to recuse both Commissioners before their vote on the final decision, albeit after the *preliminary* vote.  Thus, even under the precedent cited by defendants, it would appear that plaintiffs did not in fact waive their claims of bias or, at least, did not plead facts to establish definitively an affirmative defense of untimeliness.  Accordingly, the court is not persuaded by defendants' untimeliness argument on the pleadings alone.

## III.  Motions to Stay

The intervening defendants and defendants have also filed two motions to stay discovery, which are not briefed and pending before this court.  (Dkts. #101, 129.)  Both motions argue that discovery should be stayed pending resolution of asserted governmental

immunity defenses.   However, as discussed above, the court has concluded that the Commissioners are not immune from suit.  Moreover, the court does not believe that those defenses are likely to prevail in an interlocutory appeal.  Accordingly, both motions to stay will be DENIED.

## ORDER

IT IS ORDERED that:

1) Defendants' motion to dismiss (dkt. #6) and intervening defendants' motion to dismiss (dkt. #16) are GRANTED IN PART and DENIED IN PART as follows: defendants Public Service Commission of Wisconsin and Ellen Nowak are DISMISSED from this case; plaintiffs' takings claim is also DISMISSED; and plaintiffs may proceed on their remaining claims as pleaded.

2) Defendants' and intervening defendants' motions to stay discovery (dkts. #101, 129) are DENIED.

3) The dispositive motion deadline is reset to January 4, 2021, with responses due January 25, 2021, and replies due February 4, 2021.

Entered this 20th day of November, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge