# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 20-3325

DRIFTLESS AREA LAND CONSERVANCY and
WISCONSIN WILDLIFE FEDERATION,

*Plaintiffs-Appellees,*

*v.*

REBECCA VALCQ and TYLER HUEBNER,*
in their official capacities as members of
the Public Service Commission of Wisconsin,

*Defendants-Appellants,*

*and*

AMERICAN TRANSMISSION COMPANY LLC, et al.,

*Intervenor Defendants-Appellants.*

———————————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 19-cv-1007 — **William M. Conley,** *Judge.*

———————————

ARGUED FEBRUARY 17, 2021 — DECIDED OCTOBER 21, 2021

———————————

* Commissioner Tyler Huebner has been substituted for former Commissioner Michael Huebsch, who resigned from office. *See* FED. R. APP. P. 43(c)(2).

Before SYKES, *Chief Judge*, and FLAUM and ROVNER, *Circuit Judges*.

SYKES, *Chief Judge*. This appeal is another chapter in concurrent federal and state litigation challenging the construction of a $500 million, 100-mile power line in southwestern Wisconsin. In September 2019 the Public Service Commission of Wisconsin issued a permit authorizing two transmission companies and an electricity cooperative to build and operate the line. A few months later, two environmental groups filed lawsuits in both federal and state court seeking to invalidate the permit. As relevant here, the parallel suits allege that two of the three commissioners had disqualifying conflicts of interest and should have recused themselves. Both suits raise federal due-process claims; the state litigation also invokes state recusal law and contests the permit on other state-law grounds.

The case was last here at an early stage of the proceedings when the district judge rejected the permit holders' motion to intervene. We reversed that decision and remanded with instructions to grant the intervention motion. *Driftless Area Land Conservancy v. Huebsch* ("*Driftless I*"), 969 F.3d 742 (7th Cir. 2020). Rulings on dismissal motions followed, and the judge significantly narrowed the scope of the case. But he denied the commissioners' motion to dismiss based on sovereign immunity. The case returns to us on that issue.

The commissioners have been sued in their official capacities, so sovereign immunity blocks this suit in its entirety unless it falls within the *Ex parte Young* exception, which authorizes a federal suit against state officials for the purpose of obtaining prospective relief against an ongoing

violation of federal law. The environmental groups seek an order vacating the permit or enjoining its enforcement; the latter is prospective relief. The harder question is whether the suit challenges an ongoing violation of federal law. The alleged due-process violation occurred (if at all) in September 2019 when the commissioners approved the permit. The environmental groups contend that the violation is ongoing as long as the permit remains in force and effect and the commissioners have the power to enforce, modify, or rescind it. Though there is little precedent precisely on point for a claim like this one, we hold that *Ex parte Young* applies and therefore agree with the judge's ruling on sovereign immunity.

The commissioners also moved for abstention under *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 818 (1976), which authorizes a federal court to abstain from exercising jurisdiction and stay a case to await the outcome of parallel state litigation when there is a substantial likelihood that the state case will resolve the federal claim. The judge denied the request, reasoning that the federal and state suits are not parallel because the state case doesn't raise a federal due-process claim. That was an error; as we've noted, both cases raise federal due-process claims. Although the abstention ruling is not before us, we may raise abstention sua sponte and do so here.

The state and federal suits are clearly parallel for purposes of *Colorado River*. The environmental groups have raised materially identical due-process recusal claims in both state and federal court. Given the context—this case implicates serious state interests regarding the operation of Wisconsin administrative law and judicial review of state-agency

proceedings—it's appropriate to abstain from exercising
federal jurisdiction to give the state courts an opportunity to
decide the recusal issue. Litigating the same conflict-of-
interest questions in both court systems is duplicative and
wasteful; comity and the sound administration of judicial
resources warrant abstention under *Colorado River*. We
remand with instructions to stay the case pending resolution
of the state proceedings.

## I. Background

The underlying administrative proceedings are complex,
but the details are largely unimportant here. What's needed
is a basic understanding of the state regulatory framework
and the background of the federal and state litigation. We
assume familiarity with *Driftless I* and will be as brief as
possible, but some length cannot be avoided.

The plaintiffs are two Wisconsin environmental groups,
Driftless Area Land Conservancy and the Wisconsin Wildlife
Federation. They sued the Public Service Commission of
Wisconsin and its three commissioners—Rebecca Valcq,
Michael Huebsch, and Ellen Nowak. The intervenors are the
utility companies that hold the permit and will own and
operate the power line: American Transmission Company
LLC, ITC Midwest LLC, and Dairyland Power Cooperative
(we refer to them collectively as "the transmission compa-
nies").

To place the sovereign-immunity and abstention issues in
context, some background about the regulatory scheme is
necessary. The Commission "has jurisdiction to supervise
and regulate every public utility" in Wisconsin. WIS. STAT.
§ 196.02(1). Its three commissioners are appointed by the

governor and confirmed by the state senate. One of the
Commission's many duties is to regulate the construction of
high-voltage electricity transmission lines. *Id.* § 196.491(1)(e),
(3). With one irrelevant exception, transmission lines may be
constructed only if the Commission grants a permit known
as a "certificate of public convenience and necessity." *Id.*
§ 196.491(3)(a)1. Although a permit is a prerequisite for
projects that require the use of eminent domain, the
Commission itself does not condemn the land needed for
construction. Rather, state law transfers the state's eminent-
domain power to the utility once the permit has been ap-
proved. *Id.* § 32.02. That is, a utility company holding an
approved permit may use the condemnation power to
acquire the land needed to complete an approved project.

The permitting process is complex. The Commission may
grant a permit only if the transmission line is "in the public
interest." *Id.* § 196.491(3)(d)3. An application commences a
highly technical inquiry. The Commission must consider a
multitude of factors such as the reliability of the power
supply, alternative sources of supply, economic factors,
engineering obstacles, safety, and environmental impact. *Id.*
The Commission's role continues after it issues a permit. The
enabling statute is expansive and gives the Commission
sweeping jurisdiction to "supervise and regulate every
public utility in this state and to do all things necessary and
convenient to its jurisdiction." *Id.* § 196.02(1). This includes
the power to file lawsuits, *id.* § 196.02(12), and to "rescind,
alter[,] or amend" a permit at any time, *id.* § 196.39(1).

The Commission also coordinates with the Midcontinent
Independent System Operator ("MISO"), a regional trans-
mission organization that operates interstate electricity grids

on behalf of its constituent utility companies.[1] MISO must involve the Commission in all grid-expansion activities. *See* 18 C.F.R. § 35.34(k)(7). In order to coordinate with MISO, the Commission delegates to one commissioner the authority to represent it before MISO's Advisory Committee and the Board of the Organization of MISO States, a group that represents the interests of state regulators. Commissioner Huebsch was the Commission's designated MISO representative during the relevant period, and he also served as secretary of the Organization of MISO States.

The events giving rise to the parallel state and federal litigation began in April 2018 when the transmission companies applied for a permit to construct a 100-mile, high-voltage power line stretching from Dane County in south-central Wisconsin to Dubuque County in eastern Iowa. At a projected cost of about $500 million, the power line would serve the electricity needs of consumers in the southwestern quadrant of the state. The application required the Commission to convene a class 1 "contested case" proceeding under state administrative law. WIS. STAT. § 227.01(3)(a). More than 50 parties intervened, including Driftless and the Wildlife Federation. On behalf of themselves and their members, they opposed the project based on environmental and land-use impacts.

After extensive proceedings and submissions, on August 20, 2019, the Commission held an open meeting and

---

[1] A regional transmission organization is a voluntary association of utility companies that operates electrical grids on behalf of the utilities. *See Ill. Com. Comm'n v. Fed. Energy Regul. Comm'n,* 721 F.3d 764, 769 (7th Cir. 2013).

unanimously voted to conditionally grant the permit. A month later the two environmental groups moved to disqualify Commissioners Valcq and Huebsch based on alleged conflicts of interest. On September 26, 2019, the Commission issued a 112-page order finalizing and approving the permit. The order addressed and rejected the recusal motion as untimely, procedurally improper, and lacking a "factual basis to support recusal."

On December 11 Driftless and the Wildlife Federation sued the Commission and the commissioners in federal court in the Western District of Wisconsin seeking to invalidate the permit. Two days later they filed two suits in state court seeking the same relief under Chapter 227 of the Wisconsin Statutes, which authorizes judicial review of state administrative proceedings. *See id.* § 227.53. Within days they intervened in a third judicial-review lawsuit filed by another party. (From now on we refer to the two environmental groups collectively as "Driftless.")

The federal suit raises due-process and takings claims under 42 U.S.C. § 1983. The first two counts center on allegations that Commissioners Valcq and Huebsch had disqualifying conflicts of interest that required them to recuse themselves from the permit proceeding. Count One alleges a violation of due process. Count Two, styled as a violation of "Due Process and Eminent Domain," simply repackages the due-process claim as an unconstitutional taking of private property. This count adds nothing of legal significance; allegations of adjudicator bias implicate the Due Process Clause, not the Takings Clause, so Count Two can be ignored. Count Three, a true Takings Clause claim, alleges that

the permit authorizes an unconstitutional taking of private property for private use.

The conflict-of-interest allegations against Commissioner Valcq stem from her career in the private sector. Prior to her service on the Commission, Valcq was employed as in-house and outside counsel for We Energies Corp. The parent company of We Energies owns a 60% interest in American Transmission Company, one of the permit applicants. The conflict-of-interest allegations against Huebsch center on his representation of the Commission on MISO, which intervened in the permit proceedings in support of the project. The complaint also accuses him of engaging in ex parte communications with MISO representatives and other interested parties.

The state lawsuits—including a fourth judicial-review action—were consolidated in Dane County Circuit Court, and the combined litigation raises a federal due-process claim based on the same conflict-of-interest allegations involving Commissioners Valcq and Huebsch. The state litigation also invokes the right to an impartial adjudicator under state law and raises unrelated violations of state administrative and environmental law.

The opening act in the federal suit involved a disagreement over the transmission companies' right to intervene. Our August 2020 decision in *Driftless I* authorized their intervention, and on remand the case proceeded to decision on a bevy of dismissal arguments. As relevant here, the Commission, the commissioners, and the transmission companies moved to dismiss the complaint based on sovereign immunity and the failure to state any cognizable constitutional claim. Alternatively, they urged the judge to abstain

from exercising jurisdiction and stay the case based on the ongoing state litigation, citing both *Younger v. Harris*, 401 U.S. 37 (1971), and *Colorado River*.

In November 2020 the judge issued a lengthy decision dismissing the case in part and substantially trimming its scope. First, he dismissed the case against the Commission itself, explaining that state agencies, as arms of the state, enjoy sovereign immunity from suit in federal court under the Eleventh Amendment. Indeed, Driftless conceded its mistake in suing the Commission and agreed that it must be dismissed from the suit. The commissioners' immunity claim, however, was another matter; it was hotly contested.

State officials may be sued in federal court in their official capacities notwithstanding the state's sovereign immunity if the *Ex parte Young* exception applies. Under that doctrine a plaintiff may proceed in federal court against a state official for the limited purpose of obtaining prospective relief against an ongoing violation of federal law. The judge concluded that *Ex parte Young* applies and declined to dismiss the suit against the commissioners on immunity grounds.

The judge also denied the abstention request, ruling that *Younger* abstention is inapplicable because the state case doesn't fit within the limited categories of cases covered by the doctrine. He also ruled out *Colorado River* abstention. He reasoned that the federal and state cases are not parallel in the sense meant by *Colorado River* because the state litigation does not raise a federal constitutional claim (or so he thought, mistakenly).

Moving on to the arguments on the merits, the judge dismissed Count Three—the takings claim—for failure to state a claim. Under the broad contours of the Supreme Court's Takings Clause cases, *see, e.g.*, *Kelo v. City of New London,* 545 U.S. 469, 478–82 (2005), that claim is not remotely plausible. As the judge explained, construction of a power line is universally recognized as a constitutionally permissible public purpose for using eminent domain.

That left only the due-process claim based on the conflict-of-interest allegations involving Commissioners Valcq and Huebsch. The judge concluded that the conflict allegations against them cleared the plausibility bar under the due-process standard announced in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). But nothing in the complaint suggests that Commissioner Nowak had a conflict of interest, so the judge dismissed the case against her.

The judge's sovereign-immunity ruling precipitated this appeal. An order denying a claim of sovereign immunity is immediately appealable, *Richman v. Sheahan*, 270 F.3d 430, 434 (7th Cir. 2001), so Valcq and Huebsch—the remaining defendants—appealed the denial of their motion to dismiss on immunity grounds. A stay is customary in this situation, *Allman v. Smith,* 764 F.3d 682, 684 (7th Cir. 2014), so we stayed the proceedings in the district court while the immunity appeal is pending. On August 26, 2021, Driftless moved to partially lift the stay. We address that motion below.

## II. Discussion

We begin with an oddity in the case that complicates the analysis of sovereign immunity and the *Ex parte Young*

exception. Huebsch resigned from the Commission in February 2020, shortly after the suit was filed and long before the judge ruled on the motion to dismiss. Inexplicably, he remains a defendant in this official-capacity suit even though he is out of office and no relief can be ordered against him. Under Rule 25(d) of the Federal Rules of Civil Procedure, when a public officer is sued in his official capacity and resigns from office while the suit is pending, his successor is automatically substituted. Tyler Huebner succeeded Heubsch in March 2020, but the substitution did not occur.

As the case comes to us, then, Valcq is the only defendant against whom an injunction could possibly issue. And that raises an anomaly in the district court's *Ex parte Young* analysis. An injunction against Valcq—one member of a three-member commission—would be pointless. We can fix the problem by applying Rule 43(c)(2) of the Federal Rules of Appellate Procedure, which like Rule 25(d) requires the substitution of the current officeholder. We therefore substitute Commissioner Huebner for Huebsch.

But that's not the only complication. There are notable gaps in the information we've received from the parties about the status of the concurrent state proceedings. While this appeal has been pending, significant developments have occurred in the state litigation. The parties alerted us to this information only very recently in their briefs supporting and opposing the August 26 motion to partially lift the stay. Even then, however, they omitted some important details.

Here's what we've pieced together from the public record and the parties' filings on the motion to lift the stay. On January 21, 2021—a month *before* this appeal was argued—

the judge presiding in the consolidated judicial-review proceedings in Dane County held a lengthy hearing and ruled that Commissioner Valcq's prior representation of We Energies was *not* a disqualifying conflict of interest and did not trigger a due-process duty to recuse. The judge accordingly rejected Driftless's request for discovery on those allegations and said he was "throwing out any challenge to Commissioner Valcq." Hearing Transcript (Jan. 21, 2021), Affidavit of Brian H. Potts in Response to Motion to Lift Stay, Ex. 2 at 77, No. 20-3325, ECF No. 64-2. The judge reached the opposite conclusion regarding Huebsch, ruling that the conflict-of-interest allegations against him were enough to state a prima facie case of an appearance of improper bias. *Id.* at 77–79. The judge therefore authorized discovery on the recusal question involving Huebsch and directed the parties to propose a discovery plan. They did so. On May 25 the judge issued a written order memorializing his oral rulings and setting a discovery schedule. *County of Dane v. Pub. Serv. Comm'n of Wis.*, No. 2019CV003418 (Wis. Cir. Ct. Dane Cnty. May 25, 2021) (decision and order).

Some procedural skirmishes ensued, and by July the litigation over Huebsch's alleged conflict of interest had moved to the court of appeals. More procedural maneuvering followed, and by the end of the summer, the case landed at the Wisconsin Supreme Court's doorstep. On September 21 the state high court granted Huebsch's petition for expedited review and set a briefing schedule. *County of Dane v. Pub. Serv. Comm'n of Wis.*, No. 2021AP1321-LV (Wis. Sept. 21, 2021) (order granting expedited review). The petition raises threshold procedural questions and several substantive questions about the legal standards for evaluating recusal issues under *Caperton* and state law and the proper applica-

tion of those standards to the allegations involving Huebsch. The Dane County proceedings are stayed while the case is pending before the state supreme court.[2]

There is more. On June 28 the transmission companies returned to the Commission and asked it to reopen the permit proceedings on its own motion to rescind and reconsider the permit based on the conflict-of-interest allegations regarding Heubsch. On July 1 the Commission issued a notice of intent to rescind the permit and invited comments by July 19. Notice of Intent and Request for Comments, Cardinal-Hickory Creek Project, Pub. Serv. Comm'n of Wis., No. 5-CE-146, Ref# 415003 (July 1, 2021), https://apps.psc.wi.gov/ERF/ERFview/viewdoc.aspx?docid=415003. A hearing was held on July 29; the minutes reflect that the Commission discussed the matter but took no action. *Id.*, Minutes and Informal Instructions of the Open Meeting of Thursday, July 29, 2021, Ref# 418174 (Aug. 5, 2021), https://apps.psc.wi.gov/ERF/ERFview/viewdoc.aspx?docid=418174.

As best we can tell, that's where things stand in the state courts and before the Commission. These important developments inform the abstention inquiry, to which we'll turn in a moment. But sovereign immunity is our first issue. It is a

---

[2] Yesterday Driftless notified us of additional events in the state case. On October 8 Driftless filed an emergency motion for injunctive relief blocking construction activity—the same relief it wanted to pursue in the district court if its motion to lift the stay in this case were successful. On October 12 the Dane County judge stayed the proceedings pending a decision by the Wisconsin Supreme Court, but on October 18 he nonetheless held a telephonic hearing on the emergency motion and orally granted it. The docket reflects that he is currently considering a motion to stay his order pending appeal.

jurisdictional defense. *See, e.g., Gorka v. Sullivan*, 82 F.3d 772, 774 (7th Cir. 1996) (describing sovereign immunity as a "jurisdictional bar"); *Crosetto v. State Bar of Wis.*, 12 F.3d 1396, 1400 (7th Cir. 1993) (labeling "state sovereign immunity" as "one of the Constitution['s] unavoidable jurisdictional hurdles").

## A. Sovereign Immunity

"Sovereign immunity is the privilege of the sovereign not to be sued without its consent" and is secured to the states by the Eleventh Amendment. *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011). As the Supreme Court has explained, the Eleventh Amendment "confirm[s] the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant." *Id.*

The text of the Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. CONST. amend. XI. Although this language does not "by its terms … bar suits against a State by its own citizens," the Supreme Court "has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). "[I]f properly raised, the [A]mendment bars actions in federal court against a state, state agencies, or state officials acting in their official capacities." *Council 31 Am. Fed'n of State, Cnty. & Mun. Emps. v. Quinn*, 680 F.3d 875, 881 (7th Cir. 2012) (quotation marks omitted).

But "sovereign immunity is not absolute immunity." *Id.* at 882. The doctrine of *Ex parte Young*, 209 U.S. 123 (1908), creates an exception to state sovereign immunity "by asserting that a suit challenging the constitutionality of a state official's action in enforcing state law is not one against the State." *Green v. Mansour,* 474 U.S. 64, 68 (1985). The doctrine is "accepted as necessary to permit the federal courts to vindicate federal rights." *Stewart*, 563 U.S. at 254–55 (quotation marks omitted). "It rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Id.* at 255 (cleaned up).

But *Ex parte Young* is "limited to that precise situation." *Id.* It applies only when a plaintiff seeks prospective relief against an ongoing violation of federal law. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997). Accordingly, our task is to "conduct a straightforward inquiry into whether [the plaintiffs'] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quotation marks omitted).

## 1. *Prospective Relief*

Analyzing the form of relief is the simpler part of the inquiry. Injunctive relief is prospective relief. *See Coeur d'Alene*, 521 U.S. at 277 ("[W]e have consistently allowed suits seeking prospective injunctive relief based on federal violations to proceed."); *Hutto v. Finney*, 437 U.S. 678, 690 (1978) ("[S]tate officers are not immune from prospective injunctive relief."); *Edelman*, 415 U.S. at 664 ("[T]he relief awarded in *Ex parte Young* was prospective only; the Attorney General of

Minnesota was enjoined to conform his future conduct of that office to the requirement of the Fourteenth Amendment."). It's usually easy to separate suits for prospective relief from those that seek retroactive remedies; the latter primarily take the form of monetary damages to remedy past harms. *See McDonough Assocs. v. Grunloh*, 722 F.3d 1043, 1050–51 (7th Cir. 2013) (explaining that courts cannot "direct a state to make payments … to remedy a past injury to a private party"); *MSA Realty Corp. v. Illinois*, 990 F.2d 288, 291 (7th Cir. 1993) ("The [E]leventh [A]mendment bar extends to suits for money damages against state officials sued in their official capacities … .").

Here, Driftless seeks (1) a declaration that Valcq and Huebsch had a due-process duty to recuse themselves from the permit proceeding; (2) a declaration that the permit is void as a matter of law; (3) an order vacating the permit; and (4) an injunction barring the enforcement of the permit. Declaratory and injunctive relief are paradigmatic examples of prospective relief. *See Alden v. Maine*, 527 U.S. 706, 747 (1999) (recognizing that *Ex parte Young* allows "certain suits for declaratory or injunctive relief against state officers" to proceed in federal court). But vacatur of the permit is retrospective. Although an injunction and vacatur have similar real-world effects in that each will prevent construction of the power line, the two forms of relief have different legal consequences.

A federal injunction does not erase an unconstitutional state law from existence; federal courts cannot repeal state laws. *See Borden v. United States*, 141 S. Ct. 1817, 1835 (2021) (Thomas, J., concurring) ("Courts have no authority to 'strike down' statutory text." (cleaned up)); *Skilling v. United States*,

561 U.S. 358, 424 (2010) (Scalia, J., concurring in part) ("I continue to doubt whether 'striking down' a statute is ever an appropriate exercise of our Article III power."). Rather, a federal injunction prevents state officials from enforcing the challenged statute, regulation, or agency action in the future based on its incompatibility with federal law. An injunction operates on the enjoined officials; the law, regulation, or agency action remains on the books, and if the injunction is lifted by the issuing court, overturned by a higher court, or superseded by federal law, it resumes effect. *See generally* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933 (2018).

Vacatur, in contrast, retroactively undoes or expunges a past state action. Vacatur is "[t]he act of annulling or setting aside." BLACK'S LAW DICTIONARY (11th ed. 2019). Unlike an injunction, which merely blocks enforcement, vacatur unwinds the challenged agency action. *Ex parte Young* does not encompass retroactive remedies like vacatur—and for good reason: the federal judiciary is not an oversight board over state agencies and has no power to vacate the actions of state agencies. That power belongs to the state courts, WIS. STAT. § 227.57(5), or the agency itself.

Still, the complaint's request for injunctive relief brings this case within *Ex parte Young*—provided, however, that Driftless has plausibly alleged an ongoing violation of federal law.

### 2. *Ongoing Violation*

The more challenging aspect of *Ex parte Young* analysis is the proviso that the suit must seek relief against an "ongoing" violation of federal law. An ongoing violation of federal

law is one that is "continuing." *Green*, 474 U.S. at 68. Because *Ex parte Young* is limited to federal-court orders "granting prospective injunctive relief to prevent a continuing violation of federal law," the doctrine does not apply when "federal law has been violated [only] at one time or over a period of time in the past." *Papasan v. Allain*, 478 U.S. 265, 277–78 (1986). This part of the inquiry may seem simple at first, but "the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night." *Edelman*, 415 U.S. at 667.

This case lies in that twilight zone. It presents a difficult question of first impression: Is there an ongoing violation of federal law when the alleged violation is a procedural error committed by a state actor at a discrete point in time? The commissioners argue that the due-process violation (if there was one) was complete when the permit was approved and thus cannot be considered "ongoing" for purposes of *Ex parte Young*. Driftless insists that the violation is ongoing so long as the permit remains in force and effect and the Commission continues to exercise jurisdiction over the transmission companies *in the present* by virtue of its power to enforce, amend, or rescind the permit.

Three cases are instructive here, although none is precisely on point. The first is *Verizon v. Public Service Commission of Maryland*. There, the telecommunications carrier Verizon negotiated an interconnection agreement with its competitor WorldCom as required by federal law. The state agency with jurisdiction over the matter approved the agreement, but a few months later, WorldCom filed a complaint with the agency accusing Verizon of violating the agreement. The

agency ruled in favor of WorldCom on grounds pertaining to state contract law. Verizon then filed a federal lawsuit against the agency's commissioners in their official capacities alleging that the agency's order was preempted by the Telecommunications Act of 1996 and a recent FCC ruling. *Verizon*, 535 U.S. at 639–40. The Supreme Court held that the Eleventh Amendment did not bar Verizon's suit. *Id.* at 635. Verizon's prayer for injunctive relief asked the federal court to enjoin the state officials "from enforcing the order in contravention of controlling federal law." *Id.* at 645. That was sufficient to bring the case within *Ex parte Young*. *Id.*

The second relevant precedent is *MCI Telecommunications Corp. v. Illinois Bell Telephone Co.*, 222 F.3d 323 (7th Cir. 2000), another telecommunications case, though one from this court. There, the Illinois and Wisconsin utility commissions arbitrated several interconnection agreements between telecommunications companies. One of them sued the commissioners in their official capacities claiming that the approved agreements violated the Telecommunications Act. The commissioners raised sovereign immunity, arguing that "if any violations occurred, they occurred in the past," so *Ex parte Young* did not apply. *Id.* at 345. We disagreed, observing that the "challenged determinations are still in place, and the [plaintiffs] seek to have the commissioners conform their future actions, including their continuing enforcement of the challenged determinations, with federal law." *Id.*

The final case is *Town of Barnstable v. O'Connor*, 786 F.3d 130 (1st Cir. 2015), which involved a challenge to a state agency's energy policy. A Massachusetts utility commission approved a merger between two electricity companies. The Town of Barnstable, joined by an environmental group and

several other plaintiffs, filed a federal suit alleging that the merger was incompatible with the Federal Power Act and also violated the dormant Commerce Clause. Citing *Verizon*, the First Circuit rejected the commissioners' claim of sovereign immunity. The court held in relevant part that "the continued enforceability of the [merger agreement] represents an ongoing violation of federal law because [it] binds the parties to abide by the [agreement's] allegedly unconstitutional terms." *Id.* at 139.

At first glance these cases seem closely analogous to this one. But there is a distinction. Each of these cases raised a *substantive* violation of federal law: the challenged state-agency determinations authorized the regulated parties to conduct their ongoing activities in violation of an FCC order, the Telecommunication Act, and the Federal Power Act and Commerce Clause, respectively. In contrast, this case raises a discrete *procedural* violation: the alleged due-process error occurred when commissioners with disqualifying conflicts of interest approved the power-line permit. In other words, Driftless does not assert that the permit *substantively* violates federal law (at least not in this suit); it challenges only the *process* by which the permit was issued.

In the end, we're not convinced that the difference between substance and procedure is decisive. As the First Circuit observed in *Town of Barnstable*, the "continued enforceability" of an unlawful state-agency decision can amount to an ongoing violation of federal law. Nothing in *Ex parte Young* or its successors suggests that the distinction between substantive and procedural violations makes a difference, so we hesitate to draw that line here. The relevant inquiry is whether the suit seeks prospective relief against an

ongoing violation of federal law. A permit issued in violation of due process remains unlawful as long as it is in force and effect.

The commissioners point to *Sonnleitner v. York,* 304 F.3d 704 (7th Cir. 2002), which has surface similarity to this case—it too involved a due-process claim—but on close review is distinguishable. *Sonnleitner* involved a suit by a state employee who was demoted without a predisciplinary hearing. He later prevailed at a postdeprivation hearing but was not reinstated, in part due to his own procedural missteps. He then sued his supervisors in federal court seeking an injunction reinstating him to his position. He alleged that the denial of a predisciplinary hearing violated his right to due process. We held that the claim was barred by sovereign immunity. *Id.* at 718. Because the plaintiff was "eventually given an opportunity to tell his side of the story" at the postdeprivation hearing, we concluded that his due-process claim concerned "at most, a past rather than an ongoing violation of federal law." *Id.*

Our holding in *Sonnleitner* turned on the fact that the plaintiff had received a postdeprivation hearing that complied with due-process requirements. After the postdeprivation hearing, the alleged error in the predeprivation process could not be characterized as "ongoing." The due-process violation at issue here is different. Driftless contends that the Commission's approval of the permit was tainted by adjudicator bias in violation of the Due Process Clause.

Finally, the commissioners argue that if this case is allowed to proceed under *Ex parte Young*, then all manner of final state-agency rulings will suddenly become reviewable in federal court based on allegations of adjudicator bias. This

would complicate state judicial review of agency rulings and erode state sovereign immunity. It could also open the floodgates to federal suits by parties complaining about biased state administrative adjudicators.

We are sensitive to these concerns. Federal courts are not oversight boards designed to police the final actions of state agencies. *Cf. River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 165 (7th Cir. 1994) ("Federal courts are not boards of zoning appeals."). Challenges to state administrative actions usually belong in state courts, which are interested in and fully capable of ensuring that state agencies comply with federal due-process requirements. *See Coeur d'Alene*, 521 U.S. at 276 ("Where, as here, the parties invoke federal principles to challenge state administrative action, the courts of the State have a strong interest in integrating those sources of law within their own system for the proper judicial control of state officials.").

At bottom, these concerns rest on federalism principles. State sovereign immunity is, of course, rooted in the anchoring structure of our system of federalism. So too, however, is abstention doctrine. The commissioners' arguments about federalism and comity are valid, but we think they are better addressed by abstention doctrine. For the foregoing reasons, we conclude that the due-process claim against them satisfies the requirements of *Ex parte Young* and now move to the abstention question.

## B. Abstention

The commissioners also asked the district judge to abstain and stay this case to await the outcome of the state litigation, citing both *Younger* and *Colorado River* abstention.

The judge denied the request. We see no flaw in the judge's analysis of *Younger*, but his *Colorado River* ruling rests on a misunderstanding of the claims in the state litigation, which in turn led him to mistakenly conclude that the federal and state cases are not parallel within the meaning of the doctrine.

### 1. *Raising Abstention Sua Sponte*

The abstention issue is not formally before us, but the Supreme Court has held that a reviewing court may raise abstention sua sponte in an appropriate case. *See Bellotti v. Baird*, 428 U.S. 132, 143 n.10 (1976) ("[T]he fact that the full arguments in favor of abstention may not have been asserted in the District Court does not bar this Court's consideration of the issue."). We have done so at least twice before, though the cases are a bit dated.

We raised abstention sua sponte in *Waldron v. McAtee*, 723 F.2d 1348 (7th Cir. 1983), citing *Bellotti* and noting that a reviewing court has "the power and in an appropriate case the duty to order abstention, if necessary for the first time at the appellate level, even though no party is asking for it." *Id.* at 1351. We explained that abstention doctrines do not exist "to protect the rights of one of the parties" but instead to "promote a harmonious federal system." *Id.* We later characterized *Waldron* as recognizing a clear rule that "appellate courts are free to raise and resolve the abstention issue *sua sponte*." *Gen. Ry. Signal Co. v. Corcoran*, 921 F.2d 700, 708 (7th Cir. 1991) (citing *Waldron*, 723 F.2d at 1351).

We also raised abstention sua sponte in *In re Complaint of McCarthy Brothers Co.*, 83 F.3d 821 (7th Cir. 1996), a complicated admiralty action involving an ironworker who was

injured while working on a barge on the Mississippi River. Admiralty law has its own arcane abstention doctrine known as *Langnes* abstention, which advises federal courts to "permit[] proceedings in state court to go forward on the question of liability and retain[] jurisdiction over any question that might arise as to the shipowner's right to limit his liability." *Id.* at 828 (describing *Langnes v. Green*, 282 U.S. 531 (1931)). Though no one argued the point, we decided "to raise the issue of abstention *sua sponte*," explaining that reversal for application of *Langnes* abstention was necessary to correct the district court's error and facilitate the "operation of the complicated admiralty jurisdictional rules." *Id.* at 826.

This too is an appropriate case in which to raise abstention sua sponte. The error in the judge's *Colorado River* ruling is plain, and our concerns about federal interference in ongoing state litigation justify taking this step. In so doing we follow the lead of our colleagues in the First Circuit. *See Jiménez v. Rodríguez-Pagán*, 597 F.3d 18, 27 n.4 (1st Cir. 2010) ("As with other forms of abstention, our decision to decline jurisdiction under *Colorado River* may be sua sponte.").

## 2. Colorado River *Abstention*

We begin with first principles. Although abstention "is the exception, not the rule," *Colorado River*, 424 U.S. at 813, "a federal court may, and often must, decline to exercise its jurisdiction where doing so would intrude upon the independence of the state courts and their ability to resolve the cases before them," *SKS & Assocs., Inc. v. Dart*, 619 F.3d 674, 677 (7th Cir. 2010). The main categories of abstention are known by the names of the Supreme Court cases that creat-

ed them: *Pullman*, *Burford*, *Younger*, and *Colorado River*.[3]
These categories are not rigid, however. The animating force
of the Court's abstention cases is that "they all implicate (in
one way or another and to different degrees) underlying
principles of equity, comity, and federalism foundational to
our federal constitutional structure." *J.B. v. Woodard,* 997 F.3d
714, 722 (7th Cir. 2021).

Under the doctrine announced in *Colorado River*, a federal
court may abstain and stay or dismiss a suit in deference to
parallel state proceedings in exceptional circumstances
where abstention would promote "wise judicial administra-
tion." 424 U.S. at 818. Several prudential principles are
embedded in this highly generalized statement of the doc-
trine. Among them are the interest in conserving judicial
resources, the desirability of avoiding duplicative litigation
and the risk of conflicting rulings, and the benefits of pro-
moting a comprehensive disposition of the parties' dispute
in a single judicial forum. *Id.*

We have found it useful to approach *Colorado River* ab-
stention in two steps. *DePuy Synthes Sales, Inc. v. OrthoLA,
Inc.*, 953 F.3d 469, 477 (7th Cir. 2020). "The first question is
whether the concurrent state and federal actions are actually
parallel. If so, the second question is whether the necessary
exceptional circumstances exist to support" abstention. *Id.*
(cleaned up).

"Two suits are considered parallel when substantially the
same parties are contemporaneously litigating substantially

---

[3] *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941); *Burford v. Sun Oil
Co.*, 319 U.S. 315 (1943); *Younger v. Harris*, 401 U.S. 37 (1971); *Colo. River
Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).

the same issues in another forum. Formal symmetry is unnecessary, as long as there is a substantial likelihood that the state litigation will dispose of all claims presented in the federal case." *Id.* at 477–78 (cleaned up). On this understanding, there is no doubt that the state and federal suits here are parallel.

True, the suits are not *completely* identical: the state litigation raises state-law issues in addition to the duplicative due-process claim. But perfect symmetry isn't necessary. The cases are parallel in all the ways that matter under *Colorado River*. The due-process recusal claims "involve the same parties, the same facts, and the same issues." *Id.* at 478. Indeed, the claims are materially identical: they will "be resolved by examining largely the same evidence," *Huon v. Johnson & Bell, Ltd.*, 657 F.3d 641, 647 (7th Cir. 2011), and are governed by the legal standard announced in *Caperton*. So it's not just "substantially likely" that the state litigation will dispose of the federal case—it is nearly certain that it will do so.

The second step in the framework is to determine whether exceptional circumstances justify abstention. A plethora of nonexclusive, unweighted factors can inform this question, including:

1.  Whether the case concerns rights in property, and if so, whether the state has assumed jurisdiction over that property;
2.  The inconvenience of the federal forum;
3.  The desirability of consolidating litigation in one place (put otherwise, the value in avoiding "piecemeal" or broken-up proceedings);

4.  The order in which jurisdiction was ob-
    tained in the concurrent fora;

5.  The source of governing law—federal or
    state;

6.  The adequacy of the state-court action to
    protect the federal plaintiff's rights;

7.  The relative progress of the state and fed-
    eral proceedings;

8.  The presence or absence of concurrent ju-
    risdiction;

9.  The availability of removal; and

10. Whether the federal action is vexatious or
    contrived.

*DePuy*, 953 F.3d at 477. We have cautioned that this overa-
bundant list of factors "is designed to be helpful, not a
straitjacket. Different considerations may be more pertinent
to some cases, and one or more of these factors will be
irrelevant in other cases." *Loughran v. Wells Fargo Bank, N.A.*,
2 F.4th 640, 647 (7th Cir. 2021). Nor does the list "preclude
the district court from taking into account a special charac-
teristic of the case before it." *DePuy*, 953 F.3d at 477.

More generally, the decision to abstain "does not rest on
a mechanical checklist, but on a careful balancing of the
important factors." *Moses H. Cone Mem'l Hosp. v. Mercury
Constr. Corp.*, 460 U.S. 1, 16 (1983). In short, abstention law
doesn't demand an exact fit with the precise parameters of a
doctrinal category. *J.B.*, 997 F.3d at 723–24. Instead, the
abstention inquiry is flexible and requires a practical judg-
ment informed by principles of comity, federalism, and
sound judicial administration.

With these principles in mind, we find it neither neces-
sary nor helpful to march through our 10-factor "test" and
decide which factors support abstention and which do not.
*DePuy*, 953 F.3d at 479 (explaining that the factors in a multi-
factor, unweighted test often point in different directions);
*see also United States v. Mayfield*, 771 F.3d 417, 435 (7th Cir.
2014) (en banc) ("Multifactor tests are common in our law
but they can be cryptic when unattached to a substantive
legal standard, as this one is. Knowing what factors to look
*at* is useless unless one knows what to look *for*.").

Several compelling considerations justify abstention in
this case, and all can be loosely keyed to the factors on the
list. The first is the desirability of avoiding piecemeal litiga-
tion over the legality of the power-line permit. Multi-
jurisdictional legal challenges involving the same subject
matter are costly, disruptive, and run the risk of a collision of
conflicting rulings. A related consideration is the wholly
duplicative nature of this suit. The takings claim was
doomed from the start and can fairly be characterized as
contrived, and there is no good reason to litigate identical
due-process recusal claims in state and federal court. *See
Interstate Material Corp. v. City of Chicago*, 847 F.2d 1285, 1289
(7th Cir. 1988) (holding that a federal lawsuit "could be
considered" contrived when the plaintiff files parallel suits
"seeking substantially the same relief from substantially the
same parties").

Needless to say, the state courts routinely apply federal
constitutional standards, as they must under the Supremacy
Clause. More to the point here, Wisconsin courts are fully
capable of applying *Caperton* and have begun to do so. *See In
re Paternity of B.J.M.*, 944 N.W.2d 542, 549 (Wis. 2020). And

No. 20-3325                                                     29

they have long applied federal due-process standards to recusal questions involving administrative adjudicators. *See Guthrie v. Wis. Emp. Rels. Comm'n*, 331 N.W.2d 331, 336 (Wis. 1983). So there is nothing about this particular legal context that cautions against abstention. To the contrary, it appears that Driftless simply wants two bites at the apple. And that weighs heavily in favor of abstention.

What's more, the state case has advanced toward a resolution of the due-process claim. As we've explained, the Dane County judge already ruled against Driftless on its allegations against Valcq. The allegations involving Huebsch remain, but the case is now before the Wisconsin Supreme Court on that issue. The petition for review raises substantive questions about the application of *Caperton*—both in general and in light of the specific allegations involving Huebsch. Under these circumstances, the use of federal judicial resources to decide the same questions cannot be justified. "The principal purpose of a stay under *Colorado River* is judicial economy … ." *Schneider Nat'l Carriers, Inc. v. Carr*, 903 F.2d 1154, 1157 (7th Cir. 1990). There is "no reason for identical suits to be proceeding in different courts." *U.S.O. Corp. v. Mizuho Holding Co.*, 547 F.3d 749, 750 (7th Cir. 2008). Judicial economy strongly favors abstention.

That brings us to a final consideration, and it is far from the least important one. Although *Colorado River* abstention is primarily concerned with judicial economy, it also implements the fundamental federalism principles that animate all abstention categories. *See, e.g.*, *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 486 (7th Cir. 2011) (describing *Colorado River* as a "federalism doctrine"); *Black Sea Inv., Ltd. v. United Heritage Corp.*, 204 F.3d 647, 650 (5th Cir. 2000) ("The *Colorado River*

abstention doctrine is based on principles of federalism, comity, and conservation of judicial resources.").

Federalism concerns loom large here. This case implicates Wisconsin's sovereign interest in the proper functioning of its administrative law and procedure and the role of the state courts in reviewing the decisions of administrative agencies. Wisconsin has created an elaborate permitting regime for important public-utility projects like this one, and aggrieved persons are entitled to judicial review in the state courts. *See generally* WIS. STAT. § 227.53. Only the state courts can review the agency's work for compliance with the procedural and substantive requirements of state law. And the state courts alone have the authority to vacate the permit and order the Commission to conduct a new hearing—whether as a remedy for a violation of state law *or* as a remedy for a violation of the federal constitutional guarantee of due process.

Conversely, there is no significant federal interest at stake here that necessitates or even encourages federal-court review of the procedural regularity of the permit proceeding before the agency. A foundational premise of our federalism is "the assumption that state courts are co-equal to the federal courts and are fully capable of respecting and protecting" federal constitutional rights. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1074 (7th Cir. 2018). "Principles of comity entitle the states to make their own decisions, on federal issues as well as state issues, unless there is some urgent need for federal intervention." *Nicole K. ex rel. Linda R. v. Stigdon*, 990 F.3d 534, 537–38 (7th Cir. 2021). The federal courts have no institutional superiority in ruling on *Caperton*

claims.[4] Accordingly, "[e]xercising federal jurisdiction over [this] claim[] would reflect a lack of respect for the state's ability to resolve the[] issues properly before its courts." *J.B.*, 997 F.3d at 722 (quotation marks omitted).

Finally, the recent developments before the agency are worth mentioning. As we've noted, the Commission recently reopened its proceedings to determine whether to rescind and reconsider the permit based on the conflict-of-interest allegations involving Huebsch. Of course, we cannot predict what it will do. But if the Wisconsin Supreme Court rules in favor of Driftless and allows the due-process claim to move forward in Dane County Circuit Court, remedial steps by the Commission would not be surprising.

In short, abstention under *Colorado River* is amply justified. The judge was wrong to conclude otherwise.

### III. Conclusion

For the foregoing reasons, the judge correctly denied the commissioners' motion to dismiss based on sovereign immunity. But he incorrectly denied the motion for *Colorado*

---

[4] By our count, we have addressed *Caperton* claims in just five reported cases: *Gacho v. Wills*, 986 F.3d 1067, 1071–76 (7th Cir. 2021); *United States v. Williams*, 949 F.3d 1056, 1061–63 (7th Cir. 2020); *Wozniak v. Adesida*, 932 F.3d 1008, 1011 (7th Cir. 2019); *Alston v. Smith*, 840 F.3d 363, 368–69 (7th Cir. 2016); and *Suh v. Pierce*, 630 F.3d 685, 691–92 (7th Cir. 2011). Another four make passing reference to *Caperton*: *Trustmark Ins. Co. v. John Hancock Life Ins. Co.*, 631 F.3d 869, 872 (7th Cir. 2011); *Bauer v. Shepard*, 620 F.3d 704, 712 (7th Cir. 2010); *Siefert v. Alexander*, 608 F.3d 974, 980 (7th Cir. 2010); and *Chen v. Holder*, 607 F.3d 511, 513 (7th Cir. 2010). Not that case counts matter. The Wisconsin Supreme Court is equally capable of applying *Caperton*, even if it has done so less frequently than this court.

32                                            No. 20-3325

*River* abstention. We therefore REVERSE and REMAND with instructions to stay this case pending dispositive developments in the state litigation. The motion to partially lift the stay pending appeal is denied as moot.

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit